AF Approval __*SN*__                          Chief Approval __*JWT*__

## UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO. 6:20-cr-97-GAP-LRH

JOEL MICAH GREENBERG

## **PLEA AGREEMENT**

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by Karin Hoppmann, Acting United States Attorney for the Middle District of Florida, and the defendant, JOEL MICAH GREENBERG, and the attorney for the defendant, Fritz Scheller, mutually agree as follows:

**A.    Particularized Terms**

1.    Count Pleading To

The defendant shall enter a plea of guilty to Counts One, Eight, Nine, Fourteen, Twenty-Four, and Twenty-Six of the Third Superseding Indictment. Count One charges the defendant with sex trafficking of a child, in violation of 18 U.S.C. § 1591. Count Eight charges the defendant with production of a false identification document, in violation of 18 U.S.C. § 1028(a)(1). Count Nine charges the defendant with aggravated identity theft, in violation of 18 U.S.C. § 1028A. Count Fourteen charges the defendant with wire fraud, in violation of 18 U.S.C. § 1343. Count Twenty-Four charges the defendant with stalking, in violation of 18 U.S.C. § 2261A.

Defendant's Initials 

Count Twenty-Six charges the defendant with conspiracy to commit an offense against the United States, in violation of 18 U.S.C. § 371.

2.    <u>Minimum and Maximum Penalties</u>

Count One is punishable by a mandatory minimum term of imprisonment of 10 years up to life, a fine of $250,000, a term of supervised release of not less than 5 years up to life, and a special assessment of $100.

Count Eight carries a maximum sentence of 15 years imprisonment, a fine of $250,000, a term of supervised release of 3 years, and a special assessment of $100.

Count Nine is punishable by a mandatory minimum term of imprisonment of 2 years (consecutive to the sentence for any other count of conviction), a fine of $250,000, a term of supervised release of 1 year, and a special assessment of $100.

Count Fourteen carries a maximum sentence of 20 years imprisonment, a fine of $250,000, or twice the gross gain caused by the offense, or twice the gross loss caused by the offense, whichever is greater, a term of supervised release of 3 years, and a special assessment of $100.

Count Twenty-Four carries a maximum sentence of 5 years imprisonment, a fine of $250,000, a term of supervised release of 3 years, and a special assessment of $100.

Count Twenty-Six carries a maximum sentence of 15 years imprisonment, a fine of $250,000, or twice the gross gain caused by the offense, or

Defendant's Initials ___                    2

twice the gross loss caused by the offense, whichever is greater, a term of supervised release of 3 years, and a special assessment of $100.

With respect to certain offenses, the Court shall order the defendant to make restitution to any victim of the offenses, and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offenses, or to the community, as set forth below.

Additionally, pursuant to 18 U.S.C. § 3014(a)(1), the Court shall impose a $5,000 special assessment on any non-indigent defendant convicted of an offense under chapter 77 (relating to peonage, slavery, and trafficking in persons), including a violation of 18 U.S.C. § 1591 as charged in Count One.

4.  *Apprendi v. New Jersey*

Under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), a maximum sentence of 15 years' imprisonment may be imposed as to Count Twenty-Six because the following facts have been admitted by the defendant and are established by this plea of guilty: the defendant committed the offense while on release pursuant to an order in *United States v. Joel Micah Greenberg*, Case No. 6:20-cr-97-GAP-LRH, in the United States District Court for the Middle District of Florida, which order notified the defendant of the potential effect of committing an offense while on pretrial release.

Defendant's Initials ⟨W⟩ ___          3

5.    Elements of the Offenses

The defendant acknowledges understanding the nature and elements of the offenses with which defendant has been charged and to which defendant is pleading guilty.

The elements of Count One are:

First:       The defendant knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, or solicited by any means the individual identified in the Third Superseding Indictment;

Second:      The defendant did so having had a reasonable opportunity to observe the individual identified in the Third Superseding Indictment or knowing or in reckless disregard of the fact that the person had not attained the age of 18 years and would be caused to engage in a commercial sex act;

Third:       The individual identified in the Third Superseding Indictment was a person who had attained the age of 14 years but had not attained the age of 18 years; and

Fourth:      The defendant's acts were in or affected interstate or foreign commerce.

The elements of Count Eight are:

First:       The defendant knowingly produced an identification document, authentication feature, or false identification document;

Second:      Without lawful authority;

Defendant's Initials _____        4

<table>
<tr><td>Third:</td><td>The production of the identification document, authentication feature, or false identification document was in or affected interstate or foreign commerce, or the identification document or false identification document was transported in the mail in the course of the production prohibited by this section.</td></tr>
</table>

The elements of Count Nine are:

<table>
<tr><td>First:</td><td>The defendant knowingly transferred, possessed, or used another person's means of identification;</td></tr>
<tr><td>Second:</td><td>Without lawful authority;</td></tr>
<tr><td>Third:</td><td>During and in relation to a felony violation of 18 U.S.C. § 1028(a)(1); and</td></tr>
<tr><td>Fourth:</td><td>The defendant knew that the means of identification belonged to an actual person.</td></tr>
</table>

The elements of Count Fourteen are:

<table>
<tr><td>First:</td><td>The defendant knowingly devised or participated in a scheme to defraud, or to obtain money or property by using false pretenses, representations, or promises;</td></tr>
<tr><td>Second:</td><td>The false pretenses, representations, or promises were about a material fact;</td></tr>
<tr><td>Third:</td><td>The defendant acted with the intent to defraud; and</td></tr>
<tr><td>Fourth:</td><td>The defendant transmitted or caused to be transmitted by wire some communication in interstate commerce to help carry out the scheme.</td></tr>
</table>

Defendant's Initials _____    5

The elements of Count Twenty-Four are:

<u>First</u>: The defendant used the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct;

<u>Second</u>: The course of conduct caused, attempted to cause, or would be reasonably expected to cause substantial emotional distress to a person; and

<u>Third</u>: The defendant acted knowingly and with the intent to injure, harass, or intimidate another person.

The elements of Count Twenty-Six are:

<u>First</u>: Two or more persons in some way agreed to try to accomplish a shared and unlawful plan;

<u>Second</u>: The defendant knew the unlawful purpose of the plan and willfully joined in it;

<u>Third</u>: During the conspiracy, one of the conspirators knowingly engaged in at least one overt act as described in the Third Superseding Indictment;

<u>Fourth</u>: The overt act was committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy; and

<u>Fifth</u>: The defendant committed the offense while on release pursuant to an order in *United States v. Joel Micah Greenberg*, Case No. 6:20-cr-97-GAP-LRH, in the United States District Court for the Middle District of Florida, which order notified the defendant of the potential effect of committing an offense while on pretrial release.

Defendant's Initials           6

6.    Counts and Indictments Dismissed

At the time of sentencing, Counts Two through Seven, Ten through Thirteen, Fifteen through Twenty-Three, Twenty-Five, and Twenty-Seven through Thirty-Three of the Third Superseding Indictment, will be dismissed pursuant to Fed. R. Crim. P. 11(c)(1)(A), as will be the Indictment, Superseding Indictment, and Second Superseding Indictment against the defendant in this case.

7.    No Further Charges

If the Court accepts this plea agreement, the United States Attorney's Office for the Middle District of Florida agrees not to charge defendant with committing any other federal criminal offenses known to the United States Attorney's Office at the time of the execution of this agreement that are related to the conduct giving rise to this plea agreement.

8.    Mandatory Restitution to Victims of Offenses of Conviction

Pursuant to 18 U.S.C. § 3663(a) and (b), 18 U.S.C. § 3663A(a) and (b), and 18 U.S.C. § 1593, defendant agrees to make full restitution to the Minor Victim (or the "Minor" as referenced in the Factual Basis), as identified in Count One, in an amount as determined by the Court and the Probation Office for the offense charged in Count One.

Pursuant to 18 U.S.C. § 3663(a) and (b) and 18 U.S.C. § 3663A(a) and (b), defendant agrees to make full restitution to E.J.C.C., as identified in Count Eight, and R.Z., as identified in Count Nine, in amounts as determined by the Court for the offenses charged in Counts Eight and Nine; to Seminole County and the Seminole

Defendant's Initials  ⟨signature⟩                    7

County Tax Collector's Office, as identified in the wire fraud scheme charged in Counts Ten through Twenty, in an amount as determined by the Court and the Probation Office for the offense charged in Count Fourteen; to the school employee (or "Teacher" as referenced in the Factual Basis), as identified in Count Twenty-Four, in an amount as determined by the Court and the Probation Office for the offense charged in Count Twenty-Four; and to the Small Business Administration in an amount as determined by the Court and the Probation Office for the offense charged in Count Twenty-Six.

Further, pursuant to 18 U.S.C. § 3664(d)(5), the defendant agrees not to oppose bifurcation of the sentencing hearing if the victims' losses are not ascertainable prior to sentencing.

9.      Guidelines Sentence

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States will recommend to the Court that the defendant be sentenced within the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines, as adjusted by any departure the United States has agreed to recommend in this plea agreement.   The parties understand that such a recommendation is not binding on the Court and that, if it is not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw his plea of guilty.

Defendant's Initials                 8

10.   Acceptance of Responsibility - Three Levels

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG §3E1.1(a).   The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG §3E1.1(b) and all terms of this plea agreement, including but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.5., the United States agrees to file a motion pursuant to USSG §3E1.1(b) for a downward adjustment of one additional level.   The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

11.   Cooperation - Substantial Assistance to be Considered

Defendant agrees to cooperate fully with the United States in the investigation and prosecution of other persons, and to testify, subject to a prosecution

Defendant's Initials ⟨⟩                9

for perjury or making a false statement, fully and truthfully before any federal court proceeding or federal grand jury in connection with the charges in this case and other matters, such cooperation to further include a full and complete disclosure of all relevant information, including production of any and all books, papers, documents, and other objects in defendant's possession or control, and to be reasonably available for interviews which the United States may require.  If the cooperation is completed prior to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion at the time of sentencing recommending (1) a downward departure from the applicable guideline range pursuant to USSG §5K1.1, or (2) the imposition of a sentence below a statutory minimum, if any, pursuant to 18 U.S.C. § 3553(e), or (3) both.  If the cooperation is completed subsequent to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion for a reduction of sentence within one year of the imposition of sentence pursuant to Fed. R. Crim. P. 35(b).  In any case, the defendant understands that the determination as to whether "substantial assistance" has been provided or what type of motion related thereto will be filed, if any, rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

Defendant's Initials _____        10

12.     Use of Information - Section 1B1.8

Pursuant to USSG §1B1.8(a), the United States agrees that no self-incriminating information which the defendant may provide during the course of defendant's cooperation and pursuant to this agreement shall be used in determining the applicable sentencing guideline range, subject to the restrictions and limitations set forth in USSG §1B1.8(b).

13.     Cooperation - Responsibilities of Parties

a.     The government will make known to the Court and other relevant authorities the nature and extent of defendant's cooperation and any other mitigating circumstances indicative of the defendant's rehabilitative intent by assuming the fundamental civic duty of reporting crime. However, the defendant understands that the government can make no representation that the Court will impose a lesser sentence solely on account of, or in consideration of, such cooperation.

b.     It is understood that should the defendant knowingly provide incomplete or untruthful testimony, statements, or information pursuant to this agreement, or should the defendant falsely implicate or incriminate any person, or should the defendant fail to voluntarily and unreservedly disclose and provide full, complete, truthful, and honest knowledge, information, and cooperation regarding any of the matters noted herein, the following conditions shall apply:

(1)     The defendant may be prosecuted for any perjury or false declarations, if any, committed while testifying pursuant to this agreement, or for obstruction of justice.

Defendant's Initials        11

(2)     The United States may prosecute the defendant for the charges which are to be dismissed pursuant to this agreement, if any, and may either seek reinstatement of or refile such charges and prosecute the defendant thereon in the event such charges have been dismissed pursuant to this agreement.  With regard to such charges, if any, which have been dismissed, the defendant, being fully aware of the nature of all such charges now pending in the instant case, and being further aware of defendant's rights, as to all felony charges pending in such cases (those offenses punishable by imprisonment for a term of over one year), to not be held to answer to said felony charges unless on a presentment or indictment of a grand jury, and further being aware that all such felony charges in the instant case have heretofore properly been returned by the indictment of a grand jury, does hereby agree to reinstatement of such charges by recision of any order dismissing them or, alternatively, does hereby waive, in open court, prosecution by indictment and consents that the United States may proceed by information instead of by indictment with regard to any felony charges which may be dismissed in the instant case, pursuant to this plea agreement, and the defendant further agrees to waive the statute of limitations and any speedy trial claims on such charges.

(3)     The United States may prosecute the defendant for any offenses set forth herein, if any, the prosecution of which in accordance with this agreement, the United States agrees to forego, and the defendant agrees to waive the statute of limitations and any speedy trial claims as to any such offenses.

Defendant's Initials __🖊__          12

(4)     The government may use against the defendant the defendant's own admissions and statements and the information and books, papers, documents, and objects that the defendant has furnished in the course of the defendant's cooperation with the government.

(5)     The defendant will not be permitted to withdraw the guilty pleas to those counts to which defendant hereby agrees to plead in the instant case but, in that event, defendant will be entitled to the sentencing limitations, if any, set forth in this plea agreement, with regard to those counts to which the defendant has pled; or in the alternative, at the option of the United States, the United States may move the Court to declare this entire plea agreement null and void.

14.   Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. §§ 981(a)(1)(C), 982(a), 1028(b)(5), 1594, and 28 U.S.C. § 2461(c), whether in the possession or control of the United States, the defendant or defendant's nominees.

The assets to be forfeited specifically include, but are not limited to, at least $654,799.95 in proceeds the defendant admits he obtained as the result of the commission of the offenses to which the defendant is pleading guilty. Specifically, with respect to Count Fourteen (the wire fraud scheme), this total includes at least $222,099.95, which represents the total proceeds obtained by the defendant from interstate wires described in Counts Eleven through Twenty. This figure also includes

Defendant's Initials _____        13

at least $432,700.00, which represents the proceeds the defendant admits he obtained as a result of the conspiracy charged in Count Twenty-Six.

The defendant acknowledges and agrees that: (1) the defendant obtained this amount as a result of the commission of the offenses, and (2) as a result of the acts and omissions of the defendant, the proceeds have been transferred to third parties and cannot be located by the United States upon the exercise of due diligence. Therefore, the defendant agrees that, pursuant to 21 U.S.C. § 853(p), the United States is entitled to forfeit any other property of the defendant (substitute assets), up to the amount of proceeds the defendant obtained, as the result of the offenses of conviction. The defendant further consents to, and agrees not to oppose, any motion for substitute assets filed by the United States up to the amount of proceeds obtained from commission of the offenses and consents to the entry of the forfeiture order into the Treasury Offset Program. The defendant agrees that forfeiture of substitute assets as authorized herein shall not be deemed an alteration of the defendant's sentence.

The defendant additionally agrees that since the criminal proceeds have been transferred to third parties and cannot be located by the United States upon the exercise of due diligence, the preliminary and final orders of forfeiture should authorize the United States Attorney's Office to conduct discovery (including depositions, interrogatories, requests for production of documents, and the issuance of subpoenas), pursuant to Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, to help identify, locate, and forfeit substitute assets.

Defendant's Initials _____      14

The defendant also agrees to waive all constitutional, statutory, and procedural challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis for the forfeiture of the property sought by the government. Pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered. In the event the forfeiture is omitted from the judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

The defendant agrees to take all steps necessary to identify and locate all substitute assets and to transfer custody of such assets to the United States before the defendant's sentencing. To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control, including all assets held by nominees, to execute any documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years. The defendant agrees to be interviewed by the government, prior

Defendant's Initials _____          15

to and after sentencing, regarding such assets. The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States. The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG § 1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of the defendant's cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to any substitute assets before the defendant's sentencing. In addition to providing full and complete information about substitute assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this

Defendant's Initials _____          16

agreement. The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be binding upon defendant's heirs, successors and assigns until the agreed forfeiture, including the forfeiture of any substitute assets, is final.

15.     Sex Offender Registration and Notification

The defendant has been advised and understands, that under the Sex Offender Registration and Notification Act, a federal law, the defendant must register and keep the registration current in each of the following jurisdictions: the location of the defendant's residence, the location of the defendant's employment; and, if the defendant is a student, the location of the defendant's school. Registration will require that the defendant provide information that includes name, residence address, and the names and addresses of any places at which the defendant is or will be an employee or a student. The defendant understands that he must update his registrations not later than three business days after any change of name, residence, employment, or student status. The defendant understands that failure to comply with these obligations subjects the defendant to prosecution for failure to register under federal law, 18 U.S.C. § 2250, which is punishable by a fine or imprisonment, or both.

**B.     Standard Terms and Conditions**

1.     Restitution, Special Assessment and Fine

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, shall order the defendant to make restitution to any victim of the offenses, pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C.

Defendant's Initials _____                    17

§ 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offenses, pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement. The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (28 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013. To ensure that this obligation is satisfied, the Defendant agrees to deliver a cashier's check, certified check, or money order to the Clerk of the Court in the amount of $5,600, payable to "Clerk, U.S. District Court" within ten days of the change of plea hearing.

The defendant understands that this agreement imposes no limitation as to fine.

2.      Supervised Release

The defendant understands that the offenses to which the defendant is pleading provide for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

Defendant's Initials  ⓒ __      18

3.    Immigration Consequences of Pleading Guilty

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

4.    Sentencing Information

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the counts to which defendant pleads; to respond to comments made by the defendant or defendant's counsel; and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

5.    Financial Disclosures

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition. The defendant promises that his financial statement and disclosures will be complete, accurate, and truthful and will include all assets in which he has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee, or other third party. The defendant further agrees to execute any documents requested by the United States

Defendant's Initials _____          19

needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this plea agreement, consents to the release of the defendant's tax returns for the previous five years. The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court. The defendant expressly authorizes the United States Attorney's Office to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

6.    Sentencing Recommendations

It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office. Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be

Defendant's Initials _____        20

rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement. The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

7.    Defendant's Waiver of Right to Appeal the Sentence

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

8.    Middle District of Florida Agreement

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although this office will bring

Defendant's Initials _____    21

defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

9.   Filing of Agreement

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

10.   Voluntariness

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind.   The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up

Defendant's Initials _____          22

those rights and there will be no trial.  The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement.  The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

11.   Factual Basis

Defendant is pleading guilty because defendant is in fact guilty.  The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

12.   Entire Agreement

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

Defendant's Initials _____        23

13.    Certification

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this _May_ day of ~~April~~, 2021.

KARIN HOPPMANN
Acting United States Attorney


JOEL MICAH GREENBERG
Defendant

Jennifer Harrington
Assistant United States Attorney


Fritz Scheller
Attorney for Defendant

Roger B. Handberg
Assistant United States Attorney
Chief, Orlando Division


Josephine W. Thomas
Assistant United States Attorney
Chief, Criminal Division


Defendant's Initials _____        24

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                          CASE NO. 6:20-cr-97-GAP-LRH

JOEL MICAH GREENBERG

### PERSONALIZATION OF ELEMENTS

#### Count One

First:      Did you knowingly recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize, or solicit by any means the individual identified in the indictment?

Second:     Did you do so having had a reasonable opportunity to observe the individual identified in the indictment or knowing or in reckless disregard of the fact that the person had not attained the age of 18 years and would be caused to engage in a commercial sex act?

Third:      Was the individual identified in the indictment a person who had attained the age of 14 years but had not attained the age of 18 years?

Fourth:     Were your acts in or affecting interstate or foreign commerce?

#### Count Eight

First:      Did you knowingly produce an identification document, authentication feature, or false identification document?

Second:     Did you do so without lawful authority?

Third:      Was the production of the identification document, authentication feature, or false identification document in or affecting interstate or foreign commerce, or was the identification document or false identification document transported in the mail in the course of production?

Defendant's Initials _____            25

## Count Nine

First:      Did you knowingly transfer, possess, or use another person's means of identification?

Second:     Did you do so without lawful authority?

Third:      Did you do so during and in relation to a felony violation of 18 U.S.C. § 1028(a)(1)?

Fourth:     Did you know that the means of identification belonged to an actual person?

## Count Fourteen

First:      Did you knowingly devise or participate in a scheme to defraud, or to obtain money or property by using false pretenses, representations, or promises?

Second:     Were the false pretenses, representations, or promises about a material fact?

Third:      Did you act with the intent to defraud?

Fourth:     Did you transmit or cause to be transmitted by wire some communication in interstate commerce to help carry out the scheme?



## Count Twenty-Four

First:       Did you use the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct?

Second:      Did the course of conduct cause, attempt to cause, or reasonably be expected to cause substantial emotional distress to a person?

Third:       Did you act knowingly and with the intent to injure, harass, or intimidate another person?

## Count Twenty-Six

First:       Did two or more persons in some way agree to try to accomplish a shared and unlawful plan?

Second:      Did you know the unlawful purpose of the plan and willfully join in it?

Third:       During the conspiracy, did one of the conspirators knowingly engage in at least one overt act as described in the indictment?

Fourth:      Was the overt act committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy?

Fifth:       Did you commit the offense while on release pursuant to an order in *United States v. Joel Micah Greenberg*, Case No. 6:20-cr-97-GAP-LRH, in the United States District Court for the Middle District of Florida, which order notified you of the potential effect of committing an offense while on pretrial release?

Defendant's Initials ⟨⟨⟨                     27

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                        CASE NO. 6:20-cr-97-GAP-LRH

JOEL MICAH GREENBERG

### FACTUAL BASIS

Joel Micah Greenberg was elected as Seminole County Tax Collector in 2016, and he started in office on or about January 3, 2017. During his tenure as Tax Collector and after his arrest on June 23, 2020, Greenberg committed multiple federal criminal offenses.

### Count One

As used in this plea agreement, the term "commercial sex act" shall mean, as defined by 18 U.S.C. § 1591(e)(3), any sex act, on account of which anything of value is given to or received by any person. Greenberg paid for commercial sex acts. In particular, Greenberg was involved in what are sometimes referred to as "sugar daddy" relationships where he paid women for sex, but attempted to disguise the payments as "school-related" expenses or other living expenses. Greenberg had an online account at a website that advertised itself as a place where "sugar daddies" could find "sugar babies" (referred to herein as the "Website"). Greenberg used an account at the Website to identify women whom he later paid to engage in commercial sex acts with him and others.

Defendant's Initials           28

Greenberg used at least four accounts to pay for commercial sex acts: his personal Venmo account, his personal American Express account, his American Express account at the Tax Collector's Office, and his personal Fifth Third Bank account. From December 2016 to December 2018, Greenberg used those accounts to conduct more than 150 financial transactions totaling over $70,000, all of which involved Greenberg paying women for commercial sex acts using those accounts. With respect to Greenberg's personal Venmo account, the transactions were often between $200 to $1,000, and Greenberg often falsely represented that the purpose of the payments was for school-related or other living expenses. For example, some of the common messages that Greenberg included with his payments for commercial sex acts were "school," "food," and "ice cream." Venmo is a mobile payment service that Greenberg had as an app on his cellular phone, and it is a facility and instrumentality in interstate commerce.

One of the individuals who Greenberg paid for commercial sex acts was a minor under the age of 18 for part of the time when Greenberg paid her to engage in commercial sex acts with him and others (referred to herein as the "Minor"). Greenberg met the Minor over the Internet on the Website. The Minor had an account on the Website in which the Minor represented that she was an adult. Greenberg contacted the Minor and asked for the Minor to provide him her Snapchat, which is a multimedia messaging app used on cellular telephones and which is a facility and an instrumentality of interstate commerce. Using his own Snapchat account to contact the Minor, Greenberg and the Minor met.

Defendant's Initials _____        29

The first meeting involved Greenberg and the Minor meeting on his boat. No sexual acts occurred, and Greenberg paid the Minor approximately $400. After that, Greenberg contacted the Minor using his cellular phone or Snapchat and invited her to a hotel in the Middle District of Florida. At the hotel, Greenberg and the Minor engaged in commercial sex acts for which Greenberg paid her over $400.

After that, Greenberg and the Minor met at hotels in the Middle District of Florida, often with others, at which Greenberg and the Minor engaged in commercial sex acts. Greenberg engaged in commercial sex acts with the Minor in the Middle District of Florida at least seven times when she was a minor. During these commercial acts, Greenberg often would offer and supply the Minor and others with Ecstasy, which Greenberg would take himself as well. Oftentimes, Greenberg would offer to pay the Minor and others an additional amount of money to take Ecstasy. Greenberg also introduced the Minor to other adult men, who engaged in commercial sex acts with the Minor in the Middle District of Florida.

Greenberg's payments for commercial sex acts with the Minor involved several facilities and instrumentalities of interstate commerce. For example, Greenberg and the Minor used their cell phones in the Middle District of Florida to call or text each other on or about April 24, 2017, June 4, 2017, June 5, 2017, June 6, 2017, June 7, 2017, June 8, 2017, June 9, 2017, June 17, 2017, June 22, 2017, June 23, 2017, June 24, 2017, June 25, 2017, June 26, 2017, June 28, 2017, June 30, 2017, July 14, 2017, July 15, 2017, July 23 2017, July 24, 2017, and July 30, 2017, many of which calls or texts were for the purpose of scheduling times to meet to engage in commercial sex

Defendant's Initials _C___                30

acts. Greenberg used his personal Venmo account to pay $300 to the Minor on June 17, 2017, which Greenberg stated in his message accompanying the payment was for "Food," as part of an effort to conceal that the payment was actually for a commercial sex act. Greenberg used his personal and Tax Collector credit cards to pay for hotels in the Middle District of Florida that he used to engage in commercial sex acts with the Minor, including at Embassy Suites on or about June 7, 2017 ($166.88 using his personal American Express card), June 24, 2017 ($155.68 using his Tax Collector's Office American Express card), and June 25, 2017 ($155.68 using his Tax Collector's Office American Express card). American Express credit card transactions affect interstate commerce, because they are processed by servers located outside of Florida.

At times, Greenberg used his access to the Florida Driver and Vehicle Information Database (known as "DAVID") to look up and investigate his sexual partners. Those searches were not authorized and violated the federal Driver's Privacy Protection Act, and they had nothing to do with any legitimate activities of the Tax Collector's Office. One of the individuals whom Greenberg searched for in the DAVID system was the Minor. On or about September 4, 2017 at 1:29 p.m., Greenberg ran a search for the Minor, because he had reason to believe that the Minor was under the age of 18.

Greenberg agrees and acknowledges that he acted in reckless disregard of the fact that the Minor was less than 18 years old when he engaged in commercial sex acts with the Minor and that Greenberg had a "reasonable opportunity to observe" the Minor, as that phrase is used in 18 U.S.C. § 1591, when Greenberg engaged in

Defendant's Initials _____          31

commercial sex acts with the Minor, especially given the number of times that Greenberg paid the Minor to engage in commercial sex acts with him when the Minor was under the age of 18 years old, the number of times that they texted and talked on the phone when the Minor was under the age of 18 years old, the number of times that they were in each other's company when the Minor was under the age of 18 years old, the fact that other men who Greenberg introduced the Minor to engaged in commercial sex acts with the Minor in Greenberg's presence when the Minor was under the age of 18 years old, and Greenberg's search of the DAVID system about the Minor.

After he was federally charged and arrested for other offenses on June 23, 2020, Greenberg learned that investigators were investigating his commercial sex acts with the Minor. Greenberg contacted the Minor, directly and through one of the Minor's friends, for the purpose of asking the Minor to lie and say that the reason why Greenberg looked the Minor up in the DAVID system was because the Minor had asked him to do that, which, as Greenberg knew, was not true. Greenberg also asked the Minor for help in making sure that their stories would line up, because he knew that his commercial sex acts with her were illegal.

### Counts Eight and Nine

#### Count Nine

The Minor was not the only person regarding whom Greenberg accessed the DAVID system to advance his personal interests. DAVID is a database of information about Florida driver's licenses and vehicle registrations. DAVID is an Internet based

Defendant's Initials         32

system that can be accessed over the Internet, an instrumentality and facility of interstate commerce, from any secure computer using the Internet uniform resource locator of https://david.flhsmv.gov.   DAVID is used in and affecting interstate commerce.

Because of its role in issuing Florida driver's licenses and identification cards, the Florida Department of Highway Safety and Motor Vehicles provided the Seminole County Tax Collector's Office with access to DAVID.   Greenberg was one of the individuals at the Tax Collector's Office who had an account with DAVID.   Rather than limiting his use of the DAVID system to activities permitted by federal and Florida law, Greenberg used his access to the DAVID system to conduct hundreds of unauthorized searches that had nothing to do with any legitimate activities of the Tax Collector's Office.

One of the individuals Greenberg used his access to the DAVID system to search for was R.Z.   In 2015, Greenberg purchased a boat from R.Z.   In connection with that transaction, Greenberg obtained the personal information of R.Z., which Greenberg used to obtain a replacement driver's license for R.Z. on November 11, 2015, without R.Z.'s knowledge, consent, or authorization.   Greenberg obtained the Florida driver's license for R.Z. by using the online Florida Department of Motor Vehicle's system, which Greenberg accessed while in the Middle District of Florida. To access R.Z.'s records, Greenberg was presented with a warning that the information in the system was protected under federal law by the Driver Privacy Protection Act and that "[y]ou are not authorized to access personal information for

anyone other than yourself through this web site unless you have specific written permission to do so. Any access or attempted access to personal information of others may subject you to criminal prosecution or civil liability." Greenberg clicked, "I agree."

After that screen, Greenberg entered the following information about R.Z. to get to the screen where he could order a replacement license and change the mailing address: last name; date of birth; address; and R.Z's full social security number (or the last 5 numbers of R.Z.'s social security number, plus one of the following: R.Z.'s driver license number, license plate number, title number, or documented vessel number).

Greenberg entered the information and ordered a replacement license for R.Z. Greenberg used his Discover card to pay for it, and he had the license mailed to a P.O. Box associated with Greenberg in Longwood, Florida.

On the same day that Greenberg took office as Tax Collector on January 3, 2017, Greenberg changed the mailing address for R.Z. from the Longwood P.O. Box back to R.Z.'s actual residence. R.Z. never authorized Greenberg to obtain a replacement driver's license using his identity, and R.Z. never knew what Greenberg had done.

After he became Tax Collector, Greenberg used the Florida driver's license that he had unlawfully obtained using R.Z.'s identity to make himself a fake driver's license with R.Z.'s information but Greenberg's photograph. To do that, Greenberg used his access to the DAVID system to run a search for R.Z. on November 18, 2017 in the Middle District of Florida. Some of the information that Greenberg was able to access

Defendant's Initials _____        34

from that search included R.Z.'s name, R.Z.'s address, R.Z.'s date of birth, R.Z.'s signature, R.Z.'s height, R.Z.'s original issue date of license, R.Z.'s driver license number, and some medical information about R.Z.

Greenberg used the replacement Florida driver's license of R.Z. that he obtained in November 2015 and his access to the information in the DAVID system to produce a fake Florida driver's license using R.Z.'s personal information but Greenberg's photograph. To do that, Greenberg used a badge-making machine that he purchased using Tax Collector funds. According to documents provided to investigators by the Tax Collector's Office, Greenberg ordered the badge-making machine from Office Depot and had it shipped to the Tax Collector's office by UPS Next Day service on July 25, 2017. The shipment went from an Office Depot location in Illinois to the Tax Collector's Office in the Middle District of Florida. Greenberg received an email confirmation from ODOline@OfficeDepot.com. On July 26, 2017, Greenberg emailed himself a copy of an Internet video to teach himself how to install the ribbon for the machine.

Greenberg used the badge-making machine and a computer to scan the actual Florida driver's license of R.Z. onto the computer. Greenberg added his photograph and changed the "replacement date" of the license from November 11, 2015 to November 2017. Greenberg then used the badge machine to produce the fake Florida driver's license with R.Z.'s information but Greenberg's photograph. When he produced this fake Florida driver's license of R.Z., Greenberg knew that R.Z. was a real person who had not authorized him to produce or consented to the production of

Defendant's Initials _____     35

the license.  Greenberg produced the fake driver's license in the Middle District of Florida on or about the date of his access of R.Z.'s information in the DAVID system (November 18, 2017).  On or about June 23, 2020, federal agents executed a federal search warrant at Greenberg's residence in the Middle District of Florida.  Agents found the fake driver's license of R.Z. in Greenberg's wallet.

The badge making machine and card stock were made in France.  Greenberg's production of the fake Florida driver's licenses affected interstate and foreign commerce due to his use a machine and card stock that were manufactured outside of Florida and that were transported here in interstate commerce, as well as his use of an actual Florida driver's license that had been mailed and his access of the DAVID system using the Internet.

**Count Eight**

Greenberg used his position as Tax Collector to facilitate the production of a fake driver's license for himself on another occasion as well.  On or about September 21, 2018, E.J.C.C. came to the Tax Collector's Office to turn in his Puerto Rico driver's license and obtain a Florida driver's license.  When a customer applies for a new driver's license, the Tax Collector's Office either "clips" the old driver's license and returns it back to the customer, or the license is kept by or surrendered to the Tax Collector's Office.  In the event the old driver's license is surrendered to the Tax Collector's Office, the clerk processing the transaction will place the license into a basket at their counter. At the end of the day, all of the clerks take their individual baskets and pour out all of the old driver's licenses collected throughout the day into a

Defendant's Initials _____          36

main basket behind the counter. Old driver's licenses collected in the main basket are shredded and destroyed approximately every 45 days.

Greenberg took E.J.C.C.'s Puerto Rico driver's license out of the basket before it could be shredded. On or about a date between on or about September 21, 2018 and June 23, 2020, in the Middle District of Florida, Greenberg used the badge-making machine, the card stock, and a computer, to produce, in and affecting interstate commerce, a fake Puerto Rico driver's license using E.J.C.C.'s personal information but Greenberg's photograph. When he produced this fake Florida driver's license of E.J.C.C., Greenberg knew that E.J.C.C. was a real person who had not authorized him to produce or consented to the production of the license. On or about June 23, 2020, federal agents executed a federal search warrant at Greenberg's residence in the Middle District of Florida. Agents found the fake driver's license of E.J.C.C. in Greenberg's wallet.

Greenberg stole other driver's licenses from the Seminole County Tax Collector's Office. During the execution of a federal search warrant on June 23, 2020 for the work vehicle that Greenberg was using, agents found three driver's licenses in Greenberg's backpack. The three licenses are from Canada, Virginia, and Florida, consisting of licenses for two men and one woman. Each of them was issued to someone other than Greenberg. According to a search of driver's licenses records, each of the three licenses belong to individuals who obtained Florida driver's licenses in December 2019 or February 2020. The addresses for the three victims for their new Florida driver's licenses are in Seminole County.

Defendant's Initials __ ○ __                     37

Greenberg stole surrendered driver's licenses on multiple other occasions. Employees of the Seminole County Tax Collector's Office advise that an employee observed Greenberg take surrendered licenses from the shred basket prior to them being shredded. When Greenberg was confronted about what he had done by one employee, Greenberg gave the employee an excuse that had something to do with "demographics," which was a lie.

Greenberg's thefts of surrendered driver's licenses continued until his last day in office. On June 24, 2020, an employee of the Seminole County Tax Collector's Office saw some surrendered licenses in Greenberg's office. The employee asked Greenberg why he had those surrendered licenses. Greenberg responded that the collection of licenses was a "lost and found," which was another lie.

Witnesses who were present when Greenberg was with some of the women who Greenberg paid for commercial sex acts observed Greenberg offer some of the women the use of a stolen license from the Tax Collector's Office.

### Count Fourteen

#### Overview

After assuming office as the Tax Collector, Greenberg used his access to the accounts and funds of the Tax Collector's Office to engage in a scheme to defraud that enabled him to deprive the Tax Collector's Office and Seminole County of the use and benefit of those funds. In some cases, these deprivations took the form of short-term loans that benefitted Greenberg personally. In others, Greenberg intended a permanent deprivation.

Defendant's Initials _____     38

One of the focuses of Greenberg's fraud scheme related to his desire to acquire cryptocurrency for himself. In general, cryptocurrency is a decentralized, peer-to peer, network-based medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies. Examples of cryptocurrency include Bitcoin.

Starting in February 2017, Greenberg obtained a series of American Express credit cards in the name of the Tax Collector's Office. Greenberg used those American Express credit card accounts to purchases thousands of dollars of personal items. Some of those purchases consisted of cryptocurrency that Greenberg purchased for himself. Greenberg's personal purchases of cryptocurrency violated Tax Collector Office policy, which provided that Tax Collector credit cards "cannot be used for cash advances, personal or non-business related purchases" and that "[p]olicy violations" include "[a] cash advance, use of the card for non-business purposes."

Greenberg ultimately paid for some of his personal cryptocurrency purchases using his own funds, but he did not pay for all of them. The Tax Collector's Office paid for the following $7,203.94 personal cryptocurrency purchases that Greenberg made using his Tax Collector's Office American Express corporate cards:

| | |
|---|---|
| 11/07/2017 | $504.94 |
| 11/07/2017 | $300 |
| 11/07/2017 | $300 |
| 11/09/2017 | $1,600 |
| 11/09/2017 | $1,500 |
| 11/25/2017 | $2,999 |

Defendant's Initials _____        39

**$100,000 Cryptocurrency Purchase in December 2017**

During Greenberg's tenure as Tax Collector, the Tax Collector's Office had bank accounts at Wells Fargo, Seacoast National Bank, and Florida Capital Bank. For each of those accounts, Greenberg was one of three signatories on the account.

On or about September 20, 2017, Greenberg opened an account in the name of the "Seminole County Tax Collector" at a different bank, Fifth Third Bank, in Lake Mary, Florida.   Greenberg was the sole signatory on the account.   Greenberg concealed the existence of the account from the Tax Collector's Office Chief Financial Officer, who was unaware of its existence, and Greenberg was the only one who had access to the account.  Greenberg established the account to help him execute a scheme to use the funds of the Tax Collector's Office to benefit himself.

Greenberg funded the Fifth Third account with money from the Tax Collector's Office, including:

- a September 20, 2017 deposit of a $27,000 check from CarMax made payable to the "Seminole County Tax Collector," related to the sale of a vehicle owned by the Tax Collector's Office;

- a November 7, 2017 deposit of a handwritten $2,500 check from a Tax Collector Office's Wells Fargo account signed by Greenberg, with a notation "Transfer 53 Op Acct";

- a November 7, 2017 deposit of a handwritten $4,500 check from a Tax Collector Office's Wells Fargo account signed by Greenberg, with a notation "Transfer"; and,

- a November 21, 2017 deposit of a handwritten $2,500 check from a Tax Collector Office's Wells Fargo account signed by Greenberg, with a notation "Transfer."

Defendant's Initials ___*C*___          40

Bank records establish that Greenberg engaged in cash withdrawals from the Fifth Third Bank account of the Tax Collector's Office that benefitted himself. For example, on or about November 15, 2017, Greenberg withdrew $4,500 in cash at a branch of Fifth Third Bank in the Middle District of Florida. The next day, on or about November 16, 2017, Greenberg deposited $5,000 in cash into one of his personal accounts at Fairwinds Credit Union (#******2824). On or about that same day, Greenberg transferred almost all of that $5,000 deposit ($4,900) to an account at Fairwinds Credit Union for JMG Ventures (#******2505). Greenberg opened that account in or around April 2015. Greenberg is a managing member of that entity, and Greenberg is the sole signatory on the JMG Ventures account. Greenberg used some of the funds that originated from the Tax Collector's Office and that were transferred into the JMG Ventures account to make a payment towards a portion of what he personally owed for one of his American Express cards from the Tax Collector's Office: $5,455.32 on or about November 16, 2017.

On or about November 29, 2017, Greenberg wrote a check on the Tax Collector's Office Fifth Third account made payable to himself in the amount of $5,000, with a memo line of "Cash – Office." That was a false representation that Greenberg made to conceal the fact that he obtained the cash for his own personal benefit. The Tax Collector's Office had no need for Greenberg or any other employee to get cash for the office, because the Tax Collector's Office used an armored car service to make pickups and deliveries of cash from the branch offices. Greenberg used the funds to benefit himself.

Defendant's Initials __ _C_ _          41

By early December, Greenberg had returned most of the funds that he had obtained from his scheme up until that point. Greenberg's purpose in these transactions was to give himself a series of what amounted to short-term loans that he concealed.

Greenberg's transactions thus far were a prelude to a large cryptocurrency purchase that Greenberg made for himself using Tax Collector funds in December 2017.

On or about December 20, 2017, Greenberg emailed the Chief Financial Officer and asked "how much do we have that can be used for a 60-90 day investment fund [for the Tax Collector's Office]? What's the most you can do?" The Chief Financial Officer explained in an email to Greenberg that "the most we could invest if we don't have any unexpected expenses is about $100,000." In an email dated on or about December 21, 2017, Greenberg told the Chief Financial Officer that he wanted that full amount:

> Will you please draft a check payable to the Seminole County Tax Collector for $100,000. I'm going to go with the short term investment which I believe will have a much higher yield in 60-90 days. Thank you S[].[1] I'll be in today to pick it up.

In his emails, Greenberg falsely represented that the purpose of the $100,000 investment was to benefit the Tax Collector's Office. In fact, his purpose was to deprive the Tax Collector's Office and Seminole County of those funds that Greenberg

---

1 Where [] is used in this plea agreement with a name, it means that the name has been redacted.



would use for another short-term loan for his benefit. The reason why Greenberg needed to engage in this deception was that he knew that he was not allowed to use Tax Collector funds for himself and that his use of the funds could be discovered by auditors. The Chief Financial Officer warned him of this possibility regarding the auditors and the fact that they needed "documentation" regarding the purported investment on behalf of the Tax Collector's Office, in an email dated December 21, 2017:

> As for the investment, just let me know where it gets invested so that we can have documentation with the account number and investment income earned. They need to send the information here so that we have it in our scanning program. That will be critical for the auditors next year (always looking out for the next audit!).

To prevent the auditors from learning that he had not used the funds for any type of permissible investment for the Tax Collector's Office, Greenberg concealed from the Chief Financial Officer any details about the investment that he made.

In response to Greenberg's direction, the Chief Financial Officer provided Greenberg with the $100,000 in the form of a check written on the account of the Tax Collector's Office at Wells Fargo. The check was dated on or about December 21, 2017, and it was made payable to "Seminole County Tax Collector." Greenberg deposited the check into the Fifth Third account on or about December 26, 2017.

Approximately three days later, on or about December 29, 2017, Greenberg obtained from the Fifth Third account a cashier's check made payable to himself ("Joel M. Greenberg"), which he deposited into his personal account at Fairwinds in the Middle District of Florida on or about December 29, 2017. That same day, Greenberg

Defendant's Initials _____        43

used an interstate wire to transfer the $100,000 from his Fairwinds account in the Middle District of Florida to his personal account at Entity A, located outside of Florida.

Entity A is an asset exchange and custodian headquartered in New York. It allows both individual and institutional customers to buy, sell, and store digital assets, such as cryptocurrencies like Bitcoin. Entity A has provided records regarding Greenberg's personal account. According to those records, Greenberg opened the account in the name of Greenberg's personal email account in or around June 2017. The account tier was listed as "Retail 2." In the section of information called "User Provided," the records reflect that the name provided for the account was "Joel Greenberg," that the address provided was Greenberg's home address, and that the phone number provided was Greenberg's personal cell phone.

The transaction history for Greenberg's personal account shows that Greenberg's first cryptocurrency purchase was made on or about June 12, 2017. From on or about June 12, 2017 until on or about December 29, 2017, Greenberg made regular deposits of typically $500 into his account, totaling approximately $11,375, which Greenberg used to purchase various cryptocurrencies. On or about December 4, 2017, Greenberg used interstate wires to send an electronic message to an employee at Entity A asking, "What is the maximum amount I can purchase via wire in a single day?"

Defendant's Initials _____       44

The December 29, 2017 $100,000 wire transfer was the largest deposit that Greenberg had made into his Entity A account at the time.  Greenberg immediately used those funds to purchase cryptocurrency.

The funds were deposited into Greenberg's personal account at Entity A at approximately 10:09 p.m. UTC on or about December 29, 2017.  In less than five hours, Greenberg spent almost all of those funds on cryptocurrency purchases in a series of more than 15 transactions.  By on or about January 3, 2018, Greenberg withdrew almost all of the cryptocurrency that he purchased.  At that point, his personal Entity A account had $.79 in funds, and a small amount of cryptocurrency (.004080926 in bitcoin).

The cryptocurrency that Greenberg purchased using the $100,000 from the Tax Collector's Office was withdrawn into cryptocurrency wallets that belonged to Greenberg.  The Tax Collector's Office has never had a cryptocurrency wallet, and Greenberg never intended on depositing any of the cryptocurrency that he purchased in any account that belonged to the Tax Collector's Office.  In other words, Greenberg used $100,000 of Tax Collector's Office funds to purchase cryptocurrency using a personal account that belonged to him and that resulted in the cryptocurrency being deposited into wallets that belonged to him.

The $100,000 that Greenberg used to purchase cryptocurrency for himself added to a cash flow problem that the Tax Collector's Office was experiencing at the beginning of 2018.  In an email dated on or about January 9, 2018, the Chief Financial Officer notified Greenberg of this issue and addressed the possibility that he would

have to return the $100,000 Greenberg had told the Chief Financial Officer he was

investing for the Tax Collector's Office:

> I am sure you saw the email I sent yesterday regarding bills and not much
> money coming in. We are going to need additional funds before the end of the
> month to get all expenses paid. I can either get back the $100K in the short term
> investment account that I had given to you or we need to pull some funds back
> from [an investment company that had funds in separate investments unrelated
> to the $100,000]. (We might need to do that last part in either case). We have
> Winter Springs invoices coming in as well as our normal items and some old
> invoices are trickling in from prior months as vendors realize that they never got
> paid for things. At this rate there will not be enough money for the end of month
> payroll.

On or about January 18, 2018, Greenberg obtained a cashier's check from

Fairwinds in the amount of $100,000. Greenberg did not get the funds for that check

from any of his cryptocurrency purchases. Instead, a family member wrote him a

check for $90,000 with a notation of "loan," which Greenberg deposited into his

personal account at Fairwinds on or about January 17, 2018. Greenberg used those

funds to get a $100,000 cashier's check, which he deposited into the Fifth Third

account on or about January 18, 2018 in the Middle District of Florida. Greenberg

wrote a check dated on or about January 18, 2018 on the Fifth Third account made

payable to the "Seminole County Tax Collector" in the amount of $100,000. The

handwritten notation on the check was "Returned Investment funds," and it was

deposited into the Wells Fargo account of the Tax Collector's Office on or about

January 18, 2018. As can be seen in this convoluted series of financial transactions,

the purpose of the Fifth Third account was to conceal the fact that Greenberg was not

returning any proceeds received from any investment for the Tax Collector's Office,

Defendant's Initials ___*C*___              46

but was transferring funds from a personal account because no investment had been made on behalf of the Tax Collector's Office.

Greenberg knew that he had to conceal the Fifth Third account and his use of the $100,000 for himself from the auditors, which is what he did. One of the roles of the auditor is to ensure that any unused funds of the Tax Collector's Office are placed in permissible investment. This is required under Florida law. In particular, Florida Statutes, § 218.415 states, in part, that "[i]nvestment activity by a unit of local government must be consistent with a written investment plan adopted by the governing body, or in the absence of a governing body, the respective principal officers of the unit of local government and maintained by the unit of local government[.]" That section expressly provides that "[s]uch policies shall be structured to place the highest priority on the safety of the principal and liquidity of funds" and that the "optimization of investment returns shall be secondary to the requirements of safety and liquidity." *See also* Fla. Stat. § 218.415(2) ("Investment objectives shall include safety of capital, liquidity of funds, and investment income, in that order."). Similarly, Florida Statutes, § 219.075(1)(a) provides: "[e]xcept when another procedure is prescribed by law or by ordinance as to particular funds, a tax collector or any other county officer having, receiving, or collecting any money, either for his or her office or on behalf of and subject to subsequent distribution to another officer of state or local government, while such money is in excess of that required to meet current expenses or is pending distribution, shall invest such money, without limitation, as provided in s. 218.415."

Defendant's Initials _____        47

Greenberg was aware of these statutory limitations, in part, because the Tax Collector's Office has a written investment policy. It authorizes investments in collateralized repurchase agreements, U.S. Treasury obligations, U.S. Agency obligations, Federal instrumentalities, and money market funds. The Tax Collector's written plan is consistent with what is allowed pursuant to Fla. Stat. § 218.415(16) (setting out 9 categories of authorized investments). As Greenberg knew, cryptocurrency is not a permissible investment under Fla. Stat. § 218.415 or Fla. Stat. § 219.075(1)(a) or pursuant to the written policy of the Tax Collector's Office.

The only person at the Tax Collector's Office who knew what Greenberg had done with the $100,000 was Greenberg. By virtue of his position, Greenberg had a duty to disclose to, and he was obligated to advise, auditors about materials facts, such as his establishment and use of the Fifth Third Bank account and his personal use of the $100,000. Greenberg, however, did not do that, but concealed what he had done.

As part of the audit, Greenberg signed a representation letter on or about January 25, 2019 regarding the fiscal year ending September 30, 2018, which covered the time period encompassed by the $100,000 transaction in or around December 2017. Some of those representations made by Greenberg related to the information that was provided. In the January 25, 2019 representation letter, Greenberg stated that he had provided the auditors with "[a]ccess to all information, of which we are aware, that is relevant to the preparation and fair presentation of the financial statements, such as records, documentation, and other matters;" "[a]dditional information that you have requested from us for the purpose of the audit;" and "[u]nrestricted access to

Defendant's Initials _____        48

persons within the entity from whom you determined it necessary to obtain audit evidence."

In his representation letter, Greenberg claimed that he had "no knowledge of any fraud or suspected fraud that affects the entity and involves: Management, Employees who have significant roles in internal control, or Others where the fraud could have a material effect on the financial statements." Greenberg also claimed that he had "no knowledge of instances of noncompliance or suspected noncompliance with provisions of laws, regulations, contracts, or grant agreements, or abuse, whose effects should be considered when preparing financial statements." Greenberg represented that he had "identified and disclosed" to the auditors "all instances that have occurred or are likely to have occurred, of fraud and noncompliance with provisions of laws and regulations that we believe have a material effect on the financial statements or other financial data significant to the audit objectives, and any other instances that warrant the attention of those charged with governance."

As Greenberg knew when he made those representations, they were false. Greenberg had opened a Fifth Third Bank account that he used to funnel money to himself, and he had used $100,000 of Tax Collector funds to purchase cryptocurrency for himself. Greenberg knew that such an investment was not authorized under Florida law and that the personal use of Tax Collector funds was a crime.

Due to Greenberg's fraud, none of this was discovered by the auditors. Instead, the financial statements prepared by the auditors reflected the false information that Greenberg provided to them. With respect to investments, there was no mention of

Defendant's Initials __℗__                    49

the $100,000 purchase by Greenberg of cryptocurrency for himself using Tax

Collector's Office funds.  Instead, the auditors wrote in the financial statements the

following regarding "Investments:"

> Florida Statutes 218.415, 219.075, and the Tax Collector's investment policy
> authorize investments in certificates of deposit, savings accounts, repurchase
> agreements, the Local Government Surplus Funds Trust Fund administered by
> the Florida State Board of Administration, obligations of the U.S. Government
> and Government Agencies unconditionally guaranteed by the U.S.
> Government, indebtedness (bonds, debentures, notes) guaranteed by U.S.
> Government Agencies, and money market mutual funds registered with the
> Securities and Exchange Commission ("SEC").

> The Tax Collector's investments at September 30, 2018, consist of
> approximately $650,025 in money market mutual funds and treasuries.  These
> investments are reported at fair value in the accompanying governmental funds
> and fiduciary fund financial statements.

The auditors stated that its tests of the Tax Collector's Office "compliance with

certain provisions of laws, regulations, contracts and grant agreements" disclosed no

"instances of noncompliance:"

> **Compliance and Other Matters**

> As part of obtaining reasonable assurance about whether the Tax Collector's
> financial statements are free of material misstatement, we performed tests of its
> compliance with certain provisions of laws, regulations, contracts and grant
> agreements, noncompliance with which could have a direct and material effect
> on the determination of financial statement amounts. However, providing an
> opinion on compliance with those provisions was not an objective of our audit
> and, accordingly, we do not express such an opinion. The results of our tests
> disclosed no instances of noncompliance or other matters that are required to
> be reported under *Government Auditing Standards*.

Because of Greenberg's fraud, the auditors also found that no recommendations

needed to be made regarding the financial management of the Tax Collector's office

and that it did not have any findings regarding "noncompliance with provisions of

Defendant's Initials           50

contracts or grant agreements, or abuse, that have occurred, or are likely to have occurred, that have an effect on the financial statements that is less than material but which warrants the attention of those charged with governance."

### The $200,000 Cryptocurrency Purchase

About a year after defrauding the Tax Collector's Office out of $100,000 that he used to purchase cryptocurrency that he kept for himself, Greenberg defrauded the Tax Collector's Office out of another $200,000 that Greenberg used for additional cryptocurrency purchases for his own personal benefit. This time, Greenberg set up an account at Entity A in the name of the Seminole County Tax Collector's Office. Greenberg established that account on or about December 19, 2018. He was the sole user on the account and the only one at the Tax Collector's Office who had access to it.

To fund the account, Greenberg, once again, turned to the Chief Financial Officer. In an email on or about December 12, 2018, Greenberg told the Chief Financial Officer:

S[] there is a fund that I would like to invest in. How much do we have available that I can allocate to this fund? I was wanting to do between $100k and $200k. It would be a 90 day investment, aiming to yield about 20%.

In an email on or about that same day, the Chief Financial Officer reminded Greenberg that there were limitations on where funds could be invested: "It has to fall within our investment policy guidelines. What is the investment?"

Defendant's Initials           51

In an email to the Chief Financial Officer on or about December 12, 2018,

Greenberg described the investment:

> This a new platform which allows for the composition of multiple funds to be purchased as one. So instead I'm having to purchase a whole share of Bond A and Bond B, you can purchase Bond C which is made up of Bond A and Bond B. Fully licensed and in compliance. They are called Motifs.

As Greenberg knew, this was not true. The real purpose for which Greenberg was

seeking the funds was to purchase cryptocurrency for himself.

On or about December 20, 2018, the Chief Financial Officer, at Greenberg's

direction, used interstate wires to transfer $200,000 from the account of the Tax

Collector's Office at Florida Capital Bank to the bank (Silvergate Bank) for the Entity

A account of the Tax Collector's Office located outside of Florida (**Count Fourteen**).

As he had with the $100,000 in Tax Collector Office funds that he received in or

around December 2017, Greenberg quickly spent the $200,000 in multiple purchases

of cryptocurrency. Greenberg engaged in more than 40 transactions over the course

of about four days. By on or about December 27, 2018, Greenberg withdrew almost

all of the cryptocurrency from the account, so that the account balance was $.01 with

small amounts of cryptocurrency remaining (.00001819 in bitcoin, .005588 in ETH,

and .00000054 BCH).

The cryptocurrency that Greenberg purchased using the $200,000 from the Tax

Collector's Office ended up in cryptocurrency wallets or accounts that belonged to

Greenberg. In other words, Greenberg used $200,000 of Tax Collector's Office funds



to purchase cryptocurrency that resulted in the cryptocurrency being deposited into wallets or accounts that belonged to him.

Greenberg knew that he had done something that was wrong. In January 2019, Greenberg approached a family member to ask for $200,000. In explaining why he needed the funds, Greenberg stated that he was in "big trouble" and that he had commingled Tax Collector funds with his own. His relative gave him a check for $200,000, which Greenberg used to purchase more cryptocurrency for himself. None of those funds went to the Tax Collector's Office.

Greenberg concealed from the Chief Financial Officer the details about his purchases of cryptocurrency for himself using Tax Collector funds. On or about February 21, 2019, the Chief Financial Officer emailed Greenberg and asked whether there was any interest income or dividends that needed to be booked for the investment. Greenberg stated, "[n]o ma'am." Greenberg concealed what the investment really had been and the fact that there were little to no funds left in the Entity A account of the Tax Collector's Office.

In April 2019, Greenberg wanted to send another $200,000 to the Entity A account for Greenberg to use to purchase cryptocurrency. The only reason why the additional $200,000 transaction was not consummated was because Entity A closed the account prior to the transfer being attempted.

Prior to April 23, 2019, Greenberg had used the $200,000 funds from December 2018 to purchase cryptocurrency for himself that ended up in cryptocurrency wallets that belonged to him. Greenberg knew that he had committed a crime by doing that.

Defendant's Initials _____       53

On an unknown date in April 2019, Greenberg asked the family member who had given him $200,000 back in January 2019 for another $200,000. When asked what had happened with the other money, Greenberg explained that he had used it to purchase cryptocurrency for himself. Greenberg stated that he would go to jail if he did not pay the $200,000 back to the Tax Collector's Office.

On the morning of April 23, 2019, federal agents served a Grand Jury subpoena on the Tax Collector's Office. The subpoena was served to an employee of the office. That employee immediately took it to the in-house counsel for the Tax Collector's Office, who immediately provided it to Greenberg.

Prior to the service of subpoenas on April 23, 2019, Greenberg did not know about the federal investigation. After he saw the subpoena on the morning of April 23, 2019, Greenberg knew that there was a federal investigation regarding his misuse of Tax Collector funds to benefit himself. The subpoena requested records related to, among other things, the American Express accounts and any investments made using Tax Collector funds (federal investigators were already aware of Greenberg's transfers of $100,000 in December 2017 and $200,000 in December 2018 to Entity A accounts). In response, Greenberg got a family member, that afternoon, to provide a check for $200,000 that was used to obtain a $200,000 cashier's check from the Longwood, Florida branch of Seacoast Bank where Greenberg and the family member shared an account. None of the funds used to fund the $200,000 cashier's check came from any cryptocurrency wallet or account that belonged to the Tax Collector's Office. Instead, the funds came from a family member of Greenberg. The cashier's check was made

Defendant's Initials _____        54

payable to the Seminole County Tax Collector, with "Joel Greenberg" listed as the remitter. Greenberg provided it to the Chief Financial Officer. On or about April 24, 2019, the Chief Financial Officer deposited it into one of the accounts belonging to the Tax Collector's Office.

In or around May 2019, the Tax Collector's Office produced documents related to its investments in response to the subpoena. The cover sheet represented that the Tax Collector's Office was producing documents "for all investment accounts and supporting documentation." No documents were provided, however, regarding Entity A.

It was not until approximately six months later that the Tax Collector's Office produce any records regarding Entity A. One of the documents that was produced was a photograph of a memorandum and the $200,000 cashier's check. The memorandum is undated. The memorandum indicates that it regarded the "[Entity A] Account" and that the "Status" of the account was "Closed April 2019." The memorandum states:

> Account was opened to provide liquidity for stablecoin project. Project has been delayed until further notice and [Entity A] account has been closed. Funds Returned.

Greenberg was the one who prepared this memorandum and who took the photograph of the memorandum and the check. The memorandum contains material misrepresentations. By on or about April 10, 2019, the account was essentially empty. The funds for the $200,000 cashier's check came from Greenberg's family member. In

Defendant's Initials _____        55

addition, the $200,000 that had been wire transferred to Entity A back on or about December 28, 2018 was unrelated to the "stablecoin project."

Entity A is the creator of a "stablecoin," which is a cryptocurrency that is pegged to a stable asset such as fiat currency or gold. Documents obtained from Entity A, however, establish that Greenberg's $200,000 in cryptocurrency purchases had nothing to do with the "stablecoin" project. In fact, Greenberg admitted to Entity A in an email exchange on December 12, 2018 that the two items were "unrelated" and that he "was trying to setup an account for my office for possible investments in the near future. So the two [*i.e.*, the stablecoin project and future investments] are unrelated."

The Tax Collector's Office employee responsible for blockchain matters has confirmed that the Tax Collector's Office did not need its own supply of cryptocurrency as part of its operations, that the Tax Collector's Office did not actually accept any cryptocurrency ever, and that the Tax Collector's Office did not hold any cryptocurrency. In other words, the memorandum regarding the "return" of the $200,000 was a document intended by Greenberg to falsely represent, and cover up, why Greenberg had obtained the $200,000.

Greenberg concealed all of this from the auditors. For the 2019 fiscal year, Greenberg completed the same "management representation" letter that he had for the 2018 fiscal year, and he made the same false representations about his compliance with Florida law regarding his investment and his lack of knowledge about any failures to comply with Florida law or fraud by management (which would include any violations

Defendant's Initials __*C*__          56

of the Florida statutes regarding investments).   Although he had a duty to do so, Greenberg failed to disclose the existence of the Entity A account, the $200,000 transfer to the account, and his use of those funds to purchase cryptocurrency that he continued to possess in wallets that belonged to him.

Greenberg's lies worked.   The Comprehensive Annual Financial Report for the 2019 fiscal year revealed no information about the December 28, 2018 wire transfer of $200,000 to Entity A that Greenberg had used to purchase cryptocurrency for himself. As they did with respect to the Tax Collector's Office for the 2018 fiscal year, the auditors performed tests of the compliance of the Tax Collector's Office "with certain provisions of laws, regulations, contracts and grant agreement, noncompliance of which could have a direct and material effect on the determination of financial statement amounts."   The auditors stated that their tests "disclosed no instances of noncompliance or other matters that are required to be reported under *Government Auditing Standards*."   The auditors stated that they also did not have any findings regarding "noncompliance with provisions of contracts or grant agreements, or abuse, that have occurred, or are likely to have occurred[.]"

Because of his fraud, Greenberg benefitted from the market appreciation of the cryptocurrency that he had purchased.   Between the time of his purchases and the service of the Grand Jury subpoena, the value of cryptocurrency had increased. Greenberg kept any of those gains for himself.

Defendant's Initials ___ 　　　　57

## Government Blockchain Systems

In 2019, Greenberg purchased additional cryptocurrency for himself using Tax Collector funds. For this part of his scheme, Greenberg used an entity by the name of Government Blockchain Systems, LLC.

On or about July 19, 2019, Greenberg submitted Articles of Organization to the Florida Secretary of State for Government Blockchain Systems, LLC ("Government Blockchain Systems"). Greenberg and another individual (the "other individual") were designated as managers of the company, and Greenberg was designated as its registered agent.

The other individual's involvement was short lived. In or around September 2019, the Orlando Sentinel wrote an article about Government Blockchain Systems. In response to that publicity, the other individual was removed from the entity.

On or about September 23, 2019, the attorney for the Tax Collector's Office, R.S., revised the Articles of Amendment to make the Tax Collector's Office the sole member of the entity and to remove Greenberg and the other individual as managers. The attorney for the Tax Collector's Office was designated at the new registered agent. The authorized member of the company was designated as the Seminole County Tax Collector.

During his time as member of Government Blockchain Systems, the other individual never knew that the Tax Collector's Office had provided funds to Government Blockchain Systems. In fact, Greenberg opened an account at Fifth

Defendant's Initials _____     58

Third Bank in the name of Government Blockchain Systems on or about September 5, 2019. As he did with the Fifth Third Account that he had established in the name of the Tax Collector's Office in 2017, Greenberg made himself the sole signatory on the Government Blockchain Systems' account. Five days later, on or about September 10, 2019, Greenberg deposited approximately $65,860 into the account. The deposit consisted of a check from the Tax Collector's Office's Florida Capital Bank account.

Greenberg used interstate and foreign wires to transfer most of those funds to accounts that he used to purchase cryptocurrency, including approximately $55,000 to a Greenberg's personal account at Entity B and approximately $19,137.50 to an account controlled by him at Entity C:

| Date | Transfer |
| --- | --- |
| 9/20/2019 | $5,000 to Entity B |
| 9/24/2019 | $5,000 to Entity B |
| 9/24/2019 | $5,000 to Entity B |
| 9/24/2019 | $5,000 to Entity B |
| 9/24/2019 | $5,000 to Entity B |
| 9/25/2019 | $5,000 to Entity B |
| 9/26/2019 | $500 to Entity B |
| 9/26/2019 | $4,500 to Entity B |
| 9/27/2019 | $1,035 to Entity C |
| 9/27/2019 | $4,140 to Entity C |
| 9/27/2019 | $5,000 to Entity B |
| 9/30/2019 | $1,016.76 to Entity C |
| 9/30/2019 | $4,158.24 to Entity C |
| 9/30/2019 | $5,000 to Entity B |
| 10/1/2019 | $5,000 to Entity B |
| 10/1/2019 | $5,000 to Entity B |
| 10/3/2019 | $4,647.50 to Entity C |
| 10/4/2019 | $4,140 to Entity C |

Defendant's Initials _____

Entity B and Entity C offered customers the ability to open accounts that could be used to purchase and trade cryptocurrency and other assets.  Once the funds were transferred to accounts that Greenberg controlled at Entity B and Entity C, he used those Tax Collector funds to purchase cryptocurrency that ended up in wallets that belonged to him.

Greenberg used the Government Blockchain Systems Fifth Third account to make additional cryptocurrency purchases.  On or about October 5, 2019, Greenberg deposited a check in the amount of approximately $68,087.46 into the Fifth Third account of Government Blockchain Systems.  That check was from a contractor with the Tax Collector's Office (referred to as the "Contractor"), and it was dated on or about October 2, 2019.  Greenberg transferred those funds to accounts that he used to make additional cryptocurrency purchases, consisting of approximately $35,600 using Greenberg's Entity B account and approximately $23,214.85 to the account controlled by him at Entity C:

| Date | Transfer |
|------|----------|
| 10/7/2019 | $1,035 to Entity C |
| 10/9/2019 | $100 to Entity B |
| 10/9/2019 | $1,000 to Entity B |
| 10/9/2019 | $1,000 to Entity B |
| 10/9/2019 | $1,000 to Entity B |
| 10/10/2019 | $2,500 to Entity B |
| 10/15/2019 | $3,008.10 to Entity C |
| 10/15/2019 | $3,105 to Entity C |
| 10/15/2019 | $4,140 to Entity C |
| 10/15/2019 | $5,000 to Entity B |
| 10/15/2019 | $5,000 to Entity B |
| 10/15/2019 | $5,000 to Entity B |
| 10/15/2019 | $5,000 to Entity B |

Defendant's Initials _____          60

| 10/16/2019 | $5,000 to Entity B |
| 10/17/2019 | $5,000 to Entity B |
| 10/18/2019 | $429.37 to Entity C |
| 10/21/2019 | $2,587.50 to Entity C |
| 10/21/2019 | $4,154.09 to Entity C |
| 10/21/2019 | $1,037.38 to Entity C |
| 10/23/2019 | $4,148.28 to Entity C |

During the federal investigation, the Tax Collector's Office provided investigators with every one of Greenberg's non-privileged emails, totaling over 300,000 pages. A search of those emails revealed not a single email between Greenberg and the Contractor regarding Government Blockchain Systems. There are no emails between them explaining the connection between the Contractor and Government Blockchain Systems, and nothing that addresses why the Contractor provided Greenberg with a $68,087.46 check made payable to Government Blockchain Systems. Greenberg used the funds from the Contractor to do the same thing he had done with the Tax Collector Office funds, which is to purchase cryptocurrency that was withdrawn into wallets that belonged to, and were controlled by, Greenberg.

Because of the press attention that Government Blockchain Systems received in September 2019, the auditors asked Greenberg about it. Based upon their conversations with Greenberg, the auditors provided the following in the fiscal year 2019 audit:

**Blended Component Unit**

The financial statements also include Government Blockchain Systems LLC (the "Company"), a newly formed entity by the Tax Collector, which is reported

Defendant's Initials           61

as a blended component unit. A blended component unit is a legally separate entity that is in substance part of the Tax Collector's, the "primary government", operations. Blended component units have government bodies that are substantially the same as the primary government or they provide services nearly exclusively to the primary government.

The Company is a Florida Limited Liability Company that was created effective July 19, 2019 to provide citizens the ability to utilize digital currency as a form of payment for their taxes. The governing board of the Company is the Tax Collector, which has operational responsibility for the component unit. The Company had no material assets, liabilities or fund equity, nor any revenues or expenditures as of September 30, 2019.

In an audit that was conducted after Greenberg was federally charged in this case, the auditors revealed that Greenberg had provided them with false information:

During this investigation, we were told that one of the objectives of GBS was to create a Seminole County cryptocurrency. That information was inconsistent with what the Tax Collector had disclosed during the 2019 financial audit, which was to create a county-wide platform for accepting cryptocurrency as payments.

In fact, Greenberg's true purpose in using Government Blockchain Systems was to purchase cryptocurrency for himself, mine cryptocurrency for himself, and sell cryptocurrency machines for which he would keep the funds. Greenberg started by using Tax Collector funds to purchase approximately $70,221 of cryptocurrency mining equipment using his American Express card:

| Date | Amount | Description |
|------|--------|-------------|
| 7/13/2019 | $7,160 | EDP\nIntegrated Circuit and Data Server x 8 |
| 7/18/2019 | $226.39 | Server fans\nServer ventilation shroud 4inch |
| 7/19/2019 | $5,070.70 | EDP\nIntegrated Circuit and Data Server x 8 |
| 7/23/2019 | $155.99 | 1 Power supply unit for data server |
| 7/26/2019 | $848.64 | 5 Power Supply Units for Data Servers |

Defendant's Initials _____     62

| 7/29/2019 | $4,530.00 | EDP\nIntegrated Circuit and Data Server x 6 |
| 7/30/2019 | $500.00 | EDP\nGray Matter Industry Custom Server Rack |
| 7/31/2019 | $4,530.00 | EDP\nIntegrated Circuit and Data Server x 6 |
| 8/2/2019 | $198.69 | EDP\nBasic Power Distribution Unit w/10 outlets |
| 8/14/2019 | $956.97 | EDP/Office Supplies\n\n3 Power Distribution Units with 10 outlets\n10 white C14 extension cords\n10 black C14 extension cords\n1 CyberPower PDU with 8 outlets\n |
| 8/15/2019 | $6,326.71 | EDP\nIntegrated Circuit and Data Server |
| 8/24/2019 | $6,316.99 | EDP\nIntegrated Circuit and Data Server |
| 9/3/2019 | $2,449.05 | EDP\nIntegrated Circuit and Data Server x 4 |
| 9/3/2019 | $5,833.15 | EDP\nIntegrated Circuit and Data Server |
| 9/15/2019 | $147.97 | HVAC Air duct and 8 inch and 6 inch duct booster fan |
| 9/16/2019 | $4,990.00 | EDP\nIntegrated Circuit and Data Server |
| 9/17/2019 | $19,980.00 | EDP\nIntegrated Circuit and Data Server x 4 |

Of the approximately $132,952.35 of the cryptocurrency purchased with funds received by Government Blockchain Systems, Greenberg used at least $68,685.78 of the cryptocurrency to purchase cryptocurrency mining machines that were shipped to the Tax Collector's Office from China using United Parcel Service or Federal Express:

| Date | Amount Paid | Miner | Quantity |
| --- | --- | --- | --- |
| 9/9/2019 | $3420.51 | S17e | 1 |
| 10/20/2019 | $2297.93 | S17 | 1 |
| 10/22/2019 | $5,182.92 | S17 | 2 |
| 10/22/2019 | $1722.56 | T17 | 1 |

Defendant's Initials            63

| | | | |
|---|---|---|---|
| 10/29/2019 | $3984.81 | S17e | 2 |
| 10/29/2019 | $1376.69 | T17 | 1 |
| 10/29/2019 | $2297.93 | S17 | 1 |
| 10/29/2019 | $2297.93 | S17 | 1 |
| 10/29/2019 | $2297.93 | S17 | 1 |
| 10/29/2019 | $2297.89 | S17 | 1 |
| 10/29/2019 | $2297.89 | S17 | 1 |
| 11/8/2019 | $2083.28 | S17 | 1 |
| 11/8/2019 | $1599.81 | S17 | 1 |
| 11/19/2019 | $1610.16 | S17 | 1 |
| 11/20/2019 | $1291.01 | S17 | 1 |
| 11/20/2019 | $1116.59 | S9 | 3 |
| 11/20/2019 | $354.41 | S9 | 3 |
| 11/27/2019 | $1456.77 | S17 | 1 |
| 12/11/2019 | $458.11 | S9 | 2 |
| 12/15/2019 | $199.18 | S9 | 1 |
| 12/15/2019 | $211.78 | S9 | 1 |
| 12/20/2019 | $1294.08 | T17 | 1 |
| 12/24/2019 | $1030.05 | S9 | 6 |
| 12/24/2019 | $833.01 | S9 | 8 |
| 12/25/2019 | $1767.81 | S17 | 1 |
| 12/25/2019 | $3043.98 | S17e | 2 |
| 12/28/2019 | $387.25 | S9 | 2 |
| 12/28/2019 | $218.72 | S9 | 2 |
| 12/28/2019 | $218.72 | S9 | 1 |
| 12/30/2019 | $1778.87 | S17 | 1 |
| 12/30/2019 | $1778.87 | S17 | 1 |
| 12/30/2019 | $1656.51 | S17e | 1 |
| 1/4/2020 | $1713.32 | S17 | 1 |
| 1/8/2020 | $8670.66 | S17+ | 5 |
| 1/12/2020 | $926.53 | T17 | 1 |
| 1/14/2020 | $1951.71 | T17e | 2 |
| 1/15/2020 | $407.88 | S9 | 2 |
| 1/15/2020 | $407.88 | S9 | 2 |
| 1/16/2020 | $407.94 | S9 | 2 |
| 1/16/2020 | $335.9 | S9k-13 | 2 |

Greenberg sold some of the cryptocurrency machines that he purchased with

Tax Collector funds (including funds from Government Blockchain Systems, a Tax

Defendant's Initials _____   64

Collector entity) on Amazon using an account that he set up for Government Blockchain Systems for that purpose (the following table reflects $79,614.27 in sales):

| Date | Amount Charged | Miner | Quantity |
|------|----------------|-------|----------|
| 11/15/2019 | $300 | S9i/j | 1 |
| 11/15/2019 | $317.8 | S9i/j | 1 |
| 11/17/2019 | $318 | S9k | 1 |
| 11/21/2019 | $300 | S9i/j | 1 |
| 11/23/2019 | $686.22 | S9i | 3 |
| 11/23/2019 | $600 | S9k | 2 |
| 11/26/2019 | $323.25 | S9i/j | 1 |
| 11/28/2019 | $300 | S9k | 1 |
| 11/30/2019 | $226.79 | S9i/j | 1 |
| 12/1/2019 | $300 | S9i/j | 1 |
| 12/2/2019 | $363.79 | S9 | 1 |
| 12/6/2019 | $725.02 | S9 | 2 |
| 12/6/2019 | $339.99 | S9 | 1 |
| 12/7/2019 | $600 | S9k | 2 |
| 12/7/2019 | $313.8 | S9i/j | 1 |
| 12/10/2019 | $719.98 | S9 | 2 |
| 12/14/2019 | $374.5 | S9 | 1 |
| 12/14/2019 | $300 | S9i/j | 1 |
| 12/14/2019 | $372.09 | S9 | 1 |
| 12/15/2019 | $290 | S9k | 1 |
| 12/17/2019 | $3745.19 | S17+ | 1 |
| 12/18/2019 | $300 | S9i/j | 1 |
| 12/20/2019 | $350 | S9 | 1 |
| 12/24/2019 | $387.98 | S9k | 1 |
| 12/26/2019 | $375 | S9 | 1 |
| 12/27/2019 | $378.88 | S9 | 1 |
| 12/27/2019 | $378.35 | S9 | 1 |
| 12/27/2019 | $700 | S9 | 2 |
| 12/28/2019 | $3480.19 | S17 | 1 |
| 12/29/2019 | $3035.19 | S17 | 1 |
| 1/2/2020 | $399 | S9 | 1 |
| 1/2/2020 | $366.85 | S9 | 1 |
| 1/3/2020 | $3482.3 | S17 | 1 |
| 1/5/2020 | $3538.44 | S17 | 1 |
| 1/5/2020 | $3588 | S17 | 1 |
| 1/7/2020 | $3445 | S17 | 1 |

Defendant's Initials _____          65

| | | | |
|---|---|---|---|
| 1/11/2020 | $1384.5 | T17 | 1 |
| 1/11/2020 | $1300 | T17 | 1 |
| 1/11/2020 | $688.28 | S9 | 2 |
| 1/12/2020 | $412.24 | S9 | 1 |
| 1/13/2020 | $2703.94 | S17e | 2 |
| 1/13/2020 | $630 | S9 | 2 |
| 1/13/2020 | $1979.72 | S17 | 1 |
| 1/14/2020 | $1375 | T17e | 1 |
| 1/14/2020 | $611.98 | S9k | 2 |
| 1/14/2020 | $630 | S9 | 2 |
| 1/14/2020 | $378.88 | S9 | 1 |
| 1/15/2020 | $367.96 | S9 | 1 |
| 1/15/2020 | $4020.98 | S17 | 2 |
| 1/15/2020 | $350 | S9 | 2 |
| 1/15/2020 | $378.88 | S9 | 2 |
| 1/15/2020 | $3323.3 | S17+ | 1 |
| 1/16/2020 | $350 | S9 | 2 |
| 1/16/2020 | $340 | S9k-13 | 2 |
| 1/18/2020 | $3374.19 | S17 | 1 |
| 4/29/2020 | $329.41 | S9 SE 17T | 1 |
| 4/30/2020 | $315 | S9 SE 17T | 1 |
| 5/1/2020 | $2650.51 | S17+ | 1 |
| 5/3/2020 | $5877.08 | S17+ 73TH | 2 |
| 5/14/2020 | $330 | S9 SE 17T | 1 |
| 5/16/2020 | $330 | S9 SE 17T | 1 |
| 5/18/2020 | $3598 | S17+ 58TH | 2 |
| 5/26/2020 | $1816 | S9 SE 17T | 4 |
| 6/8/2020 | $516.82 | S9 SE 17T | 1 |
| 6/8/2020 | $430 | S9 SE 17T | 1 |
| 6/9/2020 | $2800 | S17+ 58TH | 2 |

Greenberg kept the proceeds from these sales for himself. The Fifth Third Bank account for Government Blockchain reflects receipt of an additional in $7,355.92 from Amazon, from December 20, 2019 to December 31, 2019, of funds related to sales of cryptocurrency machines that had been purchased with Tax Collector funds. Greenberg used those funds to purchase cryptocurrency for himself in purchases, including transaction fees, that totaled $7,174.09 from December 30, 2019 to January

Defendant's Initials _____   66

6, 2020. Approximately $58,401.07 was disbursed to an account opened in the name of Government Blockchain Systems at Azlo from January 2020 to June 2020. None of those funds were provided to the Tax Collector's Office; they were kept by Greenberg.

Greenberg's fraud included efforts to lie about his purchase of cryptocurrency machines to hide relevant information from his office and its auditors. In January 2020, the Chief Financial Officer approached another Tax Collector's Office employee with several concerning credit card charges for multiple Bitcoin mining machines that Greenberg had purchased. Shortly after learning about the Bitcoin mining machine purchases, the Tax Collector Office employee began to ask Greenberg for answers about the equipment, citing county asset inventory requirements that require information about any assets with a value that exceeds $1,000. Greenberg stated that the equipment did not need to be inventoried because it cost less than $1,000, which he knew was not true.

Greenberg also prepared a false Joint Venture Agreement in an effort to conceal his fraud. The "Joint Venture Agreement" represented that the purpose and description of the joint venture is "research and development of blockchain based systems and applications for private and public sector use," that ownership was divided equally between the Contractor and Government Blockchain Systems, and that "[e]ach of the Parties will maintain separate accounts which will contain their own capital contributions as may be used by the Joint Venture, as well as any of their share of the profits of the Joint Venture." As Greenberg knew when he prepared the

Defendant's Initials  _C_                67

document, those representations were false. The funds were not maintained in separate accounts, and Greenberg used most of the funds to benefit himself (as was always his intent), including by using some of the funds to purchase cryptocurrency mining machines that he resold for a profit.

The Tax Collector's Office dissolved Government Blockchain Systems on or about May 8, 2020. Greenberg kept whatever funds were in the bank account for the entity, and he also kept the more than $80,000 in cryptocurrency that he had purchased with Government Blockchain Systems funds. On November 19, 2019, in conjunction with the expected Grand Jury testimony of witnesses from his office the next day, Greenberg obtained a $25,000 cashier's check made payable to the Tax Collector's Office. In February 2020, Greenberg paid another $40,860, which equaled the amount that the Tax Collector's Office had originally paid to Government Blockchain Systems. A review of bank records reveals that Greenberg paid the Contractor $3,027.62. Greenberg retained the remainder that he obtained from his fraud scheme.

After Greenberg was indicted, the auditors attempted to find any of the cryptocurrency ~~funds~~ machines that had been purchased with Tax Collector funds. They found no machines and concluded that those machines were public property when purchased. While he was Tax Collector, Greenberg used Tax Collector funds to set up an area in his personal office where the machines could run to produce cryptocurrency for him. After the administrative office was closed due to COVID, Greenberg moved some of the machines to the Lake Mary, Florida branch of the Tax Collector's Office where they were running for Greenberg's benefit. Those machines

Defendant's Initials _____          68

were damaged in a fire, which occurred due to a power surge caused by the way in which the machines were daisy chained together. The expenses incurred for the server room buildout, fire damage, and server room tear down in the Lake Mary branch were approximately $98,000. All of those costs were due to Greenberg using Tax Collector Office funds to benefit himself personally, including by operating a business out of the Tax Collector's Office for his personal benefit under the guise of Government Blockchain Systems.

When asked by the auditors about Government Blockchain Systems, Greenberg lied and claimed that he planned on using the entity to receive Bitcoin from taxpayers and convert the cryptocurrency into U.S. dollars to be remitted to the Tax Collector's Office. As shown above, Greenberg's true intent for Government Blockchain Systems was to use it to purchase cryptocurrency for himself, to operate a business selling cryptocurrency machines to benefit himself, and to mine cryptocurrency for himself.

Greenberg also used his purchases of cryptocurrency equipment to conceal other purchases that he made for his own personal benefit. For example, Greenberg used his American Express card from the Tax Collector's Office to purchase an autographed Kobe Bryan basketball ($799) on or about January 26, 2020, an autographed Michael Jordan photograph ($599.95), and an autographed Kobe Bryant trading card ($1,355) on or about January 27, 2020. The Tax Collector's Office paid for those items, because it was led to believe that those purchases related to cryptocurrency purchases (which is how they were coded in the Tax Collector's Office records).

Defendant's Initials ___⟁___          69

At the time of his arrest on June 23, 2020, a series of cryptocurrency machines in Greenberg's office were set up to mine cryptocurrency. The Tax Collector's Office has no wallet to receive any mined cryptocurrency. Any cryptocurrency mined by those machines was going to Greenberg to benefit him personally.

### Count Twenty-Four

The victim of Count Four is a teacher at a school located in the Middle District of Florida (referred to herein as the "Teacher"). On or about October 4, 2019, the Teacher filed with the Seminole County Supervisor of Elections to run for the elected office of Seminole County Tax Collector in the 2020 election. Because the Teacher had filed to run in opposition to him, Greenberg used the mail, an interactive computer service, an electronic communication service, an electronic communication system of interstate commerce, and a facility of interstate commerce to engage in a course of conduct that caused, attempted to cause, and would be reasonably expected to cause substantial emotional distress to the Teacher.

Greenberg started by mailing letters. On or about October 10, 2019, Greenberg used the United States Mail to send an anonymous letter that purported to be from a "concerned student." The letter was mailed from the Middle District of Florida and was addressed to the head of the school where the Teacher worked. The envelope contained an anonymous typed letter addressed to the head of the school that contained information, alleging an inappropriate relationship between a student and teacher. In that letter, Greenberg, posing as a student at the school, falsely represented

Defendant's Initials _____          70

that he had first-hand knowledge of a sexual relationship between another fictitious student identified as "R[]" and the Teacher.  Greenberg, posing as a student at the school, falsely represented that "R[]" admitted to engaging in oral and anal sex with the Teacher and that the incidents took place at the school.  Greenberg, posing as a student at the school, signed the letter "a very concerned student" at the school.

The following is a redacted copy of the letter that Greenberg sent:

I am writing to you today to bring attention to something that I feel you should know about. I am a student at          , a proud          and I love my school, my teachers and classmates. I have been with the same group for a while now, (I am a          ) having been with many of my fellow classmates since elementary school. At the start of this school year, I was told by one of my very close friends, let's call him          , that he has been having a sexual relationship with Mr.          . This came as a complete shock to me but I tried to listen and understand what          was going through.          told me that he had recently "come out of the closet" to a few of his closest friends and family members. I don't judge my friend because I love him dearly. I do not want to see him get in any trouble. I remember a specific conversation with          where he told me that he mentioned his sexual orientation to Mr.    . After          told Mr.    that he believed he was a homosexual, Mr.    took          into a separate room where he told          that he also had his own struggles with the "sin of homosexual thoughts" and that Mr.    would help him to "Pray the gay away"

Towards the end of August,          told me that he has performed oral sex on Mr.    three times while at school and that twice Mr.    has performed oral sex on him after school. The last conversation I had with          about his relationship with Mr.    ,          said that he and Mr.    has engaged in anal sex and that Mr.    used a cell phone to record it. I told          that I thought this was very wrong and that he should not be doing this with a teacher. I know I          's Facebook password and was able to find a conversation that Mr.    and          had at the beginning of the school year. Mr.    has been acting very odd this year. He's not the same person I knew last year and I don't know what he has going on in his personal life, but I feel it is my duty and obligation to report this to you. I hope that you will treat this matter with great concern, I am also going to send a copy of this to law enforcement. I am very scared to come forward, I know          would be made fun of or even worse, blamed for what Mr.    has done to him. I know you are a man of integrity Mr.    , I trust you will do the right thing.

Sincerely,

A very concerned student at

On or about October 11, 2019, Greenberg used the United States Mail to send eight anonymous envelopes addressed to eight other faculty members at the school where the Teacher worked. Each of the envelopes contained the same typed letter addressed to the head of the school that is set out in the prior paragraph.

Defendant's Initials ⟨signature⟩          71

On or about November 2, 2019, Greenberg established an imposter Twitter profile using the Teacher's name and photograph.  Greenberg then published, using that profile, a series of racially motivated online posts that Greenberg falsely represented were being made by the Teacher.

The imposter account falsely represented that the teacher was a racist.  The Teacher's personal description is "Music Teacher. Conspiracy Theorist. White Supremacy. Segregationist. Dad. Keep Seminole County White."   In addition, Greenberg used the fake Twitter account to make several postings (i.e., tweets) that set out racist statements:

| Date | Posting |
|------|---------|
| 11/2/2019 | I'm running for office to keep #seminolecounty white and segregated. It's time we take back ou[r] county! |
| 11/2/2019 | I'm proud of America!! Red WHITE AND blue. WHITE. |
| 11/2/2019 | This is great. Just don't become a Jew like your kids have. |

The day after Greenberg established the fake Twitter account using the Teacher's identity, Greenberg set up a fake Facebook account in an effort to disseminate publicly the false claims that he had made in the anonymous letters that he had sent to the school where the Teacher worked pretending to be a "very concerned student."  The name of the fake Facebook account was "[name of the school] Teach" (@[name of the school].teach.73).

In his postings using the imposter Facebook account on November 3, 2019, Greenberg falsely alleged that the Teacher had raped a student:



| **Facebook Postings** |
|---|
| "I am a teacher at [the school]. I post this today to make the public aware that Mr. [Teacher] has had several accusations of sexual misconduct made against him over the last two years. These complaints are within his personnel file at the school. [The school] has long kept accusations such as these hush hush, for many teachers and for many years now. This needs to be made known. –A very concerned teacher at [the school]." |
| "[The Teacher] is being investigated for multiple sexual misconduct allegations against students at [the school]. Call HR and ask for his file. You will see the reports. This main is a hypocrite and should NOT be around children." |
| "Multiple accusations have been made against him. These include rape of a male student who came to Mr. [Teacher] to seek counsel on the student's sexuality. Mr. [Teacher] told the student he had his own sinful homosexual thoughts and they would together pray the gay away. This evolved into several sexual interactions even one involving a video of the sexual encounter. This must be made known. He is a sham." |

Greenberg is the person who wrote and mailed the letters and set up and used the imposter Twitter and Facebook accounts. With respect to the letters, a Certified Latent Print Examiner found six of Greenberg's fingerprints on two of the letters, and a DNA Specialist found Greenberg's DNA on another three of the envelopes. As for the imposter Twitter and Facebook accounts, the Internet Service Provider for Greenberg's residence at the time that those accounts were established and used (November 2, 2019 and November 3, 2019) has identified Greenberg's residence at the address where those imposter accounts were established and used. Greenberg also used an email domain associated with himself (@joelgreenberg.net) in establishing the imposter Twitter account.

Defendant's Initials _____     73

Greenberg's false accusations resulted in local law enforcement conducting a criminal investigation of the Teacher. Florida Statute § 800.101 criminalizes any "authority figure," such a teacher at school, from soliciting or engaging in sexual conduct, a relationship of a romantic nature, or lewd conduct with a student enrolled at a school. Violations of the statute are second degree felonies.

Greenberg's false allegations about the Teacher involved false claims that the Teacher had committed felony criminal offenses. As Greenberg knew when he made those allegations in the letters and in the online posts, those allegations were false. Greenberg made those false allegations to cause substantial emotional distress to the Teacher. After investigating the Teacher, local law enforcement found no support whatsoever for the false allegations that Greenberg had made.

### Count Twenty-Six

In response to the COVID-19 pandemic, Congress passed the Coronavirus Aid, Relief, and Economic Security Act, also known as the CARES Act. In conjunction with an officially declared disaster by the United States Government, the CARES Act allowed for the Small Business Administration, an agency of the United States, to offer Economic Injury Disaster Loan (EIDL) funding to business owners negatively affected by the COVID-19 pandemic. To qualify, a business had to be in operation prior to February 1, 2020.

Using the SBA online portal, EIDL applicants submitted personal and business information in support of each EIDL application, and they did not have to submit supporting documentation of any sort. The application included a jurat-like paragraph

Defendant's Initials _____                74

where the applicant affirms that the information submitted is true and correct under the penalty of perjury and applicable criminal statutes.

The application process involved filling out assorted data fields relating to the size of the affected business entity, the ownership of said business, and other information such as the number of employees and gross business revenues realized in the 12 months prior to the date of the disaster (January 31, 2020). This information furnished by the applicant was then used by SBA application evaluation systems to calculate the principal amount of money the small business was eligible to receive in the form of an EIDL.

In addition to applying for an EIDL, an applicant could request and then receive up to $10,000 in an EIDL Cash Advance Grant based on the number of employees claimed. The EIDL Cash Advance Grant was disbursed in amounts of $1,000 per claimed employee. Any EIDL Cash Advance Grant funding that was received by an applicant based on the number of claimed employees did not need to be repaid to the SBA if the loan application was ultimately denied by the SBA, or if the applicant declined the EIDL that was offered by the SBA at a later date.

Pursuant to the provisions governing the EIDL program, loan proceeds had to be used by that business on certain permissible expenses. The EIDL (working capital) loans had to be used by the afflicted business to pay fixed debts, payroll, accounts payable, and other bills that could have been paid had the COVID-19 disaster not occurred.

Defendant's Initials _____                    75

To evaluate EIDL applications, the SBA computer system used automation and system programming to quickly conduct checks of each application submitted by each applicant. The SBA computer system performed checks of the applicant's credit worthiness and evaluated other elements of data furnished by the applicant to identify duplicative applications and indicators of fraudulent activity. The SBA computer system also utilized the information furnished by the applicant to determine the dollar amount of the loan offer that the applicant may be extended, which included gross revenues in the 12-month period prior to the disaster, costs of goods sold during that same timespan, and loss of rental income. If any aspect of the application did not pass the automated evaluation within the SBA computer system, the application's progress was stopped, and an electronic notification was sent to the applicant regarding the potential cause for the application to be halted. The applicant was then given the opportunity to engage with the SBA and request reconsideration of the application. The loan application evaluation system also was designed so that SBA employees, to include SBA Loan Specialists, could affect applications and manually change and override the system's actions if appropriate and necessary.

As identified in the Third Superseding Indictment, the "SBA Employee" was a resident of the Middle District of Florida and a "public official" as defined by 18 U.S.C. § 201(a)(1). In or about May 2020, the SBA Employee began working for the U.S. Government as an SBA Loan Specialist. As an SBA Loan Specialist, the SBA Employee was responsible for processing home and business loans; making recommendations on collateral needed to secure loans; applying accepted financial

Defendant's Initials _____        76

procedures to analyze financial resources to determine an applicant's ability to repay requested loans; reviewing all pertinent facts needed to make eligibility determinations by analyzing such factors as the nature and cause of damage, intended use of proceeds, legislative and administrative loan limits, and disposition of insurance and other recoveries; ensuring loan files contain all pertinent documentation, to include conversations with applicants and written recommendations or justifications for conclusions; processing loan applications on web-based computer system; and responding orally and in writing to applicants or their representatives.  Because of COVID-19, the SBA authorized the SBA Employee to work from the SBA Employee's residence located in the Middle District of Florida.

Greenberg conspired with the SBA Employee and another individual (referred to herein as the "Recruiter Conspirator") to submit false applications for EIDL loans and to pay the SBA employee bribes for her assistance in approving the fraudulent applications.

Before assuming office as the Seminole County Tax Collector, Greenberg operated several businesses.  One of those businesses was Greenberg Media Group Inc. (Greenberg Media Group).  On or about August 16, 2012, Greenberg incorporated Greenberg Media Group with the Florida Department of State. Greenberg was the President, Vice President, Treasurer, Secretary, and Registered Agent of the company.

Greenberg, or another individual, filed annual reports for the Greenberg Media Group from 2013 to 2015, but no report was filed in 2016.  As a result, the company

Defendant's Initials _____          77

was administratively dissolved.  On or about October 4, 2017, Greenberg filed a reinstatement.  Greenberg identified himself as the President of the company. Greenberg failed to file annual reports for Greenberg Media Group in either 2018 or 2019, so the company was administratively dissolved again.

A second business operated by Greenberg prior to becoming Seminole County Tax Collector was DG3 Network Inc. (DG3 Network).  On or about June 27, 2014, DG3 Network was registered with the Florida Department of State.  Greenberg was identified as the President, Treasurer, Secretary, and Director of the company.  Annual reports were filed in 2015, but not in 2016, 2017, 2018, or 2019.  As a result, the company was administratively dissolved.

Greenberg is a friend of the "Recruiter Conspirator."  The Recruiter Conspirator has filed applications for EIDL loans, and has received such loans, that were made using false representations about ~~Greenberg's~~ the Recruiter conspirator's businesses.  The Recruiter Conspirator told Greenberg about the SBA Employee and the scheme to submit false EIDL loans.  The scheme was not Greenberg's idea, but he was recruited into it and agreed to participate in it with knowledge of its illegality.

On or about June 19, 2020, the Recruiter Conspirator texted Greenberg that he had an "easy" and "quick" way for Greenberg to get a loan for "up to $160K."  The Recruiter Conspirator advised Greenberg to contact the SBA Employee.

On June 19, 2020, Greenberg texted the SBA Employee that he was referred by the Recruiter Conspirator "for assistance with a loan application."  Greenberg and the SBA Employee talked that day.  In connection with that conversation, Greenberg sent

Defendant's Initials _____  78

the SBA Employee a portion of his 2018 personal tax return. The SBA Employee advised, "We can use this to file . . . you should be able to apply for 150k." The SBA Employee requested that Greenberg send information for the loan, including his date of birth place of birth, and bank account information.

On or about June 20, 2020, in the Middle District of Florida, an individual acting on behalf of Greenberg and at the direction of the SBA Employee submitted an application for an EIDL for Greenberg. The SBA Employee asked Greenberg to forward her the email that he would receive from the SBA about the application. The SBA Employee advised that she would be able to "look into the [SBA] system and upload[] your document from there" and advise him about the "timeframe on it's competition." Six hours later, the SBA Employee told Greenberg that the application was "accepted" and that she would advise him about the "underwriting timeframe [o]ver the next week." The SBA Employee texted Greenberg a photograph of her SBA computer that displayed the approved application as shown on the SBA system.

The application prepared and submitted by the SBA Employee was fraudulent. The "business" for the application was Greenberg. The application falsely represented that Greenberg was an individual who operates under a sole proprietorship, with or without employees, or as an independent contractor. Greenberg's social security number was provided, and it was represented that he was not a non-profit entity. In terms of gross revenues for the 12 months prior to the date of the disaster (January 31, 2020), the application represented that Greenberg's gross revenues were $161,535, with $135 in cost of goods sold, that Greenberg lost $135,000 in rents for rental

Defendant's Initials _____        79

properties, and that Greenberg had two employees as of January 31, 2020. Greenberg's primary business address was identified as a prior residence where he lived in Lake Mary, Florida. The application listed Greenberg's cell phone and an email address for contact information. The application represented that the business was established on September 10, 2002 and that the funds should be sent to Greenberg's personal account at Fairwinds Bank (#****2824). The application falsely represented that no one else prepared the application.

As Greenberg knew at the time, the SBA Employee was using her access to the SBA system to ensure that he got a loan that was based on false representations. The SBA Employee texted Greenberg a screen shot from the SBA system of some of the information for his loan application, which included a claim that Greenberg earned $13,461 in monthly sales, which Greenberg knew was not true.

On June 21, 2020, the Recruiter Conspirator texted Greenberg that the SBA Employee worked at the SBA and that she processes loans for him "privately" if he asked "her to as a favor." The Recruiter Conspirator explained that Greenberg needed to pay the SBA Employee for her assistance ("so just cut her a check for whatever you get funded"). Greenberg acknowledged that he had no intention of using the funds for any type of legitimate business expenses because he had none, asking the Recruiter Conspirator, "How quickly can I blow it all on pussy?"

On or about June 20, 2020, the SBA approved Greenberg for a $2,000 advance based upon the representation that he had two employees. The SBA transferred those

funds to Greenberg's personal account at Fairwinds Bank (#****2824) on or about June 23, 2020.

On June 23, 2020, Greenberg was arrested in this case. He had his initial appearance that day and was released on conditions, which included a prohibition on committing any new criminal offenses and a statement advising him that any new criminal violations would result in the possibility of additional terms of imprisonment due to the fact that he was on pretrial release in his federal criminal case.

On or about June 24, 2020, the SBA approved Greenberg's application for an EIDL loan. On or about June 24, 2020, a Loan Authorization and Agreement was sent by email to Greenberg, who executed the Agreement that same day for a $133,000 loan from the SBA. The term of the loan is 30 years, with payments of $649 due monthly. Interest accrues at 3.75% a year.

The Loan Authorization and Agreement required Greenberg to make several certifications, including that "Borrower will use all the proceeds of this Loan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter" and that "[t]here has been no substantial adverse change in Borrower's financial condition (and organization, in case of a business borrower) since the date of the application for this Loan. (Adverse changes include, but are not limited to: judgment liens, tax liens, mechanic's liens, bankruptcy, financial reverses, arrest or conviction of felony, etc.)." By his signature, Greenberg represented that "[a]ll representations in the Borrower's Loan application (including all supplementary submissions) are true, correct and complete and are

Defendant's Initials _____       81

offered to induce SBA to make this Loan" and that "Borrower certifies that no fees have been paid, directly or indirectly, to any representative (attorney, accountant, etc.) for services provided or to be provided in connection with applying for or closing this Loan, other than those reported on the Loan Application." The Loan Authorization and Agreement specifically advised Greenberg of the penalties associated with making false statements, including fines and imprisonment pursuant to "15 U.S.C. 645, 18 U.S.C. 1001, 18 U.S.C. 1014, 18 U.S.C. 1040, 18 U.S.C. 3571, and any other applicable laws."

As Greenberg knew when he executed the Agreement, he was engaged in fraud. Greenberg was not going to use the funds "as working capital to alleviate economic injury" caused by COVID-19, because he had no business that was so impacted. Greenberg also had been indicted for felony charges and had resigned as Tax Collector effective June 24, 2020, which both were a "substantial adverse change in Borrower's financial condition."

To obtain more funds from the SBA, Greenberg reinstated two defunct businesses and used them to submit false applications for EIDL loans. As noted above, DG3 Network and Greenberg Media Group were administratively dissolved prior to June 2020. On or about June 28, 2020, Greenberg filed reinstatements for DG3 Network and Greenberg Media Group with the Florida Department of State. Greenberg listed himself as the President of the companies, with a principal place of business of his current residence in Seminole County, in the Middle District of Florida. On or about July 6, 2020, Greenberg filed an amended annual reports for DG3

Network and Greenberg Media Group that identified him as the Chairman and his wife as the CEO, with the principal place of businesses listed as their residence.

Working with the SBA Employee and the Recruiter Conspirator, Greenberg submitted false loan applications for DG3 Network and Greenberg Media Group on or about June 28, 2020. With respect to the DG3 Network application, the SBA Employee submitted the application, which falsely represented that the company had $475,000 in gross revenue for the 12 months prior to February 1, 2020; that its costs of goods sold during that period was $1,326; that the company was established on June 27, 2014; and that it had two employees. As for Greenberg personally, the application falsely represented that he was not the subject of a pending Indictment.

The SBA Employee submitted the application for Greenberg Media Group approximately 27 minutes later. As with the application for DG3 Network, similar false representations were made about the financial performance of the Greenberg Media Group. The EIDL application for Greenberg Media Group represented that the company earned $718,000 in revenue for the 12 months prior to February 1, 2020; that its costs of goods sold during that period was $1,237; that the company was established on August 16, 2012, and that it employed 10 people.

As Greenberg knew when the applications were submitted, neither DG3 Network nor Greenberg Media Group were impacted by COVID-19, because neither of them were in business when the pandemic started. Greenberg also knew that neither of those companies had any need for the loan proceeds, because neither of them were involved in any business operations. DG3 Network did not have a bank account until

Defendant's Initials _____        83

July 2020, and Greenberg Media Group's bank account had negative balances for much of 2019. Neither bank account reflected any revenues or expenses related to any business operations.

Greenberg also knew that he had defrauded the SBA, because he never intended to use any of the proceeds for any business operations of DG3 Network and Greenberg Media Group. Instead, Greenberg used the funds for personal uses.

The SBA Employee was a willing and knowledgeable participant in the fraud. Text messages between the SBA Employee and Greenberg establish that both of them knew that DG3 Network and Greenberg Media Group were not active corporations prior to submitting the EIDL loan applications. On or about June 29, 2020, Greenberg texted the SBA Employee: "The dept of state approved the request to reinstate each entity. The reinstatement fee of each entity will be $1000. Before I pay, are you confident these funding request will go through." The SBA Employee replied, "Yes it will." Based upon that guarantee that he would get EIDL loans for businesses that were not active and had to be reinstated, Greenberg reinstated both businesses on June 29, 2020, and he sent copies of the certificates of good standing to the SBA Employee that same day. Greenberg texted the SBA Employee, "I updated the address for the companies I reinstated today to my new address."

Further evidence of the SBA Employee's knowledge of the inactive nature of DG3 Network was seen in the fact that Greenberg advised the SBA Employee that DG3 Network did not have an active bank account. On June 29, 2020, Greenberg texted the SBA Employee, "I do have a bank account for Greenberg Media Group

Inc, but the bank account for DG3 Network isn't open." The SBA Employee directed Greenberg to open accounts for both businesses at a "bank like sun trust," advising "It's cleaner for me[.]" After using Greenberg's Fairwinds account successfully, the SBA Employee directed Greenberg, "Open DG3 at your normal bank."

The SBA system initially declined the loan applications for DG3 Network and Greenberg Media Group. The SBA Employee used her access to the SBA system to "reactivate the files today" on July 5, 2020. As noted above, the loan applications eventually went through and Greenberg received the loan proceeds.

The Recruiter Conspirator played an integral role in facilitating the EIDL Loans for Greenberg. The Recruiter Conspirator sent over 20 text messages to the SBA Employee to facilitate the submission of false applications for Greenberg and to arrange for payments by Greenberg to the SBA Employee.

Greenberg received $432,700 in fraudulent EIDL proceeds, consisting of $132,900 on June 26, 2020, $149,900 on July 21, 2020, and $149,900 on July 21, 2020. As was the plan from the inception from the scheme, Greenberg shared some of the proceeds that he obtained from the fraud scheme with his conspirators. Greenberg gave the Recruiter Conspirator $16,000, consisting of a $6,000 check dated June 27, 2020 with a memo line for "loan," a $5,000 check dated July 26, 2020, Greenberg with a memo line of "Fee July," and a $5,000 check dated July 26, 2020 with a memo line of "Fee August." These checks represent Greenberg sharing some of the proceeds with the person who recruited him into the conspiracy, with the three checks corresponding with when Greenberg obtained funds from his fraudulent SBA EIDL loans.

Greenberg did the same with the SBA Employee, by sending her $3,000 on or about July 16, 2020 using CashApp. Greenberg sent these funds as part of his effort to influence an official act of the SBA Employee related to the three loans that benefitted Greenberg personally and to influence the SBA Employee to allow or make an opportunity for the commission of a fraud on the United States.

Defendant's Initials _____          86