UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO. 6:20-cr-97-GAP-LHP

JOEL MICAH GREENBERG

## UNITED STATES' SENTENCING MEMORANDUM

During the 3 ½ years when he was the Tax Collector, Joel Micah Greenberg repeatedly used his position to engage in a bold, brazen, and nearly undeterrable crime-spree consisting of sex trafficking of a child, illegally producing a false identification document, aggravated identity theft, wire fraud, stalking, and conspiracy to defraud the government. The United States recommends that the Court decline any request to grant a downward variance from the applicable sentencing guidelines range and sentence Greenberg to a guidelines sentence. Such a sentence would be sufficient, but not greater than necessary to achieve the statutory purposes of sentencing.

## BACKGROUND

Greenberg's criminal conduct began prior to his 2016 election as the Tax Collector for Seminole County. In November 2015, after purchasing a boat from an individual, R.Z., Greenberg used R.Z.'s personal information to change R.Z.'s mailing address and obtain a replacement license in R.Z.'s name, without R.Z.'s consent or knowledge. PSR ¶ 49. Greenberg's election then fueled a fire that began a pervasive and wide-spread crime-spree, for which he used his position, and instrumentalities of the Tax Collector's office, to fund and facilitate.

On the very day that Greenberg took office, January 3, 2017, Greenberg used his position to access the Florida Driver and Vehicle Information Database (DAVID) and search for R.Z. *Id*. at ¶ 52. He then reverted R.Z.'s mailing address back to R.Z.'s actual residence. R.Z. never knew what Greenberg had done. *Id*. In November 2017, Greenberg searched for R.Z. again in DAVID, and using a badge-making machine that he had purchased with Tax Collector funds, produced a fake driver's license containing R.Z.'s information and Greenberg's picture. *Id*. at ¶¶ 53-54.

Though Greenberg's unlawful use of DAVID and identity theft was far from over, Greenberg's criminal acts did not just revolve around those offenses. Beginning in December 2016 and continuing through December 2018, while in office, Greenberg paid over $70,000 in more than 150 separate financial transactions to engage in commercial sex with women, disguised as "sugar daddy/baby" relationships. Funding his commercial sex habit were his own personal accounts and a government credit card. *Id.* at ¶¶ 35-36. One of the individuals who Greenberg paid for commercial sex acts was a minor. Greenberg engaged in commercial sex acts with the minor at least seven times while she was a minor. *Id.* at ¶ 40. During these commercial sex acts, Greenberg often offered and supplied the minor and others with ecstasy, which Greenberg used as well. He often paid the minor and others an additional amount of money to partake in recreational use of the drugs. *Id.*

As he was in the midst of committing those crimes, Greenberg was using his position as Tax Collector to benefit himself financially. To help conceal those efforts, Greenberg opened a bank account in the name of the "Seminole County Tax

2

Collector" in September 2017 that only he had access to and that he concealed from the Tax Collector's Office Chief Financial Officer (CFO) and the auditors. PSR ¶ 67. Greenberg funded that account with over $35,000 of Tax Collector funds. *Id.* at ¶ 68. Greenberg withdrew some of those funds in cash ($4,500), which he deposited into one of his personal accounts ($5,000) to fund a transfer to another account controlled by him. *Id.* at ¶ 69. Greenberg then used those funds to make a payment towards a portion of what he owed for one of the government credit cards that he was using for personal purchases. *Id.* at ¶ 70. In other words, Greenberg used Tax Collector funds to pay personal expenses that he had incurred using his government credit card.

Greenberg's fraud continued in November 2017, with Greenberg using his secret bank account that he opened in the name of the Tax Collector's Office to write a check with a memo line of "Cash – Office."  *Id.* at ¶ 71. This is an example of a tactic used by Greenberg throughout his scheme of using false memo lines to conceal the true purpose of the transaction. Greenberg did not obtain that cash for the office, but used the funds to benefit himself. *Id.*

Greenberg also used his government credit card to financially benefit himself during this time period.  In a series of six transactions from November 7, 2017, to November 25, 2017, Greenberg purchased $7,203.94 in cryptocurrency using his government credit card. *Id.* at ¶ 65. Often, Greenberg paid for his personal use of the card, such as when he used it in connection with his hotel charges for commercial sex acts (which was done prior to detection of the offense). By contrast, Greenberg's

$7,203.94 in personal cryptocurrency purchases were paid by the Tax Collector's Office.

With the exception of the $7,203.94 in personal cryptocurrency purchases, Greenberg had returned most of the funds that he had obtained from his scheme up until that point by early December 2017. *Id.* at ¶ 72. But Greenberg had only just gotten started in his efforts to defraud the Tax Collector's Office to fund his personal cryptocurrency purchases.

In December 2017, Greenberg falsely represented to his CFO that he needed $100,000 to invest for the Tax Collector's Office. *Id.* at ¶¶ 73-74. In fact, his purpose was to use those Tax Collector funds to purchase cryptocurrency for himself. The CFO warned Greenberg that the auditors may discover his use of the funds and require documentation from him. *Id.* at ¶ 74. To prevent that, Greenberg had the $100,000 check written to the Tax Collector's Office, which he deposited into the secret bank account. *Id.* at ¶¶ 75-76. Greenberg then obtained a cashier's check made payable to himself, which he deposited into his personal bank account. *Id.* at ¶ 77. Greenberg then wire transferred the $100,000 to a personal account that he opened at an entity that buys and sells cryptocurrency. *Id.* In less than five hours after the funds were deposited, Greenberg spent almost all of the funds on cryptocurrency purchases in a series of 15 transactions. *Id.* at ¶ 81. Greenberg later withdrew the cryptocurrency he purchased into wallets that belonged to him. *Id.* at ¶¶ 81-82.

Greenberg's fraud directly impacted the Tax Collector's Office, which experienced a cash flow problem. *Id.* at ¶ 83. Rather than reverse the transactions he

had conducted using the office's funds, Greenberg took an approach that he would use later in his scheme, which was to obtain funds from his family. To conceal the source of those funds, Greenberg engaged in a convoluted series of transactions by which he obtained a cashier's check from his personal bank, deposited it into the secret Tax Collector's Office bank account, and then wrote a check from the secret account to the Tax Collector's Office. *Id.* at ¶ 84.

Greenberg's fraud should have been disclosed to the auditors. It was not. Greenberg concealed the secret account and his use of the $100,000, and he lied in a representation letter to the auditors. *Id.* at ¶¶ 85-94. The auditors did not suspect anything. Greenberg's efforts at concealment appeared to him to be working.

His success continued to embolden him, and between September 2018 through June 2020, Greenberg used the instrumentalities of the Tax Collector's Office to create another fake driver's license, using another person's identity to make a fake driver's license with the victim's name and Greenberg's photograph. *Id.* at ¶¶ 56-61.

And Greenberg continued to be obsessed with using Tax Collector funds to purchase more cryptocurrency. In December 2018, Greenberg used Tax Collector funds to purchase $200,000 for himself. *Id.* at ¶ 95. As part of his scheme, Greenberg lied to the CFO that he needed the funds to invest in something called "motifs." *Id.* at ¶ 95-98. Greenberg's lie worked, and he received the funds.

Greenberg used those funds in much the same way as he had previously.  The difference was that Greenberg directed the CFO to wire transfer the funds to an account that he opened at a cryptocurrency trading platform in the name of the Tax

Collector's Office. *Id.* at ¶ 100. Greenberg then used those funds in more than 40 separate transactions over the course of four days to purchase cryptocurrency, which ended up in wallets or accounts belonging to him. *Id*. To conceal his fraud, Greenberg lied to the auditors again in a representation letter, and he concealed from the CFO the details about his personal cryptocurrency purchases. *Id.* at ¶¶ 103, 113.  In January 2019, Greenberg told one of his family members that he was in "big trouble" and asked for $200,000.  *Id.* at ¶ 102.  Rather than repay the Tax Collector's Office what he had obtained through his fraud, however, Greenberg used those funds to purchase more cryptocurrency for himself.  *Id.*

Greenberg soon learned that his lies and concealment had not worked with everyone. Federal criminal authorities were aware of his suspected misuse of Tax Collector funds to benefit himself and were investigating him. Greenberg learned about the criminal investigation on April 23, 2019, when the United States Secret Service served the Tax Collector's Office with a Grand Jury subpoena, seeking information related to, among other things, investments made by the Tax Collector's Office. *Id.* at ¶¶ 106-107. From reviewing the subpoena, Greenberg knew that his fraud had been detected. *Id.* But, Greenberg was undeterred. Instead of ceasing his scheme, Greenberg engaged in further efforts to conceal his fraud, including using funds from a family member to repay the $200,000 that he obtained through fraud (this $200,000 was in addition to the $200,000 a member of his family gave him in January 2019 for that same purpose) and falsely representing that he was returning the funds because they related to a project that had been closed. This representation was directly

contradicted by what he had previously written when asked that very question (stating that they were "unrelated"). *Id.* at ¶ 108.

The one thing that Greenberg did not do, however, was stop his fraud. Greenberg continued to defraud the Tax Collector's Office to obtain funds to purchase cryptocurrency for himself. His only reaction to the federal investigation was to alter his scheme.

Starting only three months after learning of the federal investigation, Greenberg began using his government credit card to purchase over $70,000 in cryptocurrency mining equipment in a series of 17 transactions during a two-month period from July 2019 to September 2019. *Id.* at ¶ 127. As the investigation would later reveal, these purchases were part of Greenberg's effort to use Tax Collector funds to operate a business that benefitted himself personally. *See id.* at ¶ 116-137.

The name given to the business was Government Blockchain Systems. *Id.* at ¶ 116. In its revised Articles of Incorporation, the entity appeared to be controlled by the Tax Collector's Office. *Id.* at ¶ 119. In fact, Greenberg used that business to benefit himself by using it as a cover to purchase cryptocurrency for himself and to purchase cryptocurrency mining equipment that Greenberg either sold to benefit himself or used to mine cryptocurrency for himself. *Id.* at ¶ 127.

Similar to what he had done before, Greenberg established a bank account for Government Blockchain Systems for which he was the sole signatory, so that he could control the entity's finances. *Id.* at ¶ 120. Greenberg deposited $65,860 in Tax Collector funds into this account, as well as another $68,087.46 that were received from a Tax

Collector's Office contractor. *Id.* at ¶¶ 120, 123.  Greenberg used the funds to purchase cryptocurrency in over 35 separate transactions over a one-month period from September 20, 2019 to October 23, 2019. *See id.* at ¶¶ 120-123. The cryptocurrency purchased by Greenberg was done using two accounts, including a personal account belonging to Greenberg and another one that he controlled. *Id.* The result was the same as his other cryptocurrency purchases using Tax Collector funds, which is that Greenberg withdrew the cryptocurrency into wallets that belonged to him.  *Id.* at ¶ 124.

But his scheme was not over.  Greenberg also used over $68,000 of the funds that he had received through his fraud involving Government Blockchain Systems to purchase cryptocurrency mining equipment in a series of 40 transactions during an over three-month period from September 2019 to January 2020. *Id.* at ¶ 128. Greenberg added these to the machines he purchased earlier in the year using his government credit card and then sold over 85 of those machines in over 60 transactions during an over six-month period from November 2019 to June 2020. *Id.* at ¶ 129. Greenberg kept the proceeds of those sales for himself. *Id.* at ¶ 130.

In the midst of defrauding the Tax Collector's Office, Greenberg added stalking to his repertoire of criminal activity. *See id.* at ¶¶ 138-147. On October 4, 2019, an individual who was a teacher at a school, filed to run for the elected office of Seminole County Tax Collector in 2020, against Greenberg. *Id.* at ¶ 138. In retaliation, Greenberg caused nine letters to be sent to the teacher's school. The letters falsely represented that they were being sent by an anonymous "very concerned student" who had information that the teacher had engaged in sexual misconduct with a particular

student. *Id.* at ¶ 139. The following month, in November 2019, Greenberg set up a Facebook account that falsely claimed to belong to a "very concerned teacher" at the school. Using that account, Greenberg made similar false allegations to the ones previously made in his letters. *Id.* at ¶¶ 143-145. Further, he created an imposter Twitter account, using the name and photograph of his political opponent, without the teacher's knowledge or consent. Greenberg then published, using that account, a series of racially motivated posts that he falsely represented were being made by the teacher, and representing that the teacher was a racist. *Id.* at ¶ 142.

While he was stalking that victim, Greenberg continued with his fraud scheme. As part of this scheme, Greenberg continued to sell the cryptocurrency machines that he had purchased with Tax Collector's Office funds. In addition, Greenberg used some of the machines to mine cryptocurrency for himself. As part of those efforts, Greenberg used Tax Collector's Office funds to build a server room in his personal office, and he operated some of the machines at the Lake Mary branch. *Id.* at ¶ 134. Because of how those machines were daisy chained together at the Lake Mary branch, they started a fire that damaged the machines and the branch office. *Id.*

To conceal his scheme, Greenberg lied to the auditors about the purpose of Government Blockchain Systems, prepared a false Joint Venture Agreement that misrepresented the purpose and description of Government Blockchain Systems, and lied to his CFO about his purchases of cryptocurrency mining equipment. *Id.* at ¶¶ 131-132, 135. These lies also helped to conceal that Greenberg used his government credit card to purchase over $2,500 in sports memorabilia in January 2020, as evidenced by

the fact that internal Tax Collector's Office records misidentified those purchases as being related to purchases of cryptocurrency machines. *Id*. at ¶ 136. In summary, Greenberg's fraud scheme involving the Tax Collector's Office involved, among other things, lies to the CFO and the auditors, two false representation letters to the auditors, a secret bank account, another bank account controlled by him, over 90 separate transactions involving purchases of cryptocurrency, over 100 transactions involving purchases and sales of cryptocurrency machines, transfers of hundreds of thousands of dollars in layered transactions involving different financial accounts, a sham corporation that served as a front for his fraud, and the deposit of hundreds of thousands of dollars of cryptocurrency into wallets controlled by Greenberg over the course of over three years.

On June 19, 2020, Greenberg started another scheme. Greenberg's new scheme involved a conspiracy with an employee of the Small Business Administration (SBA) and another individual to submit false claims to SBA for Economic Injury Disaster Loans (EIDL), available under the CARES Act to businesses negatively affected by the COVID 19 pandemic. *See id*. at ¶¶ 148-181.  On June 20, 2020, a false application was submitted to the SBA for a $133,000 EIDL to Greenberg. *Id*. at ¶ 162. Before the loan was approved, on June 23, 2020, Greenberg was arrested for stalking. *Id*. at ¶ 167. But that did not deter Greenberg.

After he was released on pretrial supervision, Greenberg continued with his scheme, executing an SBA loan agreement for $133,000 only a day after he was ordered by a United States Magistrate Judge not to commit any new offenses. *Id*.

Greenberg and the SBA employee then continued conspiring to submit loan applications for two defunct business for which false information was provided about their revenues and numbers of employees. *See id.* at ¶¶ 168-178. As a result of the conspiracy, Greenberg received over $430,000, and between June and July 2020, he paid $16,000 of that to the individual who recruited him into the scheme, $3,000 of which was a kickback to the SBA employee. *Id.* at ¶¶ 179-180.

As of June 2020, Greenberg had been arrested and indicted for stalking and identity theft, and was aware that he was under federal investigation related to his investments at the Tax Collector's office. Around that time, Greenberg also learned that he was being investigated for his commercial sex acts with the minor. Despite his pending charges and the ongoing investigation, Greenberg persisted in his criminal conduct. Sometime after his arrest, Greenberg contacted the minor, directly and through one of the minor's friends to ask the minor to lie for him. *Id.* at ¶ 45. Greenberg requested that the minor claim that Greenberg looked the minor up in DAVID at the minor's request, which he knew was not true. He also asked the minor for help in making sure that their stories would corroborate one another's, because he knew that his commercial sex acts with her were illegal. *Id.*

As the investigation into Greenberg's crimes continued, Greenberg was charged via an Indictment, second superseding Indictment, and third (and final) superseding Indictment, on July 15, 2020, August 19, 2020, and March 30, 2021, respectively. Even still, while on conditions of pretrial release, to include electronic location monitoring and a curfew, Greenberg was undeterred from continuing to disregard the rules that

11

applied to him. On February 28, 2021, in direct violation of his curfew and location restrictions, Greenberg traveled to Jupiter, Florida. At that point, his supervision was revoked, and Greenberg was incarcerated as of March 3, 2021. *Id.* at ¶ 33.

## LEGAL MEMORANDUM AND ARGUMENT

### I.    Objections to the Presentence Investigation Report

The defendant has filed two objections to the Presentence Investigation Report (PSR), which remain unresolved, and which the United States opposes.[1] The defendant objected to the enhancements applied for Greenberg's use of sophisticated means (¶ 191) and use of a computer (¶ 197). All of the enhancements as scored in the final PSR are accurate and applicable as explained below.

### a.  Sophisticated Means – USSG § 2B1.1(b)(10)(C)

Under USSG §2B1.1(b)(10)(C), "[if] the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, increase by 2 levels." The application note explains:

> For purposes of subsection (b)(10)(C), "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

USSG § 2B1.1(b)(10)(C), comment. (n.9(B)).

---

[1] The defendant has withdrawn his objection to the application of the five-level increase pursuant to USSG § 4B1.5 – Repeat and Dangerous Sex Offender Against Minors, applied in paragraph 220 of the PSR.

Although the commentary for USSG § 2B1.1(b)(10)(C) lists out specific examples of schemes that may qualify as "sophisticated means," the Eleventh Circuit has made clear that this list of examples is not exhaustive. *See United States v. Clarke*, 562 F.3d 1158, 1165 (11th Cir. 2009) (explaining that a defendant need not use off shore accounts or transactions through fictitious entities for the sophisticated means enhancement to apply). The Eleventh Circuit has repeatedly held that the totality of the defendant's conduct should be considered in determining if the scheme involved sophisticated means. *United States v. Moran*, 778 F.3d 942, 977 (11th Cir. 2015) (stating that when determining if the defendant qualifies for the increase, the proper focus is on the offense conduct as a whole, not on each individual step."); *United States v. Barrington*, 648 F.3d 1178, 1199 (11th Cir. 2011) ("Each action by a defendant need not be sophisticated in order to support this enhancement. It is sufficient if the totality of the scheme was sophisticated.").

In *United States v. Feaster*, 798 F.3d 1374 (11th Cir. 2015), for example, the Eleventh Circuit upheld a sophisticated means enhancement after reviewing the totality of the defendant's conduct, even though that conduct did not match the examples in USSG § 2B1.1(b)(10)(C), comment. (n.9(B)). In *Feaster*, the defendant worked for the Department of Veterans Affairs (VA) and used her position to steal government funds. Each time the defendant stole VA funds she, "(1) prepar[ed] a fraudulent purchase order to obtain approval in the first place to use the Purchase Card, (2) [bought] gift cards with the Purchase Card, thereby building in another layer of concealment similar to the straw man or accounts under other names used in

Campbell and Clarke, to obscure her fraudulent personal purchases, and (3) [made] fictitious entries in the VA's system to reconcile the original purchase order with the amount of money that she charged to the Purchase Card to obtain payment for the charges that she fraudulently incurred." *Id.* at 1382. The defendant did these acts repeatedly throughout the scheme. *Id.* Further, the court noted that, "because of the design of the scheme and Feaster's proficiency in running it, the scheme went undetected for two years. *Id.*; *see also United States v. Moran*, 778 F.3d 942, 977 (11th Cir. 2015) (finding sophisticated means where "[t]he offense involved the widespread use of kickbacks, the falsification of group therapy notes, and the laundering of proceeds from the fraud").

Here, much like the defendant in *Feaster*, Greenberg utilized sophisticated means to carry out his schemes by using his position of trust to gain access to funds, setting up and using a secret bank account and another bank account controlled by him, layering financial transactions to disguise the source of the funds, lying on memo lines of checks and in internal documents and email about what he was doing, lying to auditors and to his CFO, altering his scheme to avoid detection, using a sham corporation as a front for his fraud, and depositing the proceeds of his scheme into cryptocurrency wallets controlled by him. In doing all of this, Greenberg was able to conceal his fraud, which involved hundreds of transactions, for over three years.

### b. Use of a Computer – USSG § 2G1.3(b)(3)(A)

Under USSG § 2G1.3(b)(3)(A), "[i]f the offense involved the use of a computer or an interactive computer service to persuade, induce, entice, coerce, or facilitate the

14

travel of, the minor to engage in prohibited sexual conduct," the offense level is increased by two levels. USSG §2G1.3, comment. (n.4) provides that this enhancement is intended to apply to "the use of a computer or interactive computer service to communicate directly with a minor or with a person who exercises custody, care, or supervisory control of the minor." However, courts, including the 11th Circuit, have reaffirmed that the enhancement applies even when a defendant or co-defendant used the computer to post information about a minor. *See United States v. Whyte*, 928 F. 3d 1317 (11th Cir. 2019) (following earlier precedent despite defendant's argument that the enhancement did not apply because the defendant did not communicate directly with the victim or a person having control over the victim).

In *United States v. Mathis*, 767 F.3d 1264, 1283 (11th Cir. 2014), *abrogated on other grounds by Lockhart v. United States,* 577 U.S. 347 (2016), the Eleventh Circuit held that defendant's use of a cell phone to call and send text messages constitutes use of a computer for purposes of an identical enhancement under §2G2.1(b)(6)). Persuasive case law from other circuits has held the same. The Eighth Circuit has held the same with respect to the enhancement under the applicable guideline, § 2G1.3. *See United States v. Kramer*, 631 F.3d 900, 902-05 (8th Cir. 2011). The Fifth and Sixth Circuits have upheld computer enhancements even though the messages were not overtly sexual, and the Second Circuit upheld the enhancement where the defendant used a computer to communicate with the minor in order to establish a relationship, even though he enticed her through other means. *See Untied States v. Phea*, 755 F.3d 255 (5th Cir. 2014) (nothing in (b)(3)(A) requires that the communications be sexual in nature);

*United States v. Lay*, 583 F.3d 436 (6th Cir. 2009) (finding that defendant intended to have prohibited sexual relations with a minor, even though the computer messages were not explicitly sexual); *United States v. Cramer*, 777 F.3d 597 (2d Cir. 2015) (defendant used computer to establish relationship, even though he enticed the minor through other means).

In this case, the defendant met the minor online for the purpose of engaging in commercial sex. Further, the defendant and the minor used their smartphones to call and text each other directly. Many of the calls and texts were for the purpose of scheduling times to meet to engage in prohibited sexual conduct. This is not a question of whether the defendant's use of a computer to contact others qualifies him for the enhancement. There is no ambiguity in the language of the enhancement, nor even in the application notes, that would call into question the intent behind the application of the enhancement. The defendant's conduct of using a computer to contact the minor directly and repeatedly to engage in prohibited sexual conduct falls squarely in the scope of conduct articulated by the guidelines.

That the Eleventh Circuit in *Whyte* has found the enhancement to apply in scenarios involving the use of a computer to contact a third party, and not to communicate directly with a minor or a person having control of the minor, is further support that the facts in this case warrant the application of the enhancement. The defendant has acknowledged that the enhancement "technically applies," but objects based on its "irrationality." The enhancement is appropriate both technically, and in principle.

16

## II.   18 U.S.C. § 3553(a)

### a.  The Nature and Circumstances of the Offense

The nature and circumstances of the offenses committed by Greenberg, which are set forth in the PSR and outlined above, weigh in favor of a guidelines sentence. *See* 18 U.S.C. § 3553(a)(1). Each of the offenses that Greenberg committed was extremely serious. As outlined above, the variety of criminal conduct which Greenberg committed, combined with the blatant and brazen abuse of the public trust, make Greenberg's offenses especially serious. Greenberg's offenses were pervasive, wide-spread, and fueled and facilitated by his position as an elected official. His actions tear at the fabric of fair government and the public trust therein. And his repeated violations of the law, despite his knowledge of a federal investigation, and even following his arrest, make each subsequent violation even more egregious.

### b.  The History and Characteristics of the Defendant

Greenberg's history and characteristics do little to help his cause and instead weigh in favor of a guidelines sentence.  18 U.S.C. § 3553(a)(1).  The PSR sets forth various aspects of the defendant's history and characteristics for the Court to consider—such as the defendant's family history, his emotional and mental health, employment and educational background, substance abuse history, and the like. Those are relevant factors to be sure. But the defendant's background is not like so many that come before this Court. In his favor, Greenberg has no prior criminal record. However, this is explained by his background. He was raised by two supportive parents, who gave him every opportunity to be successful, even in the face of any issues

17

that he may have had when he was young. His lack of criminal history before the age of 37 is unsurprising given his upbringing, and this should not be a mitigating factor. Greenberg has certainly made up for lost time by engaging in a nearly four-year, multi-faceted crime spree as the Tax Collector of Seminole County.

### c. Just Punishment, Adequate Deterrence, Respect for the Law, and Protection of the Public

A guidelines sentence is also necessary to meet the sentencing goals of adequate deterrence, respect for the law, protection of the public and just punishment in this case. The fact that some of Greenberg's offenses are economic crimes does not diminish the need for deterrence. *See United States v. Howard*, 28 F.4th 180, 209 (11th Cir. 2022) ("General deterrence is more apt, not less apt, in white collar crime cases. The reason is that economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, which makes them prime candidates for general deterrence.") (internal quotation marks omitted), *cert. denied sub nom. Bramwell v. United States*, No. 21-8092, 2022 WL 4653181 (U.S. Oct. 3, 2022).

The defendant's grab-bag of federal crimes in this case was ongoing, pervasive, and undeterrable. He was emboldened as an elected official, and he used the public trust to facilitate his crime spree: from sex trafficking of a minor, to wire fraud, to aggravated identity theft, in all of Greenberg's criminal conduct, he not only affected the immediate victims of the crimes, but he violated the public's trust in government. Greenberg remained undeterred from criminal conduct upon learning of the federal investigation into the Tax Collector's Office in April 2019. He remained undeterred

after he was arrested for and charged with stalking a political opponent in June 2020. And he was undeterred when released on conditions of pretrial release. It thus appears that the only thing that can be done to protect the public from Greenberg, and to deter him from future criminal conduct, is for him to remain in prison. This will serve to deter Greenberg from future criminal conduct, but will also send a message to others, that public officials are not above the law.

### III.    The Defendant's Cooperation

The defendant has accepted responsibility. As a result, he has received a three-level reduction in his offense level. PSR ¶¶ 221-222. The defendant's only mitigation worthy of a downward departure and/or variance in this case is as a result of his cooperation with the United States, which has been outlined fully in the substantial assistance motion (Doc. 154) and Sealed Supplemental Memorandum.

In summary, the defendant has provided truthful and timely information to the United States which, in part, resulted in the charging of: two individuals involved in a conspiracy to provide bribes and kickbacks to the defendant,[2] one individual involved in a conspiracy to submit false claims to the SBA and to bribe an SBA employee,[3] and one individual involved in a conspiracy to defraud the Tax Collector's Office.[4] In addition, the defendant has provided substantial assistance on other matters discussed in the sealed Supplemental Memorandum Regarding Defendant's Cooperation.

---

[2] *See United States v. Joseph Ellicott*, 6:22-cr-9-GAP-DAB and *United States v. Michael Shirley*, 6:22-cr-123-GAP-DCI.
[3] *See United States v. Teresa McIntyre*, 6:22-cr-78-WWB-EJK.
[4] *See United States v. Keith Ingersoll et al.*, 6:21-cr-123-GAP-EJK.

The United States has acknowledged the value added as a result of the defendant's cooperation, and to reflect the significance of his assistance, the United States has moved for a 10-level reduction in his offense level. This is however, where his mitigation and reasons for any type of reduction in offense level should end. Considering all of the above referenced information including (1) the nature and circumstances of the instant offenses, (2) the defendant's history and characteristics, and (3) the need for the sentence imposed to provide just punishment, adequate deterrence, respect for the law, and protection of the public, the United States respectfully submits that no downward variance is warranted.

### CONCLUSION

In light of the serious nature of the defendant's variety of offenses, his personal characteristics, the need to protect the public from his further crimes, just punishment, deterrence, and the need to promote respect for the law, the United States respectfully requests that this Court sentence the defendant to a guidelines sentence.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By:   */s/ Jennifer M. Harrington*
JENNIFER M. HARRINGTON
Assistant United States Attorney
Florida Bar No. 0117748
400 W. Washington Street, Suite 3100
Orlando, Florida 32801
Telephone:   (407) 648-7500
Facsimile:     (407) 648-7643
E-mail: jennifer.harrington2@usdoj.gov

**U.S. v. JOEL MICAH GREENBERG**      **Case No. 6:20-cr-97-GAP-LHP**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 15, 2022, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system, which will send a notice

of electronic filing to the following:

Fritz Scheller, Esq.
Attorney for the Defendant

*/s/ Jennifer M. Harrington*
JENNIFER M. HARRINGTON
Assistant United States Attorney
Florida Bar No. 0117748
400 W. Washington Street, Suite 3100
Orlando, Florida 32801
Telephone:    (407) 648-7500
Facsimile:     (407) 648-7643
E-mail: jennifer.harrington2@usdoj.gov
