UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.                                    Case No.  6:20-cr-97-GAP-LHP

JOEL GREENBERG,

     Defendant.

_____/

## DEFENDANT'S SUPPLEMENTAL SENTENCING MEMORANDUM

So this is how Mr. Greenberg's case ends. Not with finality, as many of the wicked escape, and not with reasoned deliberation, as facts and circumstances necessary to a just sentence are lost. Instead, Greenberg's case stumbles and limps to an unsatisfying end, colored by governmental denouement and its righteous indignation.

The Government's memorandum necessarily betrays its belief that Greenberg is nothing more than his criminal acts. And in this regard, Greenberg provides plenty of fodder. Emboldened by a litany of his misconduct, the Government's pleading begins with a listing of Greenberg's crimes, even referring to him as "a sex trafficker of a child" and ends with its customary call for the false security of a rigid guideline sentence – a punishment that is solely based on a defendant's crime. Thus, while the Government's memo may present a tale of sound and fury, it is a pleading plagued by its unwavering focus on Greenberg's

1

criminal conduct. This memorandum establishes that Supreme Court precedent and 18 U.S.C. § 3553 demand more.

## STATEMENT OF FACTS

### *Statutory Penalties and Advisory Guideline Calculation*

In the instant case, Greenberg faces a mandatory minimum sentence of 10-years as to Count 1 ("sex trafficking"), to be followed by Count 9's mandatory consecutive penalty of 2 years for aggravated identity theft. *See* 18 U.S.C. § 1591(b)(2) & 18 U.S.C § 1028A.

Greenberg's Presentence Report (PSR) calculates his total offense level as a 39 with a criminal history category of I. PSR at ¶¶ 223 & 228. Thus, Greenberg faces an advisory guideline sentencing range of 262 to 327 months of incarceration. *See* USSG Ch. 5, Pt A. The Government, however, has filed a motion for substantial assistance pursuant to 18 U.S.C. § 3553(e) and USSG § 5K1.1. *See* Doc. 154.

The Government's motion impacts Greenberg's sentencing exposure in two ways. First, because the motion is filed pursuant to § 3553 as to Count 1, its minimum mandatory no longer applies. Moreover, the Government's request for a 10-level departure, if granted, reduces Greenberg's offense level to a 29. Because of his criminal history category of 1, Mr. Greenberg would be facing 87 to 108 months of imprisonment. *See* USSG Ch. 5, Pt. A (Sentencing Table).

Unfortunately, that is not the end of the story on Greenberg's sentencing exposure. Because the Government has not moved to reduce for a departure as to

the minimum mandatory associated with Count 9, the 2-year mandatory consecutive penalty still applies. *See* Doc. 154 at 1, n.1. The Government is indeed a shrewd, if not unforgiving, actor in the context of federal sentencing. The Government's substantial assistance motion, whether intentional or not, facilitates its control over Greenberg's ultimate sentence. Of course, what is lost in the process is judicial discretion – a terrible price to pay for any defendant. Thankfully, the Government's claim to the sentencing throne is not absolute. Although this Court may not have discretion concerning the consecutive 2-year mandatory penalty, its discretion over the rest of Greenberg's sentence remains, including the amount of reduction that the Defendant receives for his substantial assistance. See *United States v. Pippin*, 903 F.2d 1478, 1485 (11th Cir. 1990)(stating that once the government makes a § 5K1.1 motion, the government has no control over the extent of the court's departure.).

## MEMORANDUM OF LAW

Although this case may implicate the tension between prosecutorial prerogative and judicial discretion in sentencing, a recent Supreme Court decision contemplates the superior role courts play in achieving justice at sentencing. *See Concepcion v. United States*, 142 S.Ct. 2389 (June 27, 2022). In *Concepcion,* the Supreme Court reaffirmed three principles of federal sentencing.

First, the Court concluded that "[t]here is a longstanding tradition in American law, dating back to the dawn of the Republic, that a judge at sentencing

considers the whole person before him or her "as an individual.'" *Concepcion*, 142 S.Ct. at 2395 (citing *Koon v. United States*, 518 U.S. 81, 113 (1996)). Thus, a court is unencumbered in its ability "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 53 (2007) (quotation omitted).

Pursuant to its commandment of individualized sentencing, the Court's second principle encourages a district court judge to exercise "'wide discretion in the sources and types of evidence used' to craft appropriate sentences." *Concepcion*, 142 S.Ct. at 2395-6 (quoting *Williams v. New York*, 337 U.S. 241, 246 (1949)). *See also Pepper,* 562 U.S. at 488 ("Permitting sentencing courts to consider the widest possible breadth of information about a defendant ensures that the punishment will suit not merely the offense but the individual defendant").

Finally, the third principle requires a sentencing court to consider the defendant as he appears before it on the day of his sentencing, "not on the date of his offense or the date of his conviction." *Id.* (citing *Pepper*, 562 U.S. at 492)).

Consistent with these three principles, § 3553(a) requires sentencing courts to consider not only the advisory Guidelines range, but also the facts of a specific case through the lens of seven factors as discussed below. *See* 18 U.S.C. § 3553(a)(1)-(7). The factors set forth under § 3553 recognize that a court should consider a broad range of information in determining a defendant's sentence.

Perhaps the most explicit recognition of this principle is found in the statutory requirement that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.[1]

These authorities contemplate the tenet that justice lies not in the limited tales the parties tell, but rather in the expansive narratives a court needs to hear. It is only through the latter mechanism that a court achieves an accurate and complete perspective in measuring a Defendant's life. Against the backdrop of the seven statutory factors, the Government's proposed sentence would necessarily violate the requirement that a defendant's sentence be sufficient but not greater than necessary to satisfy the purposes of § 3553(a). *See Pepper*, 562 U.S. at 476 (a "sentencing judge's overarching duty under § 3553(a) [is to] to impose a sentence sufficient, but not greater than necessary").

## 1. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

By linking a defendant's criminal conduct with his personal history and characteristics, the first § 3553(a) factor comprehends that a defendant's criminal conduct should not be considered in isolation or even as the paramount sentencing

---

[1] The Supreme Court has contrasted the different limitations on presentation of evidence at trial and sentencing: "Highly relevant—if not essential to [the judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Williams*, 337 U.S. at 247.

factor. *See*, *e.g.*, *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006)(Rakoff, J.). In this way, the first factor recognizes that every case contains a narrative of "human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon*, 518 U.S. at 113.

The Government is entirely correct that Greenberg's conduct was serious. Indeed, it spends the bulk of its memo (at least 11 pages) telling us how bad it was. If Greenberg's sentence was to be solely based on the Government's recitation of his criminal conduct, then a guideline sentence would be appropriate. But of course, § 3553(a) is not founded on a single consideration.[2] And the reason for that can be seen in Greenberg's case. To be sure, moving from a sole focus on Greenberg's crime to a broader consideration of his history and characteristics, as well as the other § 3553(a) factors, provides a more accurate and just examination. Although Greenberg's conduct was serious, there are certain mitigating factors found in the offenses themselves and in the factors that compelled him to commit his crimes.

The Government's memorandum spends little time on Greenberg's sex offense. *See* Doc. 161 at 2. Devoting a mere paragraph in an 11-page description of

---

[2] A problem with the Government's sentencing memorandum, although well-written, is its overemphasis on Greenberg's offense conduct. While highly relevant of course, focusing mainly on the Defendant's crimes results in a biased and limited narrative under 18 U.S.C. § 3553. Such a biased and limited narrative has a profound and negative impact on decision-making. *See*, *e.g.*, Akira Kurosawa, *Rashomon* (Daiei Films release on Dec. 26, 1951 in the U.S.).

Greenberg's seems surprising since this charge carries a 10-year minimum mandatory penalty and is the driving force behind his high guideline range. *See Section* 4, infra. Such sparse treatment reveals the Government's recognition that this charge is the most defensible of Greenberg's offenses.

Greenberg's conviction for sex trafficking of a minor is based on a set of facts that indicate the broad reach of the sex trafficking statute. *See* 18 U.S.C. § 1951.[3] Because the statute is based essentially on strict liability, its reach extends to all offenders, regardless of their actual knowledge of the victim's age. Notably, the prior version of the statute predicated liability on the defendant's knowledge of the minor's age. *See* 18 U.S.C. § 1591 (2008).[4] The minor in question was on the brink of turning 18. She certainly appeared that she was over 18. Moreover, she had posted an escort profile on the website "Seeking Arrangements" in which she claimed she was over 18 years old. Finally, the website itself, which facilitated "sugar daddy" arrangements, cautioned that the escorts and the customers had to be over 18.

While Greenberg is certainly guilty of a § 1591 offense, his conduct does not

---

[3] The statute states that in cases involving the solicitation of a minor, the Government need only prove that "the defendant had a reasonable opportunity to observe the person so recruited . . ." and thus "the Government need not prove that the defendant knew, or recklessly disregarded the fact, that the person had not attained the age of 18 years." 18 U.S.C. § 1591(c)

[4] The 2008 version of § 1591 stated, in pertinent part, that the Defendant committed the offense if he knew the Defendant had not reached the age of 18.

depict the type of the offender that the statute is designed to reach. That is, the offender that knowingly preys on children. Nevertheless, his § 1591 conviction is the offense that sets the highest penalties, both under the statutes and the guidelines.

Turning to his other conduct, Greenberg appreciates the seriousness of his crimes. Based on such a recognition, he has been trying to make amends through cooperation and the payment of restitution. Nevertheless, the Government emphasizes the uncontrollable and pervasive nature of Greenberg's "crime spree." Doc. 161 at 1-11. While the Government's depiction is depressingly accurate, it ignores the factors that led to Greenberg's uncontrollable conduct. Such factors, rooted in Greenberg's history and characteristics, provide insight into his culpability.[5]

The Defendant's culpability in the instant case is mitigated to a degree by his struggles with mental illness. A review of Greenberg's medical records establishes a long-standing history of mental illness.

Significantly, Greenberg's struggles with mental illness began early his in his life. *See* PSR at 248. At the age of 7, he was diagnosed with ADHD. *See id.*; *see also*

---

[5] The degree of a defendant's culpability in committing his crime is generally assessed according to "his or her degree of intent (mens rea), motives, role in the offense, and mental illness or diminished capacity." Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (Feb. 2005).

*Report of Dr. Jeffrey Danziger* ('*Report*"), included in the PSR, at 3-4. From this difficult beginning, Greenberg continued to be treated throughout his childhood and teenage years through adulthood. *See Report* at 3-4. From an early age through his adult life, Greenberg was diagnosed with ADHD, panic attacks, depressive and anxiety disorders. *Id.* Significantly, he was under psychiatric treatment during the time of his pervasive criminal conduct. *Id*. at 4.

During the time of his criminal conduct, the Defendant's mother, Susan Greenberg, who has a master's degree in mental health counseling, states that her son was exhibiting manic behavior and was confronted by Mrs. Greenberg and her husband about his behavior. *See* PSR at 250. "Upon reflection, Mrs. Greenberg believes it is possible that his medications were not being properly managed. This situation, along with his mental health conditions, could have led to a deterioration in his ability to make sound decisions." *Id.* Mrs. Greenberg's description echoes the findings of Dr. Jeffrey Danziger.

In conducting his evaluation of Greenberg, Dr. Danziger[6] used numerous sources, including: 1) three interviews with the Defendant; 2) a review of the Defendant's medical records; 3) psychological testing; and 4) interviews of collateral sources. Dr. Danziger also reviewed the relevant court documents, including Greenberg's lengthy plea agreement, as well as the scientific research

---

[6] Dr. Jeffrey Danziger, a renowned psychiatrist, has testified as an expert in both federal and state courts for both the prosecution and the defense.

concerning the significant impact of stimulant use, including Adderall, on bipolar disorder. Based on his extensive examination, Dr. Danziger determined that Greenberg suffered from Bipolar Disorder Type 1[7] at the time of his offense. *See Report* at 14. Dr. Danziger opines:

> During that timeframe Joel Greenberg was engaged in the various problematic behaviors for which he was indicted, and to which he subsequently pled guilty to, he was suffering from active symptoms of a severe mental illness, bipolar disorder, with symptoms of mania interfering with his judgment, reasoning, and impulse control. While it is my opinion Mr. Greenberg would fall short of the strict Federal criteria for insanity, at the time of these incidents Mr. Greenberg, through the prism of his manic mindset, was able to rationalize and justify what he was doing, thinking he could explain it away and others would eventually agree with him, while focused on the pleasure and the immediate gratification of the moment. It is my opinion the manic episodes are to a substantial extent iatrogenic in nature, as he was receiving treatment with stimulants that was not only unhelpful, but instead was causing him harm by provoking the exacerbations of mania.

Report at ¶ 81. Dr. Danziger further concludes that Greenberg committed his crimes "while he was suffering from a significantly reduced mental capacity, with the gross impairment in judgment, reasoning, and impulse control associated with the manic and bipolar symptomatology." *Id*. at ¶ 82. Thus, Dr. Danziger asserts that "Greenberg's ability to understand the wrongfulness of the behavior comprising the offense, his ability to exercise the power of reason, and his impairment in impulse control impacting his ability to control wrongful behavior,

---

[7] According to the DSM-V, Bipolar Disorder Type 1 is characterized by one or more manic episodes. *See* American Psychiatric Society, *DSM-V,* at 126 (2013).

was all significantly impaired by his severe mental illness." *Id.*

Dr. Danziger's conclusion that Greenberg's criminal actions were impacted by his bipolar disorder are consistent with the manifestations of that mental illness. The Diagnostic and Statistical Manual of Mental Disorders ("DSM-V") notes that Bipolar Disorder Type I is "sufficiently severe to cause marked impairment in social or occupational functioning or to necessitate hospitalization to prevent harm to self or others, or there are psychotic features." *See* American Psychiatric Society, *DSM-V,* at 124 (2013). Furthermore, Dr. Danziger's findings are further supported by the circumstances surrounding Greenberg's manic and uncontrollable behavior in this case.

An examination of Greenberg's culpability is the point where the interplay between a defendant's criminal acts and his history and characteristics is particularly relevant. Greenberg's criminal conduct was not merely the result of untreated bipolar disorder, but also a mental illness whose effects were exacerbated by prescribed stimulants including amphetamines. Such a perspective explains why an individual, with no criminal history, can suddenly engage in a series of criminal acts. While the Government paints Greenberg as sinner suddenly embarking in uncontrollable and brazen crime spree, it fails to appreciate that Greenberg was sinner because of the mental illness he suffered. Robert Louis Stevenson, *The Strange Case of Dr. Jekyll and Mr. Hyde,* (Longman, Green & Co

1886)("If I am the chief of sinners, I am the chief of sufferers also.").[8]

Finally, a significant aspect that this Court should consider in sentencing Mr. Greenberg is his post-offense rehabilitation. *See, e.g.*, *Pepper*, 562 U.S. at 492 (citation omitted); *United States v. Clay*, 483 F.3d 739, 745 (11th Cir. 2007)("The departure for post offense rehabilitation reflects that, unlike some other defendants, [the Defendant] has fundamentally changed since his offense, poses a lesser risk to the community, and does not require incarceration for too long."); *Gall*, 552 U.S. at 59. Since his indictment, Greenberg has embarked on a difficult path toward rehabilitation, if not redemption. Although he has stumbled along the way, he stands before this Court a different person than he was some two years ago. He is on the right and appropriate medication. He has provided significant substantial assistance to the Government in the areas of public corruption, election fraud, wire fraud, and sex trafficking. Moreover, he will continue to provide substantial assistance to Seminole County after his sentencing without any request or expectation of any consideration. Finally, he has facilitated the payment of restitution to Seminole County for the fraud he perpetuated on its citizens.

While these efforts can never excuse Greenberg's actions, they do demonstrate that Greenberg has not only attempted to make amends, but also is

---

[8] To its credit, the Government admits that these are relevant factors for the Court's consideration. Doc. 161 at 17. Mr. Greenberg agrees.

on a rehabilitative and redemptive path.[9] To the extent that *Pepper* has any force, then the Greenberg who committed his crimes may be subject to the Government's antipathy, but the Greenberg as he appears today is worthy of this Court's mercy.

## 2. The Need for the Sentence Imposed

### A. *To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense*

In imposing a just sentence, this Court should consider the significant punishment resulting from the collateral consequences of Greenberg's felony conviction. Considering such collateral consequences is consistent with the statutory requirement that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. *See also Concepcion*, 142 S. Ct. at 2396 ("It is only when Congress or the Constitution limits the scope of information that a district court may consider in deciding whether, and to what extent, to modify a sentence, that a district court's discretion to consider information is restrained.").

---

[9] In emphasizing Greenberg's criminal past at the expense of his rehabilitation, the Government necessarily ignores the significance of redemption in human life -- a concept that is the core of religious belief and literary narrative, and which has taken root in the hearts of our political leaders. *See* Victor Hugo, *Les Miserables* (1862); Fyodor Dostoevsky, *Crime and Punishment* (1862); *Tyler Jett*, *Kamla Harris Talks Criminal Justice Reform with Former Inmates in Iowa,* Des Moines Register (Nov. 26, 2019)(discussing Vice President Harris' recognition of the role of redemption in the criminal justice system).

Prior to the instant offense, Greenberg had no felony record. Based on his felony conviction, Greenberg now faces an overwhelming number of collateral consequences. A congressional report authored by the United States Government Accountability Office (GAO) demonstrates that there are 641 collateral consequences of a nonviolent felony conviction. *See* GAO Report 17-691, NONVIOLENT DRUG CONVICTIONS, *Stakeholders Views on Potential, Actions to Address Collateral Consequences*, (Sept. 2017), summary excerpt attached hereto as Exhibit 1. Of these 641 collateral consequences, 497 (78%) of them may last a lifetime. *See id*. To be sure, "[t]he United States has a uniquely extensive and debilitating web of collateral consequences that continue to punish and stigmatize individuals with criminal records long after the completion of their sentences." U.S. Comm'n on Civil Rights, *Collateral Consequences, The Crossroads of Punishment, Redemption, and the Effects on Communities,* Executive Summary (June, 2019)("[I]ndividuals with criminal histories can face barriers to voting, serving on a jury, holding public office, securing employment, obtaining housing, receiving public assistance, owning a firearm, getting a driver's license, qualifying for financial aid and college admission, qualifying for military service, and deportation (for noncitizens)"), attached hereto as Exhibit 2.

Recognizing the effect of collateral consequences of a felony conviction, courts have emphasized the need for federal judges to account for such an impact at sentencing. *United States v. Nesbeth*, 188 F. Supp. 3d 179, 180 (E.D.N.Y.

2016)(Block, J.)(varying downward from guideline range of 33 to 44 months imprisonment to one-year of probation based in part on the number of statutory and regulatory consequences resulting from a felony conviction). *Nesbeth* establishes that the civil death that Greenberg now faces due to his conviction constitutes significant punishment. *See also United States v. Stewart*, 590 F.3d 93, 141-142 (2d Cir. 2009)("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence"). Wayne A. Logan, *Informal Collateral Consequences,* 88 Washington Law Review 1103 (2013)("Today, convict status serves as a perpetual badge of infamy, even serving to impugn reputation beyond the grave.").

Furthermore, two aspects of Greenberg's case make the collateral consequences of his conviction particularly harsh. Despite the significant mitigating circumstances surrounding his felony conviction, Greenberg will be a convicted sex offender for the rest of his life. This is a particularly harsh punishment. *United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (noting it was appropriate for the district court to consider, under § 3553(a), the "lasting effects of being required to register as a sex offender"). Under the Sex Offender and Registry and Notification Act (SORNA), Greenberg will be forced to:

> register as a sex offender . . . at least once a year; report any change of address within as little as three days; produce vehicle information, a recent photograph and a DNA sample; and abide by stringent residency restrictions, which can force individuals out of urban areas, away from family and into unemployment.

Jesse Kelly, *The Sex Offender Registry: Vengeful, Unconstitutional and Due for Full Repeal*, The Hill (March 5, 2018).

In addition to the burden attendant to his status as a convicted sex offender, Greenberg will be punished for the rest of his life with the social stigma of being a sex offender ("a sex trafficker of a child'), notwithstanding the unique circumstances of his case. *See United States v. Wachowiak,* 412 F.Supp.2d 958, 963-64 (E.D. Wisc. 2006), *aff'd,* 496 F.3d 744 (7th Cir. 2007)("The guidelines failed to account for the significant collateral consequences defendant suffered as a result of his conviction," including the stigma of being forced to live as a convicted sex offender). Such a stigma or public ruin is particularly harsh in Greenberg's case based on the intense media coverage his case has received.

### B. *To afford adequate deterrence to criminal conduct*

The preceding established that lengthy prison sentence is not necessary to accomplish just sentencing. In turn, this section addresses the question of whether a long prison sentence will accomplish the § 3553 factor of deterrence. Such an analysis requires an analysis of both general and specific deterrence.

### 1. General Deterrence

The principle of general deterrence is based on the premise that lengthy prison sentences deter crime. Not surprisingly then, federal prosecutors consistently argue the factor of general deterrence in support of guideline sentences. And why wouldn't they? If you consistently assert that prison sentences

are not only necessary to punish the Defendant but also needed to prevent crimes, then you gain strong support for guideline sentences that mandate imprisonment. The troubling aspect of the premise that incarceration deters crime is that it is utterly wrong and has led to mass incarceration. *See* Dr. Oliver Roeder et al., *What Caused the Crime Decline*?, Brennan Center for Just., 22-23 (Feb. 12, 2015). The condition of mass incarceration is especially disturbing since there is no correlation between punishment and reductions in crime. *See id; see also* Gary Kleck and J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks: Is There a "Collective Wisdom"*?, 59 Crime & Delinquency 1006, 1031-33 (2013)(concluding that "increases in punishment levels do not routinely reduce crime through general deterrence mechanisms, because the fundamental link between punishment levels and perceptions of punishment levels appears to be weak to nonexistent").

What is even more disturbing, if not hypocritical, about a federal prosecutor's fervent embrace of general deterrence is that such a posture contradicts his employer's position on the matter. Indeed, the Department of Justice (DOJ) agrees with the conclusion that incarcerating defendants is not an effective means of deterrence. *See* U.S. Dept. of Justice, Nat'l Inst. of Justice, *Five Things About Deterrence* (July 2014), attached hereto as Exhibit 3. In fact, the DOJ finds that even increasing the severity of punishment does little to deter punishment. *See id.*; *see also* Hannah Arendt, *Eichmann in Jerusalem*, Epilogue

(1963)("No punishment has ever possessed enough power of deterrence to prevent the commission of crimes."). Rather, arrests and prosecutions deter crime. *See id.*

The principle that arrests and prosecutions deter crime begs an essential question in the instant case. If the Government is so concerned with general deterrence, then why hasn't it prosecuted the other individuals, including public figures, who were also involved in Greenberg's offenses? Indeed, Greenberg's plea agreement refers to the involvement of multiple co-conspirators including individuals involved in his sex offense. The identification of these potential co-conspirators was not only provided by Mr. Greenberg in his numerous proffers, but also has been collaborated by other witnesses and records. Unfortunately, at the time of Greenberg's sentencing, many of these individuals have not been held to account.[10] Such a lack of prosecutions, which is the most powerful form of deterrence according to the DOJ, indicates that the Government's reliance on this factor rings hollow.

### 2. *Specific Deterrence*

Having established that prison sentences, regardless of length, has no

---

[10] The United States Attorney's Office for the Middle District of Florida is the only DOJ office to have brought multiple prosecutions based on Greenberg's cooperation. Perhaps the DOJ in Washington is still moving forward on its prosecutions. Perhaps the DOJ will return the prosecutions to the capable hands of U.S. Attorneys in the Middle District or the State of Florida. Perhaps the DOJ will appoint a special counsel to address those individuals that implicate broader national concerns. Perhaps the DOJ are master strategists far beyond the capabilities of the undersigned. Or perhaps the DOJ is like Nero fiddling away as Rome burns.

impact on general deterrence, this section demonstrates that the factor of specific deterrence also supports Greenberg's request for a variance.

a. *The relationship between incarceration and recidivism*

As in the case of general deterrence, the empirical evidence does not establish a relationship between sentence length and specific deterrence, regardless of the type of crime. *See* National Institute of Corrections*, Myths and Facts, Why Incarceration is Not the Best Way to Keep Communities Safe* (2016), attached hereto as Exhibit 4. To be sure, the best available evidence establishes that imprisonment does not reduce recidivism more than noncustodial sanctions. Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011). There is strong evidence that prison actually contributes to increased recidivism. *See Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002,* 6 Criminology & Public Policy 589 (2007).

Thus, the most effective way to promote public safety and ensure that convicted persons can lead law-abiding lives is through broad use of non-incarceration sentences, especially since "incarceration does little to change a person's behavior" and persons sentenced to prison have higher recidivism rates than those sentenced to community corrections.  Ex. 4 at 1, 4. *see also* Friedrich Nietzsche, *The Genealogy of Morals*, essay 2, aph. 14 (1887)("All in all, punishment hardens and renders people more insensible; it concentrates; it

increases the feeling of estrangement; it strengthens the power of resistance.").

      b.    *Mr. Greenberg's low risk of recidivism*

Against this backdrop, the likelihood that the defendant "will engage in future criminal conduct [is] a central factor that district courts must assess when imposing sentence." *Pepper,* 562 U.S. at 492. As the PSR notes, Mr. Greenberg has no criminal history points and thus is in a Criminal History Category 1. *See* PSR at ¶ 228. Recently, the Sentencing Commission concluded that recidivism data demonstrates that "first offenders" generally pose the lowest risk of recidivism. *See*, *e.g*., U.S. Sent. Comm'n, "Recidivism Among Federal Offenders: A Comprehensive Overview," at 18 (2016), available at http://www.ussc.gov/research/research-publications/recidivism-among-federal-offenders-comprehensive-overview. Accordingly, it has proposed lowering the guideline levels for such offenders.

      C.    *To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment*

Based on his education, work history and health, Greenberg does not require educational, vocational or treatment programs in the BOP. He does, however, require substance abuse treatment.

**3.    The Kinds of Sentences Available**

With the filing of the Government's motion for departure under § 3553(a), a sentence below the 10-year minimum mandatory and the advisory guideline range is permissible. As previously discussed, however, this Court must impose the 2-year consecutive penalty to sentence determined by the guidelines.

### 4. The Kinds of Sentences and the Guideline Sentencing Range Established

As recognized in *Gall*, district courts "may not presume that the Guidelines range is reasonable." 552 U.S. at 49. Thus, mitigating circumstances and substantive policy arguments that were formerly irrelevant in all, but the most unusual cases, are now potentially relevant in every case. The guidelines pose a particular risk in Greenberg's case for a more elemental reason – they falsely provide a promise of predictability and fairness.

Because we believe the guidelines to be the product of great deliberation and reasoned judgment, we use the guidelines to relieve us of the burden and uncertainty of having to decide a just sentence for every defendant.[11] In the process, we sacrifice individual consideration on the altar of consistency.[12] But such a sacrifice is undeserved since the guidelines often perpetuate injustice in demanding sentencing results that are wrong.

In the instant case, the limitations, as well as the absurdity, of the guidelines is apparent. Greenberg's guideline level (39) is primarily driven by his sex offense

---

[11] At its core, the rigid matrix of the sentencing guidelines demonstrates the deeply rooted human aversion to uncertainty and ambiguity. *See*, *e.g*, Maria Konnikova, *Why We Need Answers*, The New Yorker (Apr. 30, 2013). Because of our distress with the unknown and uncertain, we seek to achieve "cognitive closure" defined as the "desire for a firm answer to a question and an aversion to ambiguity." *Id*. (citing Dr. Arie Kruglanski, *Motivated Closing of the Mind*, Psych. Rev., at 263-83 (Apr. 1996)).

[12] "[C]onsistency is the last refuge of the unimaginative." Oscar Wilde, *The Relation of Dress to Art: A Note in Black and White on Mr. Whistler's Lecture*, *Pall Mall Gazette*, Feb. 28, 1885.

conviction. *See* USSG §§ 2G1.3 4B1.5(b)(1). Again, the victim in this offense misrepresented herself as 19-years old on the website "Seeking Arrangements," since the website stated that the escorts and the customers had to be at least 18-years old.

Notwithstanding these set of facts, Greenberg's base level is set at level 30 for his conviction under 18 U.S.C. § 1591 since it is essentially a strict liability offense. *See* PSR at 196. Consequently, Greenberg is being treated the same as more serious offenders, including pedophiles, who target children for sex. In this regard, Greenberg's case illustrates that the guidelines' quest for sentencing uniformity may pose a greater risk than the danger of sentencing disparity that the guidelines seek to eliminate.

Turning to the enhancements, an examination of their application further underscores the irrationality of the guidelines. After lying about her age, the victim posted her web profile on "Seeking Arrangements" to offer her escort services to Greenberg and others. The victim contacted Greenberg first to offer and arrange her escort services to Greenberg and to other identified, but uncharged, men. Despite her actions, Greenberg's guideline calculation is increased by two levels for the use of a computer (including a cellular telephone) to persuade or entice the minor. *See* PSR 197. In the modern age, the application of the computer enhancement is absurd since it applies in virtually every case. *See, e.g.*, *United States v. Kelly*, 868 F.Supp.2d 1202 (D.N.M. 2012)(stating in a child pornography

case that "[a]s widespread as computer use is now, enhancing for use of the computer is a little like penalizing speeding, but then adding an extra penalty if a car is involved").

The irrationality of the guidelines is further underscored by the 2-level enhancement that Greenberg receives for engaging in a commercial sex act and an additional 5 levels that he receives because he engaged in such sexual acts more than once. *See* USSG §§ 2G1.3(4)(A) and 4B1.5. While these enhancements do apply, their application demonstrates the problem of using a rigid matrix to set punishments regardless of the circumstances of the offense.

Admittedly, however, the guidelines do offer some relief for Greenberg. *See* USSG § 5K2.10 ("If the victim's wrongful conduct contributed significantly to provoking the offense behavior, the court may reduce the sentence below the guideline range to reflect the nature and circumstances of the offense"). Although § 5K2.10 specifies that it ordinarily does not apply in sex offenses, the mitigating and unique circumstances of Greenberg's sex offense support such a reduction. Additionally, recognizing that a defendant's culpability is mitigated by his mental illness, the federal sentencing guidelines authorize departures based on a defendant's diminished capacity. *See* USSG § 5K2.13.

In the end, the threat that the guidelines pose for Greenberg is that they, with their unwarranted facade of certainty, cannot account for the unique factors which support his requested variance. As this Court has noted:

> Criminal behavior can fuel public outcry and drive broad legislative and executive agendas to get "tough on crime." But how does that translate to specific instances? If you take a matrix to factor offense severity, overlay it with mandates born of popular outrage, and tailor it purportedly to address almost every eventuality, you get "justice" dictated in advance, marked by visceral condemnation, and based on the pretense of omniscience.

*United States v. Williams*, 372 F.Supp.2d 1335, 1337-1338 (M.D. Fla. 2005)(Presnell, J.).[13]

## 5.     Any Pertinent Sentencing Commission Policy Statements

Because the Sentencing Commission has recognized the low recidivism rates of first-time offenders, it has proposed lowering the guideline levels for such offenders. *See* U.S. Sent'g Comm'n, *Proposed Amendments to the Sentencing Guidelines*, at 1-4 (Dec. 19, 2016).

## 6.     The Need to Avoid Unwarranted Sentence Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct.

Regarding the goal of avoiding unwarranted disparity, it is difficult to locate a comparable sex offense to Greenberg's case based on the latter's unique circumstances. Fortunately, the Government's memorandum seems to focus on Greenberg's fraud offenses. This provides two advantages. First, the guidelines for his fraud offenses are much lower than his sex offenses. More importantly, there is sufficient material in comparing those type of cases with Greenberg's case. Such a

---

[13] Although *Williams* was reversed by the Eleventh Circuit in *United States v. Williams*, 456 F.3d 1353 (11th Cir. 2006), the Eleventh Circuit's decision was overruled by the United States Supreme Court. *See Kimbrough v. United States*, 552 U.S. 1353 (2007).

comparison indicates that the disparity factor supports Greenberg's request for variance. To support this tenet, exhibit 5 provides charts of fraud cases both nationally and in the Eleventh Circuit, many of which involved losses far greater than the alleged loss in this case. In *United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008), Judge Block took a similar collection of cases into account in imposing variances for two securities fraud offenders

## 7.  The Need to Provide Restitution to Any Victims of the Offense.

The Eleventh Circuit has concluded that "[re]stitution [is] an important component in providing punishment for the offense." *United States v. Montgomery*, 165 Fed.Appx. 840, 843 (11th Cir. 2006)(unpublished); *see also* 18 U.S.C. §3553(a)(7). Although Greenberg has satisfied his restitution obligation with Seminole County, he still owes restitution to the SBA. A shorter prison sentence will allow Greenberg to make restitution. *See also United States v. Rangel*, 697 F.3d 795, 803-04 (9th Cir. 2012)("[T]he district court's goal of obtaining restitution for the victims of Defendant's offense, 18 U.S.C. § 3553(a)(7), is better served by a non-incarcerated and employed defendant.")(citation omitted).

## CONCLUSION

An advisory guideline sentence is not only antagonistic to § 3553(a), but also violates *Koon's* holding that a court must consider the individual defendant and the unique circumstances that mitigate the crime and punishment to ensue.

/s/ Fritz Scheller
Fritz Scheller
Florida Bar Number 183113

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel in this case on November 27, 2019.

/s/ Fritz Scheller
Fritz Scheller
Florida Bar Number 183113
Fritz Scheller, P.L.
200 East Robinson, Suite 1150
Orlando, Florida 32801
Telephone 407-792-1285
Facsimile 407-649-1657
Email: fscheller@flusalaw.com
Attorney for Defendant Brannon Rue