# EXHIBIT 2

# Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities

**Briefing Before**
**The United States Commission on Civil Rights**
**Held in Washington, DC**

**Briefing Report**

**June 2019**

## Executive Summary

More than 620,000 people are released from federal and state prisons each year and return to their communities.[1] This substantial number is nearly equivalent to the population of Boston annually.[2] While these and other individuals have already served their prison or jail sentences, are currently serving probation or parole, or have completely exited criminal supervision, they still face numerous collateral consequences of their conviction or criminal history upon reentering society.[3] According to the National Institute of Justice, more than 44,000 collateral consequences exist nationwide.[4] These include civil law sanctions, restrictions, or disqualifications that attach to a person because of the person's criminal history and can affect the person's ability to function and participate in society.[5] For example, individuals with criminal histories can face barriers to voting,[6] serving on a jury,[7] holding public office,[8] securing employment,[9] obtaining housing,[10] receiving public assistance,[11] owning a firearm,[12] getting a driver's license,[13] qualifying for financial aid and

---

[1] E. Ann Carson, *Prisoners in 2016*, U.S. Dep't of Justice, Bureau of Justice Statistics, 2018, at 10, https://www.bjs.gov/content/pub/pdf/p16.pdf; Kate Walz and Marie Claire Tran-Leung, The Sargent Shriver National Center on Poverty Law, Written Statement for the *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* Briefing before the U.S. Commission on Civil Rights, May 19, 2017, at 2-3 [*hereinafter* Walz and Tran-Leung Statement].

[2] U.S. Census Bureau, "Quick Facts: Boston city, Massachusetts," July 1, 2017, https://www.census.gov/quickfacts/bostoncitymassachusetts (estimating the mid-2017 population of Boston as 685,094 people).

[3] Margaret Love, Written Statement for the *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* Briefing before the U.S. Commission on Civil Rights, May 19, 2017, at 4 [*hereinafter* Love Statement].

[4] Council of State Governments, "The National Inventory of the Collateral Consequences of Conviction," https://niccc.csgjusticecenter.org/about/ (last accessed Nov. 24, 2018) [*hereinafter* CSG, "The National Inventory of the Collateral Consequences of Conviction"].

[5] Sarah B. Berson, National Institute of Justice, "Beyond the Sentence—Understanding Collateral Consequences," *National Institute of Justice Journal*, no. 272, at 25, https://www.ncjrs.gov/pdffiles1/nij/241924.pdf.

[6] *See* Chapter 3, "Voting," *infra* notes 625-889.

[7] *See* Chapter 3, "Jury Service," *infra* notes 890-955.

[8] Michael Campagna, Cheyenne Foster, Stephanie Karas, Mary K. Stohr, Craig Hemmens, "Restrictions on the Citizenship Rights of Felons: Barriers to Successful Reintegration," *Journal of Law and Criminal Justice*, vol. 4, no. 1 (2016), 24, 25, http://jlcjnet.com/journals/jlcj/Vol_4_No_1_June_2016/2.pdf.

[9] *See* Chapter 2, "How a Criminal Record Can Affect Employment Opportunities," *infra* notes 222-409. *See also* U.S. Commission on Civil Rights, *Assessing the Impact of Criminal Background Checks and the Equal Employment Opportunity Commission's Conviction Records Policy*, 2013 [*hereinafter* USCCR, *2013 Briefing Report*], http://www.eusccr.com/EEOC_final_2013.pdf.

[10] *See* Chapter 2, "How a Criminal Record Can Affect Housing Opportunities," *infra* notes 410-525.

[11] *See* Chapter 2, "How a Criminal Record Can Affect Access to Public Benefits," *infra* notes 526-624.

[12] 18 U.S.C. § 922(d)(1); *see also* U.S. Dep't of Justice, *Federal Statutes Imposing Collateral Consequences Upon Conviction*, 2000, at 15-20, https://www.justice.gov/sites/default/files/pardon/legacy/2006/11/13/collateral_consequences.pdf.

[13] *See, e.g.,* 23 U.S.C. § 159 (withholding federal funding from any state that does not revoke or suspend the driver's licenses of individuals convicted of drug offenses); *see also* Grace Sankey-Berman, Written Statement for the *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* Briefing before the U.S. Commission on Civil Rights, April 24, 2017, at 1 (indicating that the "most critical of these barriers is access to ID credentials, vital documents that are essential for the successful transition of individuals from prison

college admission,[14] qualifying for military service,[15] and deportation (for noncitizens).[16] As one scholar noted, "the United States has a uniquely extensive and debilitating web of collateral consequences that continue to punish and stigmatize individuals with criminal records long after the completion of their sentences."[17]

The United States has the largest incarcerated population in the world, with about 2.2 million people confined to prisons and jails.[18] The country with the second-largest prison population is China, which incarcerates about 1.7 million individuals.[19] The United States also has the highest per capita rate of incarceration worldwide (670 per 100,000 people), followed by Rwanda (434 per 100,000), Russia (413 per 100,000), and Brazil (325 per 100,000).[20] These calculations do not account for the number of adults under correctional supervision, which includes not only those imprisoned but also on probation or parole; as of December 2016, about 6.6 million people in the U.S. were under correctional supervision.[21] Collectively, at least 70 to 100 million people nationwide are currently or will be affected by the collateral consequences of incarceration, arrest,

---

to the community") [*hereinafter* Sankey-Berman Statement]; Vikrant Reddy, Written Statement for the *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* Briefing before the U.S. Commission on Civil Rights, May 19, 2017, at 3-4 [*hereinafter* Reddy Statement]; Marc Levin, Written Statement for the *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* Briefing before the U.S. Commission on Civil Rights, May 19, 2017, at 1-6 [*hereinafter* Levin Statement].

[14] *See* Chapter 2, "Barriers to Financial Aid for Higher Education," *infra* notes 587-624.

[15] 10 U.S.C. § 504(a) (prohibiting any person "who has been convicted of a felony" from enlisting in "any armed force.").

[16] Michael Pinard, *An Integrated Perspective on the Collateral Consequences of Criminal Convictions and Reentry Issues Faced by Formerly Incarcerated Individuals*, 86 B.U. L. REV. 623, 636 (2006).

[17] Michael Pinard, *Collateral Consequences of Criminal Convictions: Confronting Issues of Race and Dignity*, 85 N.Y.U. L. REV. 457, 524 (2010).

[18] The Sentencing Project, *Fact Sheet: Trends in U.S. Corrections*, 2018, at 1, https://sentencingproject.org/wp-content/uploads/2016/01/Trends-in-US-Corrections.pdf (citing Roy Walmsley, "Highest to Lowest—Prison Population Total," Institute for Criminal Policy Research, World Prison Brief, http://www.prisonstudies.org/world-prison-brief (last accessed Sept. 30, 2018)).

[19] Roy Walmsley, "Highest to Lowest—Prison Population Total," Institute for Criminal Policy Research, World Prison Brief, http://www.prisonstudies.org/world-prison-brief (last accessed Sept. 30, 2018).

[20] The Sentencing Project, *Fact Sheet: Trends in U.S. Corrections*, *supra* note 18 at 1; *see also* J.F. Atlanta, "Why does America have such a big prison population?" *The Economist* (Aug. 15, 2013), https://www.economist.com/blogs/economist-explains/2013/08/economist-explains-8 (noting that the U.S. has an incarceration rate "nearly five times that of Britain, seven times that of France and 24 times that of India.").

[21] Danielle Kaeble & Mary Cowhig, *Correctional Populations in the United States, 2016*, U.S. Dep't of Justice, Bureau of Justice Statistics, 2018, at 1, https://www.bjs.gov/content/pub/pdf/cpus16.pdf. *See also* "Demographics of the Corrections Population," *infra* notes 96-130.

or conviction.[22] Due to overrepresentation in the criminal justice system, people of color,[23] people with disabilities,[24] and LGBT individuals[25] are disproportionately impacted by collateral consequences. Because the female incarceration rate has accelerated, collateral consequences increasingly impact women, many of whom are single mothers whose children will be affected.[26] Immigrants who are not U.S. citizens (and those misidentified as noncitizens) often face the unique collateral consequence of deportation, which can disrupt familial relationships.[27] The reach of each collateral consequence extends past people with criminal records to affect families and communities.[28]

---

[22] The Sentencing Project, Half in Ten, Community Legal Services, *Americans with Criminal Records*, 2015, at 1, https://www.sentencingproject.org/wp-content/uploads/2015/11/Americans-with-Criminal-Records-Poverty-and-Opportunity-Profile.pdf (estimating that "100 million Americans have a criminal record"); U.S. Dep't of Justice, Bureau of Justice Statistics, *Survey of State Criminal History Information Systems, 2012*, 2014, at 3, https://www.ncjrs.gov/pdffiles1/bjs/grants/244563.pdf (finding more than "100.5 individuals offenders" in state criminal history repositories); Gary Fields and John R. Emshwiller, "As Arrest Records Rise, Americans Find Consequences Can Last a Lifetime," *Wall Street Journal*, Aug. 18, 2014, https://www.wsj.com/articles/as-arrest-records-rise-americans-find-consequences-can-last-a-lifetime-1408415402 (reporting that "the FBI currently has 77.7 million individuals on file in its master criminal database—or nearly one out of every three American adults.").
[23] *See generally*, Michelle Alexander, *The New Jim Crow: Mass Incarceration in the Age of Colorblindness* (New York: The New Press, 2012); *see also* Chapter 1, "Demographics of the Corrections Population," *infra* notes 96-130.
[24] *See* Chapter 1, "Demographics of the Corrections Population," *infra* notes 96-130.
[25] *See* Chapter 1, "Demographics of the Corrections Population," *infra* notes 96-130. "LGBT" is an acronym for lesbian, gay, bisexual, and transgender.
[26] E. Ann Carson, *Prisoners in 2016*, *supra* note 1 at 5 (finding that the number of women sentenced to more than a year increased by 700 prisoners in 2016); *see also* The Sentencing Project, *Fact Sheet: Trends in U.C. Corrections*, *supra* note 18 at 4 (stating that "[t]he number of women in prison has been increasing at twice the rate of growth for men since 1980"); Annie E. Casey Foundation, *A Shared Sentence: The Devastating Toll of Incarceration on Kids, Families, and Communities*, KIDS COUNT Policy Report, 2016, at 2, https://www.aecf.org/m/resourcedoc/aecf-asharedsentence-2016.pdf (stating that roughly half of women ages 24 and younger in prisons are mothers); Elizabeth Swavola, Kristine Riley, Ram Subramanian, *Overlooked: Women and Jails in an Era of Reform*, Vera Institute of Justice, 2016, at 7, http://www.safetyandjusticechallenge.org/wp-content/uploads/2016/08/overlooked-women-in-jails-report-web.pdf (reporting that nearly 80 percent of women in jails are mothers and, most likely, single mothers). *See also* Chapter 2, "The Disproportionate Impact of Lifetime Drug Bans for Public Benefits," *infra* notes 563-94 (discussing the economic effects of criminal convictions on women and children).
[27] Yolanda Vázquez, *Perpetuating the Marginalization of Latinos: A Collateral Consequence of the Incorporation of Immigration Law into the Criminal Justice System*, 54 HOW. L.J. 639, 666-71 (2011); Michael Pinard & Anthony C. Thompson, *Offender Reentry and the Collateral Consequences of Criminal Convictions: An Introduction*, 30 N.Y.U. REV. L. & SOC. CHANGE 585 (2005); National Immigration Law Center, *How ICE Uses Local Criminal Justice Systems to Funnel People Into the Detention and Deportation System*, 2014, at 1, https://www.nilc.org/wp-content/uploads/2015/11/state-local-enforcement-and-ice-2014-03-25.pdf (reporting that "it is becoming more common for citizens, too, to be swept into the detention-deportation system"). *See also* Rose Cahn, Written Statement for the *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* Briefing before the U.S. Commission on Civil Rights, June 19, 2017, at 1-9 [*hereinafter* ILRC Statement]; Victoria Moreno, Written Statement for the *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* Briefing before the U.S. Commission on Civil Rights, July 19, 2017, at 1-3 [*hereinafter* Moreno Statement].
[28] *See, e.g.,* Annie E. Casey Foundation, *A Shared Sentence: The Devastating Toll of Incarceration on Kids, Families, and Communities*, *supra* note 26 at 2-3, https://www.aecf.org/m/resourcedoc/aecf-asharedsentence-2016.pdf. The authors report that at least 5 million children have had a parent incarcerated at some point during their childhood, and children of incarcerated parents are at higher risk of dropping out of school. Moreover, research has shown that living in a neighborhood with a high incarceration rate "increases residents' chances of suffering from

Collateral consequences, and their disproportionate impact on people of color and other distinct populations, implicate key civil rights issues.[29] Many advocates believe that an arrest or conviction should not unduly hinder an individual's ability to reintegrate into society and attain self-autonomy.[30] Ideas for reforming the scope of collateral consequences—with the goals of

depression and anxiety." Ibid. at 4. *See also* Chapter 3's discussion of how felony disenfranchisement may adversely affect communities at notes 635-762, *infra*.

[29] *See* this report's discussion of how people impacted by collateral consequences face unequal access to employment, housing, and public benefits, *infra* at notes 222-624, and face restrictions on the right to vote and serve on a jury, *infra* at notes 625-955.

[30] Katherine Katcher, Founder and Executive Director, Root and Rebound, Written Statement for the *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* Briefing before the U.S. Commission on Civil Rights, May 19, 2017, at 1-2 [*hereinafter* Katcher Statement]; Faiz Shakir and Vanita Gupta, Joint Written Statement for the *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* Briefing before the U.S. Commission on Civil Rights, May 19, 2017, at 1-17 [*hereinafter* ACLU and LCCHR Joint Statement]; CLASP, Written Statement for the *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* Briefing before the U.S. Commission on Civil Rights, June 13, 2017, at 1-6 [*hereinafter* CLASP Statement]; Cynthia W. Roseberry, Executive Director, Council for Court Excellence, Written Statement for the *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* Briefing before the U.S. Commission on Civil Rights, July 19, 2017, at 1-8 [*hereinafter* Council for Court Excellence Statement]; Craig DeRoche, Senior Vice President of Advocacy and Public Policy, Prison Fellowship, Written Statement for the *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* Briefing before the U.S. Commission on Civil Rights, July 19, 2017, at 1-6 [*hereinafter* Prison Fellowship Statement]; Gerald Unger, Freeborn Institute of Public Policy, Written Statement for the *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* Briefing before the U.S. Commission on Civil Rights, May 15, 2017, at 1-6 [*hereinafter* Unger Statement]; Ryan Haygood, President and CEO, New Jersey Institute for Social Justice, Written Statement for the *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* Briefing before the U.S. Commission on Civil Rights, July 17, 2017, at 1 [*hereinafter* Haygood Statement]; Shon Hopwood, Associate Professor, Georgetown University Law Center, Written Statement for the *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* Briefing before the U.S. Commission on Civil Rights, July 17, 2017, at 1-5 [*hereinafter* Hopwood Statement]; Human Rights Campaign (HRC), Written Statement for the *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* Briefing before the U.S. Commission on Civil Rights, June 19, 2017, at 1-8 [*hereinafter* HRC Statement]; Roberta Meyers, Director of National H.I.R.E. Network, on behalf of the Legal Action Center (LAC), Written Statement for the *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* Briefing before the U.S. Commission on Civil Rights, July 17, 2017, at 1-14 [*hereinafter* LAC Statement]; Brian Cladoosby, on behalf of the National Congress of American Indians (NCAI), Written Statement for the *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* Briefing before the U.S. Commission on Civil Rights, May 18, 2017, at 1-2 [*hereinafter* NCAI Statement]; ILRC Statement at 1-9; Robin Chand, on behalf of U.S. Congressman Hank Johnson, Written Statement for the *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* Briefing before the U.S. Commission on Civil Rights, July 16, 2017, at 1-3 [*hereinafter* Congressman Hank Johnson Statement]; The Reentry Working Group, Written Statement for the *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* Briefing before the U.S. Commission on Civil Rights, July 19, 2017, at 1-9 [*hereinafter* Reentry Working Group Statement]; Marina Duane and Emily Reimal, on behalf of the Urban Institute, Written Statement for the *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* Briefing before the U.S. Commission on Civil Rights, July 19, 2017, at 1-4 [*hereinafter* Urban Institute Statement]; Pamela F. Rodriguez, on behalf of Treatment Alternatives for Safe Communities (TASC), Written Statement for the *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* Briefing before the U.S. Commission on Civil Rights, May 17, 2017, at 1-4 [*hereinafter* TASC statement]; Richard T. Cassidy, on behalf of Uniform Law Commission, Written Statement for the *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* Briefing before the

promoting public safety, allowing formerly incarcerated individuals to become self-sufficient, keeping families together, and reducing stigma—have received bipartisan support.[31] In recent years, advocates, academics, researchers, and government officials have proposed reforms to improve transparency and mitigate or remove some of the consequences that formerly incarcerated individuals face.[32] In 2012, the Equal Employment Opportunity Commission (EEOC) issued a guidance about hiring some applicants with criminal backgrounds.[33] Corporations like Koch Industries, Walmart, Target, and Bed Bath & Beyond have taken affirmative steps to expand employment opportunities for individuals with criminal records.[34] States have also acted to lift restrictions on the right to vote and restore the franchise to people with criminal convictions.[35]

Alleviating the collateral consequences of conviction can help formerly incarcerated individuals lead more productive lives, secure gainful employment, find housing, and obtain the resources they need to become self-sufficient.[36] Ultimately, these positive effects may benefit the economy overall. According to the Center for Economic and Policy Research, the vastly diminished employment opportunities for men with criminal records "cost the U.S. economy between $57 and $65 billion in lost output" in 2008.[37] These data illustrate the potential economic value of lowering hurdles to employment for people with criminal records.[38] Furthermore, allowing formerly

---

U.S. Commission on Civil Rights, May 19, 2017, at 1-50 [*hereinafter* Uniform Law Commission Statement]; U.S. Senator Benjamin L. Cardin, Written Statement for the *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* Briefing before the U.S. Commission on Civil Rights, June 19, 2017, at 1-11 [*hereinafter* Senator Cardin Statement]; Moreno Statement at 1-3; Southern Poverty Law Center, Written Statement for the *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* Briefing before the U.S. Commission on Civil Rights, June 19, 2017, at 1-11 [*hereinafter* SPLC Statement].

[31] *See* Ibid. *See also* John Malcolm, Vice President of the Institute for Constitutional Government and Director of the Meese Center for Legal & Judicial Studies, The Heritage Foundation, Written Statement for the *Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities* Briefing before the U.S. Commission on Civil Rights, May 19, 2017, at 1-15 [*hereinafter* Malcolm Statement]; Levin Statement at 1-6; Sankey-Berman Statement at 1.

[32] *See, e.g., supra* notes 30-31.

[33] U.S. Equal Employment Opportunity Commission, "Consideration of Arrest and Conviction Records in Employment Decisions under Title VII of the Civil Rights Act of 1965," Enforcement Guidance 915.002, Apr. 25, 2012, https://www.eeoc.gov/laws/guidance/arrest_conviction.cfm [*hereinafter* EEOC, *2012 Guidance*]; *see also infra* notes 264-307 (discussing debate of the legality of this guidance).

[34] Christine Owens & Wade Henderson, "Koch Brothers are right on fair chance hiring," *CNN,* April 28, 2017, http://www.cnn.com/2015/04/28/opinions/owens-henderson-koch-brothers-fair-chance-hiring/index.html.

[35] *See* Chapter 3, "The Restoration of Voting Rights," *infra* at notes 805-889.

[36] The Leadership Conference, *Fact Sheet: Fair Chance Hiring*, 2017, http://civilrightsdocs.info/pdf/criminal-justice/Fair_Chance_Hiring.pdf; Marie Claire Tran-Leung, *When Discretion Means Denial: A National Perspective on Criminal Records Barriers to Federally Subsidized Housing*, Sargent Shriver National Center on Poverty Law, 2015, http://www.povertylaw.org/files/docs/WDMD-final.pdf; Amy E. Hirsch et al., *Every Door Closed: Barriers Facing Parents with Criminal Records*, Center for Law and Social Policy and Community Legal Services, 2002, https://clsphila.org/sites/default/files/issues/every_door_closed.pdf.

[37] John Schmitt & Kris Warner, *Ex-offenders and the Labor Market*, Center for Economic and Policy Research, November 2010, at 2, http://cepr.net/documents/publications/ex-offenders-2010-11.pdf (also accounting for recidivism to determine lifetime probability of impacts, at 14, Table 6).

[38] Ibid. at 1.

incarcerated individuals to participate in civic society strengthens their connections with their communities and can thereby foster meaningful rehabilitation.[39] Research strongly suggests that relieving some formerly incarcerated individuals from the burdens of certain collateral consequences cultivates successful reintegration into society, helps reduce recidivism, and promotes public safety.[40]

The main arguments against such reforms reflect concerns about the continuing risks that people with criminal records may pose to society. The prospect of recidivism, and its attendant threat to public safety, becomes an issue if individuals convicted of violent crimes[41] are permitted to interact closely with the public, particularly with more vulnerable populations such as children.[42] Although some opponents of reform insist that states should remain free to impose any collateral consequences they deem reasonable,[43] others advocate for a more balanced approach, where the exact consequences flow from the nature of the crime (i.e., prohibiting a person convicted of fraud or theft from working in a bank).[44]

---

[39] Marc Mauer, *Voting Behind Bars: An Argument for Voting by Prisoners*, 54 HOW. L.J. 549, 562 (2011).

[40] *See* Steven D. Bell, *The Long Shadow: Decreasing Barriers to Employment, Housing, and Civic Participation for People with Criminal Records Will Improve Public Safety and Strengthen the Economy*, 42 W. ST. L. REV. 1, 10-11 (2014) ("Providing individuals the opportunity for stable employment actually lowers crime recidivism rates and thus increases public safety.") (quoting American Correctional Assoc., 135th Cong. of Correction, Presentation by Art Lurigio (Loyola University), Safer Foundation Recidivism Study (Aug. 8, 2005)); *see also* Tanya N. Whittle, "Felony Collateral Sanctions Effects on Recidivism: A Literature Review," *Criminal Justice Policy Review*, vol. 29, issue 5 (2016): 505-24, http://journals.sagepub.com/doi/pdf/10.1177/0887403415623328 (citing research suggesting that collateral consequences restricting access to housing and public assistance may increase recidivism).

[41] The Commission notes that the national violent crime rate has been declining for nearly 30 years, and the rate of nonviolent property crimes is at least 6 times the rate of violent crime. *See* FBI, Uniform Crime Reports, "Estimated crime in United States-Total," https://www.ucrdatatool.gov/Search/Crime/State/RunCrimeStatebyState.cfm (last accessed Nov. 18, 2018). Moreover, most felony convictions stem from nonviolent crimes, and the relatively small percentage of people convicted of violent crimes tend to serve longer sentences in prison, where they cannot interact with the general public. *See* U.S. Sentencing Commission, *Overview of Federal Criminal Cases: Fiscal Year 2016*, 2017, at 1-2, 4, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/FY16_Overview_Federal_Criminal_Cases.pdf (finding that nonviolent drug, immigration, and fraud offenses accounted for about 70 percent of federal cases and that length of imprisonment depended upon seriousness of the crime, with people convicted of murder serving the longest sentences); U.S. Dep't of Justice, Bureau of Justice Statistics, *Felony Sentences in State Courts, 2006—Statistical Tables*, revised 2010, at 2-3, https://www.bjs.gov/content/pub/pdf/fssc06st.pdf (reporting that about 72 percent of felony convictions in state courts were for nonviolent drug or property offenses, and people convicted of violent felonies received the longest prison sentences).

[42] *See, e.g.,* Malcolm Statement at 3 (noting that "it is perfectly reasonable to prohibit convicted sex offenders from running a day care center" and "violent felons from purchasing or possessing firearms").

[43] *See, e.g.,* U.S. Commission on Civil Rights, *Briefing on Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities*, May 19, 2017 [*hereinafter Briefing Transcript*] at 82 (statement by Hans von Spakovsky, Senior Legal Fellow with the Meese Center for Legal and Judicial Studies, The Heritage Foundation) (arguing, for example, that "Congress does not have the constitutional authority to force states to restore voting rights of convicted felons . . .".) Note, however, von Spakovsky's acknowledgement that certain collateral consequences "don't make any sense, particularly for example, the loss of driver's licenses for crimes that have nothing to do with driving." Ibid. at 85.

[44] Malcolm Statement at 7 (contending that collateral consequences should be "reasonably related to the offense committed").

This report provides an overview of the relevant data and arguments for and against the imposition of collateral consequences on people with criminal records. Chapter 1 summarizes the diverse range of collateral consequences, the demographics of the populations affected, and the numerous federal and state laws imposing collateral consequences in various localities. This chapter also analyzes under what circumstances collateral consequences can be removed through government restoration of a person's civil rights, and the reported lack of transparency about how a person is notified of the potential collateral consequences of a criminal record. Chapter 2 summarizes the collateral consequences that can impede a person's access to basic needs like housing, employment, and public benefits. Chapter 3 examines the collateral consequences that hinder an individual's access to civic participation through voting and jury service and explores the racial origins and racial disparities of collateral consequences. Finally, the Commission sets forth findings and recommendations.[45]

---

[45] *See* Chapter 4, "Findings and Recommendations."