1                    **UNITED STATES DISTRICT COURT**
                      **MIDDLE DISTRICT OF FLORIDA**
2                         **ORLANDO DIVISION**

3              **Case No.:   6:20-cr-00097-GAP-LHP-1**

4    **UNITED STATES OF AMERICA,**

5              Plaintiff,                    Orlando, Florida
                                             December 1, 2022
6              v.                            9:30 a.m. – 11:15 a.m.

7    **JOEL MICAH GREENBERG,**

8              Defendant.
     _____/

9


10

                   **TRANSCRIPT OF SENTENCING PROCEEDING**
11        **BEFORE THE HONORABLE GREGORY A. PRESNELL**
                   **UNITED STATES DISTRICT JUDGE**
12

13   **APPEARANCES:**

14   **Counsel for the Government:**     Roger Bernard Handberg, III
                                         Amanda Sterling Daniels
15                                       Jennifer Michele Harrington
                                         Chauncey Arthur Bratt
16                                       United States Attorney's Office
                                         400 West Washington Street
17                                       Suite 3100
                                         Orlando, Florida  32801
18

19   **Counsel for Defendant:**          Fritz J. Scheller
                                         Fritz Scheller, PL
20                                       200 East Robinson Street
                                         Orlando, Florida  32801
21
                                         David A. Webster
22                                       1220 Commerce Park Drive
                                         Suite 207
23                                       Longwood, Florida 32779

24

25

2

```
1    Court Reporter:          Nikki L. Peters, RMR, CRR, CRC
                              Federal Official Court Reporter
2                             401 West Central Boulevard, Ste 4600
                              Orlando, Florida  32801
3                             courttranscripts@outlook.com

4    Proceedings recorded by mechanical stenography.
     Transcript produced by Computer-Aided Transcription.
5
```

6                          **INDEX OF PROCEEDINGS**

7                                                      **PAGE**

8    Presentation by Mr. Scheller                        8

9    Allocution by the Defendant                        21

10   Statement by Bryant Applegate on behalf

11   of Seminole County                                 23

12   Presentation by Mr. Handberg                       24

13   Rebuttal by Mr. Scheller                           38

14   Comments by the Court and Imposition of Sentence   41

15   Certificate of Reporter                            58

16

17

18

19

20

21

22

23

24

25

1                     **P R O C E E D I N G S**

2          (Court called to order.)

3               **THE COURT:**  Good morning, everyone.  Be seated.

4               **MR. SCHELLER:**  Good morning.

5               **THE COURT:**  Okay.  Lisa, call the case.

6               **THE COURTROOM DEPUTY:**  This is in the matter of

7     United States of America v. Joel Micah Greenberg, Case

8     No. 6:20-cr-97-GAP-LHP.

9               **THE COURT:**  Okay.  Let's take appearances.

10              Appearing for the Government?

11              **MR. HANDBERG:**  Good morning, Your Honor.  Roger

12    Handberg on behalf of the United States.  With me is Jennifer

13    Harrington, Amanda Daniels, and Chauncey Bratt from my office.

14              **THE COURT:**  All right.  Thank you.

15              For the defendant?

16              **MR. SCHELLER:**  Good morning, Your Honor.  Fritz

17    Scheller.  I'm here on behalf of Joel Greenberg.  He's standing

18    to my right, to the Court's left.

19              Also present, behind me at counsel table, is attorney

20    David Webster, who worked on the case with me, and my paralegal

21    Amy Remehan.  I was trying to correct the imbalance from

22    yesterday.

23              **THE COURT:**  Well, you're getting closer.

24              **MR. SCHELLER:**  Yeah.  Well, the marshals abandoned

25    me.  So I need backup.

1          **THE COURT:**  All right.  Thank you, Mr. Scheller.

2          Well, we're here today, finally, for the sentencing

3     in this case.  Mr. Greenberg pled guilty back in May of 2021 to

4     various counts in the indictment, including Count 1 -- and

5     we're dealing here with the third superseding indictment --

6     Count 1 involves a charge of sex trafficking of a minor;

7     Count 8 charging him with production of a false identification

8     document; Count 9, charging him with aggravated identity theft;

9     Count 14, charging him with wire fraud; Count 24, charging him

10    with stalking; and Count 26, charging him with conspiracy to

11    commit an offense against the United States.

12         I previously accepted Mr. Greenberg's guilty plea and

13    adjudged him guilty of those offenses.  So we're at the stage

14    of the proceeding now where I must impose a sentence for those

15    violations.  In connection with the sentence, I have received

16    various documents, which I have reviewed before coming in here

17    today, perhaps most importantly is the presentence report.

18    It's a 99-page report prepared by the probation officer, which

19    contains pertinent information about Mr. Greenberg, these

20    offenses, and, importantly, calculates a guideline score.

21         The parties, through their counsel, have also

22    submitted sentencing memoranda.  And the United States'

23    memorandum is at Document 161, and Mr. Scheller's memorandum on

24    behalf of Mr. Greenberg is at Document 167.  And I have

25    reviewed those.

1           Also, I have a couple of letters of support that

2     Mr. Scheller submitted on behalf of Mr. Greenberg.  And those

3     are letters from a Christopher Perryman and Eliezer Perez.  And

4     I have reviewed those documents.

5           I also have a letter from the Foley & Lardner law

6     firm, Mr. Baxa, writing on behalf of Seminole County, and

7     indicating that the $109,716.12 on deposit with the clerk of

8     the court, Seminole County considers Mr. Greenberg to have

9     satisfied his restitution obligation to Seminole County when

10    that deposit is turned over to Seminole County.

11          There's also a motion for entry and order of

12    forfeiture in this case at Document Number 120.  We'll deal

13    with that toward the end of the proceeding.

14          And the prosecution team has submitted to me a

15    proposed restitution order, which I'll also consider toward the

16    end of the proceeding this morning.

17          So with respect to the presentence report, we had a

18    hearing yesterday to consider any objections to the report as

19    well as -- including any objections that the parties might have

20    to the guideline scoring.  And there were no objections to the

21    factual content of the PSR, as we refer to it.  And it was

22    determined that the guideline score applicable to the matter is

23    offense level 29, criminal history category I.  And under the

24    United States' sentencing guidelines, that suggests

25    imprisonment in the range of 87 to 108 months.  And Count 9

1    carries a mandatory two-year consecutive sentence.  So the

2    total sentencing range becomes 111 to 132 months.  And the

3    probation officer recommends a sentence at the high end of that

4    guideline score, which would be 132 months.

5              I know that the guidelines are not mandatory.  I'm

6    not required to impose a sentence within that range.  However,

7    I am required to consider the guideline score and sentencing

8    range and use it as a benchmark when I consider the statutory

9    factors set forth in 18 United States Code, Section 3553(a).

10   And as I indicated yesterday, the weight that I give to the

11   guideline score in imposing sentence depends on my view of the

12   3553(a) factors.

13             And also in this case, I'm somewhat troubled by

14   whether the guideline score really captures the variety and

15   extent of the criminal conduct that Mr. Greenberg engaged in

16   because the multi-count grouping guideline in part 3D1.4 of the

17   guidelines is intended to apply to substantially related

18   conduct, whereas here, although the base score is -- comes off

19   the -- the sex offense in Count 1, all the other crimes are

20   essentially unrelated to that.  And so the guidelines really

21   don't give me much guidance in terms of what weight to put on

22   the guideline score.  But nevertheless, I will consider it, and

23   I will use it as a benchmark and proceed accordingly.

24             So we accomplished yesterday much of what ordinarily

25   would be done at the time of sentencing.  And so essentially

1     today I need to hear from counsel, as well as allow

2     Mr. Greenberg an opportunity to allocute.  And counsel's

3     comments to me and my consideration of Mr. Greenberg's

4     allocution, to the extent he makes one, is designed to help me

5     determine what sentence to impose in light of this guideline

6     score and considering the 3553(a) factors.

7             Those -- there are various factors set forth in the

8     statute.  Two of them are -- I consider to be primary.  And

9     those two primary considerations are the seriousness of the

10    offenses and the history and characteristics of the defendant.

11            The other factors set forth in the statute include

12    deterrence, the need for deterrence, respect for the law, and

13    protection of the public.

14            Let me say at the outset that with respect to

15    deterrence -- that is general deterrence, the concept that the

16    seriousness of my sentence today would somehow deter others

17    from committing the same crimes -- there's no social science

18    supporting that notion.  And the Department of Justice itself,

19    I think, has recognized that.  However, the fact that there

20    will be punishment of some sort obviously does have a deterrent

21    effect on others.  The extent of that is really unknown from a

22    social science standpoint.

23            Protection of the public concerns the matter that by

24    being incarcerated, Mr. Greenberg would not be at liberty to

25    commit other crimes against the public.

1           And respect for the law, of course, is a pretty

2     subjective factor that sort of overlays this entire process.

3           So that is basically an outline of what we will be

4     doing this morning.  And my process in sentencing is to

5     recognize defense counsel first, allow the defendant to

6     allocute or make a statement, if he wishes, and then the

7     prosecutor, the U.S. Attorney's Office, will then respond.  And

8     I always give defense counsel the last word.  So that's the way

9     we're going to proceed this morning.

10          So Mr. Scheller, I'll be happy to hear from you at

11    this time.

12          **MR. SCHELLER:**  Thank you, Your Honor.

13          May it please the Court.

14          Mr. Greenberg's -- yes, Mr. Greenberg's conduct was

15    bold, brazen, and undeterrable.  It was also outrageous and

16    manic.  That much is clear.  And if this Court stopped its

17    analysis at Mr. Greenberg's crimes, probation's recommendation

18    for a high guideline sentence would have a certain resonance.

19    But under 3553(a) and Supreme Court precedent, Mr. Greenberg's

20    criminal acts cannot be the only consideration in this case.

21    If it was, we should return to the mandatory guideline regime,

22    the guideline regime that this Court took the lead in

23    contesting over its 1,000 or so cases.

24          So the criminal conduct of Mr. Greenberg cannot be

25    the only consideration.  Supreme Court precedent demands more.

1    And what I think is especially important in this case is two

2    cases from the Supreme Court that were recently reaffirmed in

3    *United States v. Concepcion*.  And the first case is *Koon* where

4    the Supreme Court determined that in sentencing a defendant the

5    Court must consider the defendant as an individual and consider

6    the unique circumstances that sometimes mitigate and sometimes

7    magnify the crime and punishment to ensue.

8         Later on, in 2011, in *United States v. Pepper*, the

9    Supreme Court emphasized that a sentencing court must consider

10   the defendant as he appears before it on the day of his

11   sentencing, not on the date of his offense or even the date of

12   his conviction.

13        Then, if we apply these two principles, I submit that

14   a high-guideline sentence, essentially to be followed by a

15   two-year -- consecutive mandatory sentence of two years, which

16   equates to about 132 months, does not achieve justice in this

17   case.

18        So let me start off with *Koon*, turning to the

19   circumstances that mitigate.  Yes, Mr. Greenberg's conduct was

20   bold and brazen.  But it was also manic.  And it was the result

21   of an impaired mind.  The PSR establishes a long history of

22   mental -- excuse me, the PSR establishes a long history of

23   Mr. Greenberg's mental health problems.  It started at the age

24   of seven.  He has gone through treatment his entire life, from

25   the age of seven to the current date, so over approximately 30

1    years, Your Honor.

2              It began early on, when he was seven, with ADHD.  He

3    was -- continued to medicate throughout his childhood and his

4    adult life.  And it progressed to bipolar disorder, as

5    established in Dr. Danziger's report.  And if you look at

6    Dr. Danziger's -- and I know the Court is familiar with

7    Dr. Danziger.  He's been an expert before this Court a number

8    of times as well as an expert before other courts in this

9    district.  Dr. Danziger saw Mr. Greenberg on three different

10   occasions.  The first occasion he saw him when he was on

11   Adderall.  The second and third times he saw him when he was

12   off Adderall.  And it was clear to Dr. Danziger from the

13   testing, the collateral interviews with third parties, and his

14   three evaluations of Mr. Greenberg that Mr. Greenberg suffered

15   from bipolar disorder.  Okay?  But that's not just an excuse.

16   But it was a condition that existed at the time Mr. Greenberg

17   committed his offenses.

18             But what is important is at the time that he was

19   committing his offenses, Mr. Greenberg was on Adderall.  And

20   Adderall is a stimulant, as this Court knows, a stimulant to

21   treat ADHD.  And the FDA specifically recommends against the

22   use of Adderall for people with bipolar disorder.

23             Dr. Danziger's diagnosis of Mr. Greenberg was

24   confirmed by a second psychiatrist who began to treat him

25   differently.

1           And so when you look at Mr. Greenberg's conduct, the

2    bold, the brazenness, it was outrageous, it was undeterrable,

3    but it was also very manic.  It included outrageous conduct

4    such as stopping people who he thought were speeding, huge

5    expenditures of money, just a lack of control.  And that is

6    consistent with the DMS [sic] IV's -- excuse me, DMS V's

7    criteria for bipolar disorders, which talks about inflated

8    self-esteem or grandiosity, talkative, pressured speech --

9    which all the witnesses, including Dr. Danziger, saw --

10   excessive spending, distractibility, excessive involvement in

11   activities that have a high potential for painful consequences,

12   unrestrained buying sprees, sexual indiscretions, foolish

13   investments.  That is consistent with the way and manner in

14   which Mr. Greenberg acted over that three-year period.

15           Significantly, the sentencing guidelines take into

16   account a defendant's mental capacity at the time he committed

17   his offense.  And, of course, as noted in my memorandum, the

18   sentencing guidelines at 5K2.13 assert that a defendant's

19   diminished capacity at the time he committed his offense can

20   support a departure.  I'm not asking for a departure on those

21   grounds, Your Honor, but I think the Court should take it under

22   account under 3553 factors because it goes directly to

23   Mr. Greenberg's culpability.

24           The other part of culpability, obviously, is motive.

25   If you read the family section of the PSR, Mr. Greenberg's

1    mother details his struggles with self-worth and self-esteem

2    throughout his childhood, his struggles in school, his

3    struggles with mental illness in school.  And so when he

4    became -- and this occurred throughout his life.  In his

5    thirties he got the job as tax collector.  And part of the

6    connection in these disparate offenses that seem so distinct

7    and not -- unrelated is, actually, there's an undercurrent.

8          Mr. Greenberg was using money and sex to get access

9    in political circles.  Some of the money he took went back to

10   political campaigns.  His sexual indiscretions that support

11   Count 1 had to do -- had to do with other individuals of a

12   certain status, as I've laid out in my sealed pleadings, that

13   he could ingratiate himself with.  It doesn't excuse his

14   conduct, but it does mitigate it.  He came from a dark place, a

15   lack of self-worth, and tried to ingratiate himself with a

16   collection of people of not the best mindset, for lack of a

17   better term.

18         So the question, though, is under *Pepper* -- turning

19   to *Pepper* -- how does Mr. Greenberg appear today as opposed to

20   the Mr. Greenberg who committed his crimes over two years ago?

21   How has he changed?  How does he present himself to the Court?

22         Your Honor, he's off substance abuse -- I mean,

23   excuse me, he no longer has a substance abuse problem,

24   obviously, because of his incarceration.  He's no longer on

25   Adderall.  He has tried to make amends through significant

1       cooperation with the Government that I've set out to this

2       Court -- perhaps ad nauseam, in a number of pleadings and

3       yesterday -- to make good on his conduct.

4               He's also committed to Seminole County -- to the

5       Seminole County attorney, who's here today, to continue to

6       cooperate with Seminole County to make amends for his

7       wrongdoing.  And then, of course, he's paid his restitution to

8       Seminole County.

9               And so I would submit to this Court that we have to

10      take into account rehabilitation and redemption.  And if *Pepper*

11      has any resonance, this Court should not sentence the defendant

12      who committed his crimes two years ago but the Joel Greenberg

13      who is on the path to rehabilitation as he appears to this

14      court today.

15              So then we get to the question of just punishment.

16              As I laid out in my memorandum, we have the

17      significant collateral consequences of a felony conviction.

18      Mr. Greenberg had no criminal record, no contact with the law

19      prior to this case.  And now, because of his felony conviction,

20      as the Government has determined, he's going to suffer at least

21      600 collateral consequences.

22              Judge Black, a great judge in New York, has stated

23      that the Court should take this into account because it goes to

24      the issue of punishment.  And it goes -- it's a punishment that

25      starts as soon as Mr. Greenberg's prison sentence is over.

1          As a result of his conduct, he lost his marriage.  He

2     lost his children.  He was cut out of his parents' will

3     completely.  He's lost all financial support.  And you'll see

4     today his family is not here.

5          He has been in jail, essentially in isolation, 20

6     months at the Orange County Jail, which is, I would submit to

7     the Court, as this Court is probably aware, a pretty harsh

8     confinement.

9          But really there are two things that are really

10    driving his punishment in this case.  Just as the sex offense

11    drives the guidelines in this case, so does his conviction for

12    that sex offense determine and drive his punishment.  Because

13    of the sex offense, he will not be eligible for certain

14    reductions such as RDAP for the drug and alcohol treatment or

15    any of the considerations for -- under the First Step Act.  So

16    whatever sentence this Court imposes -- and clearly he

17    qualifies for RDAP -- he is going to serve about 85 percent of

18    it.  And I think the Court should take that into account.

19         Sex-offender registration.  As I pointed out in my

20    memo, that is a very punitive measure.  When Mr. Greenberg gets

21    out, he's going to have to register as a sex offender for the

22    rest of his life.  That's going to determine where he lives,

23    who he associates with.  It's going to affect his employment

24    opportunities.

25         And so when we look at the concept of just

1    punishment, I think the Court's analysis has to extend beyond

2    the idea of mere imprisonment.

3          General deterrence.  The Court has spoken on this.  I

4    recall seeing this Court speak at a conference in Atlanta in

5    2014 when it stated if we just determined sentences based on

6    general deterrence, the idea that prison sentences deter crime,

7    then everybody should be sentenced to prison.  The Court

8    referred to the justice department analysis.  And what I

9    submitted to the Court is that the justice department has

10   determined that long prison sentences do not deter crime.  What

11   deter crimes is prosecutions.

12         And so the fact that Mr. Greenberg has been -- his

13   prosecution has been very public.  He's been referred to as the

14   disgraced tax collector.  He's been referred to as a

15   pedophile -- will have a significant deterrent effect.

16         Recidivism.  The sentencing commission has determined

17   that people like Mr. Greenberg who have had no prior contact

18   with law enforcement prior to their offense pose a lower risk

19   of recidivism.  In its memo, the Government asserts that,

20   "Well, that's not an important factor in Mr. Greenberg's case

21   because he comes from a privileged background."  True, he comes

22   from a privileged background.  But I would submit to the Court

23   in the thousand cases that this Court has handled over its

24   career, can it recall the Government coming in and asking for a

25   variance on behalf of a defendant from an underprivileged

1    background who has no criminal record?

2         Regardless, the sentencing commission does not make a

3    distinction between a person's underprivileged and privileged

4    background.  What the statistics show is that Mr. Greenberg

5    poses a lower risk of recidivism based on the fact he had no

6    prior contact with the law before this three-year period where

7    he was out of control.

8         And then we look at the issue of recidivism.  The

9    Court and the Government were talking about -- excuse me.  The

10   Government was talking about a holistic approach.  Well, if you

11   look at the holistic approach on recidivism, he's going to be

12   registered as a sex offender.  That's going to be -- put

13   significant restrictions on him.  Then he'll be on supervised

14   release.  On supervised release, he'll have drug testing.

15   He'll also -- obviously, I'm going to ask the Court to impose a

16   condition of psychological treatment.  That is going to impact

17   his risk of recidivism.

18        And as my memo establishes, those kind of measures

19   are a much better deterrent effect than just pure prison.  And,

20   in fact, as the studies show, longer prison sentences may

21   actually increase the risk of recidivism.

22        So then we get to the guidelines and the Court's --

23   and I'm going to address the Court's concern that

24   Mr. Greenberg's guideline -- final guideline offense level of

25   29 doesn't take into account the fraud because he only got a

1    one-point bump for that.  Well, Mr. Greenberg [verbatim]

2    guideline level -- the reason he got only a one-level bump for

3    the fraud was because -- it came -- the highest count came to a

4    level 28.  Mr. Greenberg's offense level for the sex offense

5    was increased two levels for the use of a computer and

6    telephone, which the sentencing commission determines applies

7    in the vast majority of the cases.  In the context of child

8    pornography cases, 97 percent of those cases.  So he got two

9    levels for that.  He got two levels for the sex act.  And he

10   got an additional five levels for having sex with a minor on

11   more than one occasion.  So an additional nine levels.  So even

12   without the one-level bump, Mr. Greenberg, for those offenses,

13   was at a 41, Your Honor, criminal history I.  And --

14           **THE COURT:**  I think it was a 42, wasn't it?

15           **MR. SCHELLER:**  Well, 42 gave it the bump, the

16   one-level bump.  Without the bump, he was at a 41, just for the

17   sex offenses.  The one additional grouping gave it a 42.  41,

18   criminal history I.

19           So for the sex offense, Your Honor, he was looking at

20   324 to 405 months.  Okay?

21           I'm not going to make a policy argument based on the

22   guidelines because this Court is much more averse than that --

23   than me as to the sex offenses.  But here's the bottom line.

24   In this case the minor victim was almost 18.  She represented

25   herself to Mr. Greenberg and others as being 19.  She was

1       advertising on SeekingArrangements, a website for, essentially,

2       sugar daddies.

3               Under the old statute, he would have had a defense

4       because of those lies and those representations.  Under the new

5       statute, it's a strict liability offense.  Yet, he is going to

6       be -- he's under the guidelines that were designed to address

7       individuals who target children, who are truly pedophiles.

8       He's not.  But he is going to be branded one the rest of his

9       life.  And when he goes to the Bureau of Prisons, he's going to

10      be in a sex-offender program because of it.  He's going to lose

11      time off his sentence because of it.  He's going to get out of

12      jail, and for the rest of his life, he's going to have

13      restrictions on where he lives and who he associates with, what

14      he does, and how he's employed.

15              And so when the Court says, "Well, it doesn't really

16      take into account the fraud offenses," the problem is, when we

17      start at a 41 or a 42, I would submit to the Court that is such

18      an excessive penalty based on his conduct.

19              And then we take the 10 levels off of it.  And here

20      is the analytical problem with that.  When we look at the 10

21      levels in the 5K, this Court or the Government can argue,

22      "Well, it's a huge reduction from his exposure, his sentencing

23      exposure."  But as always with the sentencing guidelines, where

24      we come out is where we start.  And we're starting at a highly

25      inflated point to get to those 10 levels, to get down to the

1   10 -- level 29.

2         Obviously, there's another thing which I talk about,

3   the minor's conduct.  I've previously mentioned 5K2.13 and

4   diminished capacity.  Also, we have 5K2.10, victim conduct that

5   contributed to the offense.  Ten or 15 years ago, this would

6   have been a triable case as to Mr. Greenberg's offense, and I

7   think it was a winnable case based on the conduct of the minor.

8   The minor is the one who contacted him first.  The minor was

9   the one who also used the telephone.  Yet, he's getting two

10  points for that.  And he's getting another five points for the

11  repeat occasions with the minor.  And he's getting another two

12  points for the fact that he engaged in a sex act, an act that

13  she was advertising and soliciting on SeekingArrangements.

14        Restitution.  Your Honor, as noted by this Court, he

15  satisfied his restitution payment -- well, it will be satisfied

16  after the $109,000 will be disbursed from the clerk's office to

17  Seminole County.  That was money that Mr. Greenberg set aside

18  or was provided to the Government from the sale of his home.

19  He has no other assets now, and he has no future with his

20  family.

21        I understand the view that Mr. Greenberg's case might

22  need to make a statement to others, public officials.  But

23  justice has never been about how many skins a prosecutor can

24  put on a wall.  And making statements is not a consideration

25  under 3553, the Constitution, or Supreme Court precedent.

1          Your Honor, when I look at this case, in summary,

2     there are mitigating circumstance -- there's a number of

3     mitigating circumstances supporting a variance in this case.

4     Just to summarize, we have mitigating circumstances concerning

5     his offense, including his mental health and misdiagnosis and

6     treatment.  We have mitigating circumstances regarding his

7     commitment to make amends.  We have mitigating circumstances

8     regarding the collateral consequences of his sentence, his

9     sex-offender registration, and the loss that he has suffered

10    that goes way beyond prison.  We have the 3553 factor of

11    recidivism.  We have the policy arguments from the sentencing

12    commission that a defendant, a first-time offender with no

13    criminal history, should have his guidelines lowered.

14         But really what it comes down to in the end is if

15    this Court considers Mr. Greenberg as an individual, considers

16    the unique factors that mitigate his conduct, and looks at

17    Mr. Greenberg as he appears today, a radically different

18    individual, then this 132-month sentence does not achieve

19    justice.  It's greater than necessary to meet the elements

20    under 3553.

21         Yes, he did wrong.  He committed terrible wrongs.

22    But the last two years, he's made a consistent effort to make

23    it right.  And he will spend the rest of his life making it

24    right, starting with his cooperation with Seminole County.

25         And so, Your Honor, I ask this Court to impose a

1      six-year guideline sentence to be followed by the 2-year

2      consecutive.  That's an eight-year sentence.  He -- that's

3      essentially a little bit over a year off the bottom range of

4      the guidelines.

5              My request takes into account my understanding and

6      comprehension of the seriousness of his behavior.  And as you

7      know, I've asked for much greater variances in the majority of

8      my cases.  And so it takes in my understanding, but it also

9      takes into account and is based on the 3553 factors and the

10     decision in *Koon* as well as *Pepper*.

11             Thank you.

12             **THE COURT:**  Thank you, Mr. Scheller.

13             Does Mr. Greenberg wish to allocute?

14             **MR. SCHELLER:**  He does.

15             **THE COURT:**  Mr. Greenberg, you can either stay seated

16     there -- wherever you're comfortable.

17             Mr. Scheller will help you.

18             **MR. SCHELLER:**  May I stand next to him, Your Honor?

19             **THE COURT:**  Sure.

20             **THE DEFENDANT:**  Your Honor, nothing that I say today

21     can justify my actions.  My conduct was so shameful.  I know it

22     may not mean much today, but I feel such remorse for what I've

23     done.

24             I want to apologize to the people that I've hurt.

25             To Mr. Butte, I'm so sorry.

1              To the minor, I apologize.

2              And to the people of Seminole County, I let you down,

3     and I betrayed your trust.  I promise you I will do whatever it

4     takes to make amends.

5              I also want to apologize to the Court and to the

6     Government.

7              Finally, I must express my deep sorrow for what I've

8     put my family through, my mother and my father, and to my

9     ex-wife and especially to my children.  I know that I can never

10    make up for what I've done.  And I know I deserve punishment,

11    whatever and how long that may be.

12             Thank you.

13        **THE COURT:**  Thank you, Mr. Greenberg.

14             Mr. Handberg, before I hear from you, other than the

15    letter with respect to Seminole County, are there any victims

16    that wish to speak?

17        **MR. HANDBERG:**  I have been told that there are not,

18    but I'm going to look in the back and see if anyone has changed

19    their mind.

20        **MR. SCHELLER:**  I think the Seminole County state

21    attorney does.  I mean Seminole County --

22        **MR. HANDBERG:**  Yes, sir.  Mr. Applegate on behalf of

23    Seminole County.

24        **THE COURT:**  All right.  Come on up, Mr. Applegate.

25    Just introduce yourself there at the podium, and I'd be happy

1      to hear from you.

2                  **MR. APPLEGATE:**  Thank you, Your Honor.

3                  May it please the Court.

4                  Bryant Applegate.  I'm currently the interim county

5      manager for Seminole County but in a way also county attorney,

6      which I've been for the last 12 years.  Your Honor, I'm here

7      just to speak on the restitution issue.

8                  Mr. Greenberg, through his counsel, has paid the

9      total amount of $1,359,000 to Seminole County, which would

10     include 109,000 and change that's in the court registry at this

11     point in time.

12                 In addition, Mr. Greenberg, through counsel, has

13     agreed to cooperate with further investigations being done by

14     the Florida Department of Law Enforcement.  I'll just refer

15     back to my meeting with the U.S. Attorney, Mr. Handberg, I

16     think about a year and a half ago now, where Seminole County

17     promised not to pursue any matters until investigations were

18     completed.  Based on a conversation I had with their office

19     about two weeks ago, we have moved forward with asking FDLE to

20     pursue other investigations against other individuals.

21                 Thank you.

22                 **THE COURT:**  All right.  Thank you, sir.

23                 I appreciate your being here.

24                 **MR. APPLEGATE:**  Thank you.

25                 **THE COURT:**  All right.  Mr. Handberg.

1            **MR. HANDBERG:**   Thank you, Your Honor.

2            As the voters went to the polls in Seminole County in

3     2016, one of the races that was on the ballot was for Seminole

4     County tax collector.  The voters in that election believed, as

5     they had every right to, that the person that they were going

6     to elect was going to be their tax collector, a person who they

7     were going to entrust with a number of important government

8     responsibilities:  Collecting property taxes, issuing driver's

9     licenses, birth certificates, tags, titles, concealed weapons

10    permits, and other services.

11            The individual they elected was Joel Greenberg.  But

12    Mr. Greenberg was never really the tax collector for the people

13    of Seminole County because he never really served the people of

14    Seminole County.  Instead, Mr. Greenberg was a person who used

15    the position of trust he had been given by the people of

16    Seminole County to facilitate a series of crimes that were only

17    made possible by the position he had been entrusted to fill.

18    Mr. Greenberg's crimes came one after another, often being

19    committed in close proximity to one another.

20            For over a three-year period, Mr. Greenberg could not

21    be deterred.  He was not deterred by the laws that applied to

22    him.  He was not deterred by the auditors who would review the

23    operations of his office.  He was not deterred when he learned

24    he was under federal investigation.  He was not deterred when

25    he was arrested by federal agents.  He was not deterred when he

Case 6:20-cr-00097-GAP-LHP   Document 180   Filed 12/01/22   Page 25 of 58 PageID 1130

25

1   was brought into this building and had conditions of release

2   set by a United States magistrate directing him to commit no

3   further crimes as part of his bond conditions.

4           Mr. Greenberg could not be deterred and would not be

5   deterred because he placed his wants and needs first over

6   everything else.  He viewed the tax collector's office as

7   belonging to him, as something he could use to benefit himself

8   however he wanted.  He viewed the SBA money as something that

9   belonged to him, to be used however he wanted.

10          The result was four different federal indictments

11  charging an increasing number of crimes.  Those indictments

12  resulted in guilty pleas to six different counts that cover

13  five different categories of violations, all of which we've

14  talked about:  Commercial sex acts with a minor, aggravated

15  identity theft, and making of fake driver's licenses, a scheme

16  to defraud the -- Seminole County and the tax collector's

17  office out of hundreds of thousands of dollars, stalking, and a

18  conspiracy to commit false claims to the Small Business

19  Administration and to bribe an SBA employee.

20          Now, as Your Honor has pointed out, today is the day

21  for the Court to fashion a sentence.  And this is not a typical

22  case; five different categories of violations, an 86-page plea

23  agreement, a 99-page PSR.  And so we start where we left off

24  yesterday, with the guidelines, offense level 29, criminal

25  history category I.

s

1          And I do want to take a moment just to commend the

2    United States Probation Office, which always does an excellent

3    job.  And this case was a particularly, I think, challenging

4    one to sort through those issues.

5          And I also do want to commend Mr. Scheller and his

6    team for their professionalism.  I think the parties did a good

7    job at narrowing the issues to present the Court the issues

8    that truly need to be decided in fashioning the sentence in

9    this case.  And it's our recommendation that the Court impose a

10   sentence at the high end of the guidelines.  And we know that

11   the guidelines are just one factor to be considered.  But we

12   believe the range set forth by the guidelines is supported by

13   consideration of the 3553(a) factors.

14         Now, the Court has identified those factors,

15   including some of the ones it considers, I think appropriately

16   so, to be the primary ones.

17         The first one I'm going to talk about is the nature

18   and circumstances of the offense, the requirement that the

19   sentence imposed reflect the seriousness of the offense,

20   promote respect for the law, and provide for just punishment.

21         Ms. Harrington from my office wrote, I thought, what

22   was an excellent sentencing memorandum.  And in it, she took an

23   approach which I think is helpful for sorting out the

24   seriousness of the offense.

25         In the plea agreement -- for organizational purposes,

1      the plea agreement divided Mr. Greenberg's offenses out by

2      count.  I think what Ms. Harrington did so well in the

3      sentencing memo is she put it in chronological order so that

4      everyone could see just the scope of the crimes that were being

5      committed and also the continuous nature from 2017 through

6      2020.  And that took a little bit of time in the sentencing

7      memo to do.  And that's not because the United States was

8      focusing improperly or excessively on the offenses.  It's

9      because the crimes that Mr. Greenberg committed say a lot about

10     what the sentence should be in this case.  They talk to the

11     seriousness of the offense.  They also go to his history and

12     characteristics as a person.

13            In many of my cases, I like to try to find a short

14     version of what I would tell someone the case was about.  This

15     one, it's difficult to do, to summarize quickly.  Over the

16     course of three years, Mr. Greenberg spent over $70,000

17     engaging in commercial sex acts, consisting of over 150

18     financial transactions.  His commercial sex acts included seven

19     where he paid a minor for sex.

20            While that was going on, Mr. Greenberg was using his

21     position as a Seminole County tax collector to defraud his

22     office out of hundreds of thousands of dollars that he used to

23     buy cryptocurrency, to buy and sell cryptocurrency machines, to

24     basically operate, at the end of his tenure as a tax collector,

25     a business out of the tax collector's office.  Some of those

1    machines he attempted to use to mine cryptocurrency for

2    himself, which resulted in one of his offices catching on fire.

3          In the course of that scheme, Mr. Greenberg lied to

4    his chief financial officer and the auditors, individuals who

5    were intended to be, you know, protections for the county that

6    their money wasn't being misused.  He made two false

7    representation letters to the auditors.  He had a secret bank

8    account.  He used another bank account controlled by him.  He

9    engaged in over 97 purchases of cryptocurrency, over a hundred

10   transactions involving the purchase and sale of cryptocurrency

11   machines, and transferred hundreds of thousands of dollars in

12   layered financial transactions involving different financial

13   accounts.  He used a corporation for one part of his scheme as

14   a front for his fraud and deposited hundreds of thousands of

15   dollars of cryptocurrency into wallets that were controlled by

16   him, all of which he did over the course of three years.

17         That's not all.  While that was going on, he was

18   using his position and the resources of his office to make fake

19   driver's licenses for himself using stolen identities.  And

20   these weren't insignificant documents.  Those two fake driver's

21   licenses were found in Mr. Greenberg's wallet.

22         That's not all.  While that was going on,

23   Mr. Greenberg decided to stalk a political opponent.

24         One of the most terrible things I think you can do to

25   someone who's a teacher is to falsely accuse them of engaging

1    in sexual misconduct with a student.  And that's what

2    Mr. Greenberg did.  And he did it publicly on Facebook.

3              As I said, this case defies a short, easy summary.

4    And each part of what I just summarized has many more details

5    that I could go into.  And each of those establishes that the

6    crimes in this case are very serious.

7              But there's moments, too, that also provide further

8    information.  I often think in any criminal case there's

9    moments that are especially important.  I'm going to talk about

10   three of them.

11             The first is one you -- I think you might be

12   surprised I would actually reference, which is January 3rd of

13   2017.  That's a date of significance for two reasons.  That was

14   the date that Mr. Greenberg assumed office as the Seminole

15   County tax collector.  It's also the date that we got the first

16   indication of how he was going to use and abuse the trust he

17   had been given.

18             Prior to becoming tax collector, he had engaged in a

19   transaction with an individual.  As part of that, he got their

20   personal information and ordered a driver's license for that

21   person without their knowledge.  And in the process of doing

22   that, Mr. Greenberg changed where the driver's license went.

23   He changed it to an address that he could then get the driver's

24   license from.  And on his very first day in office, one of the

25   first things he did was he used the DAVID system, the Florida

1    driver's license system, to go in and change that, to change it
2    back to the person's actual address.

3         So from the very beginning, what Mr. Greenberg, I
4    think, showed was he had the intent to use his office in ways
5    that benefited him from day one.  And that's something that
6    continued during the entire time that he was the Seminole
7    County tax collector.

8         A second important date is April 2019.  That's when
9    the federal investigation went overt.

10        There's been some talk about investigations and how
11   they're conducted.  I think one of the -- the traits of any
12   good criminal case is by the time it ends up at this phase,
13   when you read a description of what the facts are, it has an
14   air of inevitability about it.  Everything just seems like,
15   well, of course that's what was going on.  I guess I can only
16   offer from my own personal experience that when you're in the
17   midst of one of these investigations, we don't get that
18   information in real time.  Investigations require a lot of time
19   and effort.  They have a lot of time where things go into dead
20   ends, things that don't pan out.  So I hope no one takes from
21   our sentencing memo that we had contemporaneous knowledge of
22   everything that was happening.  We didn't.

23        But April 19th, 2019, was important because of how
24   Mr. Greenberg responded to it.

25        We heard some conversation about recidivism.

1    Recidivism can be evident, I would think, in a couple of

2    different ways.  One is, does someone have a prior criminal

3    record?  I think another way that could be considered is how

4    does someone react when they know that they're being

5    investigated, when they know someone is watching?

6            And so what Mr. Greenberg did was he attempted to

7    cover up what he had done, as acknowledged in the plea

8    agreement and the PSR.  And he continued on with his scheme.

9    He was not deterred.

10           We saw that again in the third date I'm going to talk

11   about, which is June 23rd of 2020.  On that date, early in the

12   morning, federal agents went to Mr. Greenberg's house and

13   executed a search warrant at his residence and arrested him.

14   He was brought to this building for his initial appearance on a

15   federal indictment.  He had conditions of release set and was

16   released.

17           What would only be determined later was at the time

18   that that happened, Mr. Greenberg had already started down the

19   road of a false SBA claim.  And after sitting in federal court

20   and having a federal magistrate judge tell him that he is not

21   to commit any further crimes or offenses and obey all of the

22   conditions of release, the next day he finished up the

23   paperwork to get his fake loan.  And then he did it two other

24   times.

25           Recidivism may be evidence sometimes of someone who's

1    got a criminal record.  But sometimes it's evident in terms of

2    how they respond to lawful expressions of authority and

3    knowledge of investigations.

4         I think all of that and all of that that's in the PSR

5    and the plea agreement establish the seriousness of the

6    offense.  But that's not all we're to consider.

7         We do need to consider his history and

8    characteristics.  And we don't intend any slight by pointing

9    out that Mr. Greenberg comes from a good family.  It's just a

10   fact.  His family is a good family.  And they're wealthy.  They

11   could provide for him.  He had things that others probably

12   wouldn't.

13        One of the things he had was he had -- he had mental

14   health treatment.  Because one of the factors I hear about

15   Mr. Greenberg and I see presented as possible mitigation is

16   that he was misdiagnosed.

17        Now, when I look at the PSR and the materials

18   attached -- and my count may be off.  I think I counted maybe

19   three prior doctors or psychiatrists or psychologists who

20   diagnosed Mr. Greenberg.  According to Mr. Danziger --

21   Dr. Danziger, who is very well respected and we've all had

22   cases with, that was wrong, those three, or however many it

23   was, they got it wrong, and he had something different, and he

24   should have had different medication.

25        Paragraph 244 of the PSR talks about during the

1    entire period of time that's covered by the criminal activity

2    in this case, that Mr. Greenberg was being treated by a

3    particular doctor who had diagnosed him.  According to

4    Dr. Danziger, that's wrong.  I'm not in a position to say

5    whether it's right or wrong.  I have tremendous respect for

6    Dr. Danziger.  But what I would suggest is that in this

7    particular case that misdiagnosis, to the extent that there was

8    one, is not impactful in terms of mitigating Mr. Greenberg's

9    situation because his conduct was knowingly, intentionally

10   done, with criminal intent, over a period of a long time.

11        There was a reference to Mr. Greenberg pulling

12   someone over.  So just for record purposes, I believe what's

13   being referred to was, as I understand it just from media

14   reports, Mr. Greenberg at one point in time believed because he

15   was the Seminole County tax collector he had law enforcement

16   powers, and, as part of that, he had the ability to pull people

17   over for, I would assume, traffic violations.  And I think one

18   of those got publicized.  And maybe that was a not-thought-out,

19   impulsive move.  I don't know.  What I do know is that's not

20   why Mr. Greenberg is here.

21        The reason it takes 86 pages of a plea agreement to

22   describe what he did was, especially with respect to his

23   fraudulent conduct, it was detailed.  It was thought out.  It

24   was logical, and it worked.  He was able to deceive auditors.

25   He was able to deceive his chief financial officer.  He was

1    able to layer financial transactions.  And it took the work of

2    a great investigative team, who I was grateful to get a chance

3    to work with, from the Secret Service, FBI, Seminole County

4    Sheriff's Office, and SBA Inspector General's office to try to

5    sort it out.

6          That's not the sort of conduct of someone who was

7    acting impulsively.  That can't explain what Mr. Greenberg was

8    doing.

9          Your Honor has talked about deterrence.  There's a

10   similar concept there in cases about certain white-collar cases

11   being suited for general deterrence because they're rational

12   and thought-out crimes.  So to the extent I think the Court

13   considers that factor, I think that would weigh in favor of a

14   guideline sentence.

15         What I don't think should be -- have an impact is the

16   fact that Mr. Greenberg, one of the things he's going to be

17   sentenced for has a minimum mandatory to it.  The charging of

18   that minimum mandatory was not intended to take away any

19   discretion from the Court in terms of what his sentence is.

20   The United States, I certainly know -- I know what a minimum

21   mandatory is.  I know what the impact of that is.

22         The reason the minimum mandatory was charged is

23   because that's what Mr. Greenberg did.  Mr. Greenberg, as the

24   tax collector, used the resources of his office to steal

25   identities and to make fake driver's licenses with other

1    people's information and his photo.  He made that an

2    appropriate charge through his conduct.  And it was important

3    to him by the fact that those two were found in his wallet.

4           Similarly, Mr. Greenberg is responsible for the

5    various enhancements that should be applied in this case.  They

6    apply because he made them apply because those are the crimes

7    he committed.

8           Mr. Greenberg is the one who caused more than

9    $550,000 in loss.  Mr. Greenberg is the one who abused his

10   position of trust.

11          Mr. Greenberg is the one who obstructed justice

12   twice, once by committing a crime while on pretrial release and

13   then by attempting to obstruct justice in terms of the

14   commercial sex acts investigation.

15          Mr. Greenberg is the one who used a computer to

16   entice a child to engage in commercial sex acts.  Mr. Greenberg

17   is the one who committed a sex act with a child.  Mr. Greenberg

18   is the one who committed those acts on multiple occasions, and

19   Mr. Greenberg is the one engaged in a pattern of stalking.

20          Mr. Greenberg's conduct made each of those

21   enhancements applicable.  And each of them was a necessary part

22   of what he was doing.  He's being held accountable for the

23   things he did and the things that he had to do for his crimes

24   and schemes.

25          Just as the upward enhancements are appropriate, I

1    also think the downward enhancements are appropriate too.

2    Mr. Greenberg has accepted responsibility.  He -- I've met with

3    him, and I believe he has a sincere remorse over what he's

4    done.

5         Mr. Greenberg has cooperated with the United States,

6    and I believe that to be sincere as well.

7         And through his counsel, Mr. Greenberg has made

8    efforts on restitution.  The $109,000 that's in the court

9    registry, Mr. Scheller hasn't pointed this out, but I will.  We

10   know about that because Mr. Scheller contacted me about it.  So

11   those are -- those are facts that I think the Court should

12   know.  But none of those, I believe, mitigate the situation

13   that Mr. Greenberg has, at least from a guidelines perspective.

14        In the defense's sentencing memo, there's a chart.  I

15   think it's Exhibit 5.  And it goes to the factor of ensuring

16   that we're avoiding unwarranted sentencing disparities.  And so

17   I think that's an appropriate consideration.  And so I agree

18   with the premise of the chart, which is to make sure that we

19   don't have those unwarranted sentencing disparities.  But I

20   imagine if I put -- if I had the technical ability to do it, I

21   would put all those names of cases up on the computer screen,

22   and then I would remove them for all of the things that they

23   don't have in common with this case.

24        I'd remove all the ones where it wasn't a public

25   official.  I'd remove all the ones where the defendant hadn't

1    committed commercial sex acts with a child.  I'd remove all the

2    ones where a defendant had not used his position as an elected

3    official to financially benefit himself.  I'd remove all the

4    ones where the defendant had not used an elected position to

5    try to make fake driver's licenses.  I'd remove all the ones

6    with someone who did not stalk a teacher by falsely accusing

7    them of sexual misconduct with a student.  I'd remove all the

8    ones where someone did not bribe an SBA employee and defraud

9    the SBA.

10          And I would imagine -- I don't know those cases on

11   that chart.  But I imagine if I did that, there wouldn't be a

12   single name left on that screen.

13          And so I do believe that we need to not have

14   unwarranted sentencing disparities.  And I think the tool we

15   have to use to get there is the sentencing guidelines, which

16   does the best it can to try to identify the characteristics to

17   allow us to sentence similarly situated defendants similarly.

18          And I think when considering all of the 3553(a)

19   factors in this case, we recommend a sentence, Your Honor, at

20   the high end of the guidelines, which would be 11 years.

21          Thank you very much.

22          For clarity, the 11 years is the nine years, which is

23   the high end of the guidelines, plus the two-year minimum

24   mandatory.

25          **THE COURT:**  Mr. Scheller, any final words?

1              **MR. SCHELLER:**   Thank you, Your Honor.

2          I appreciate Mr. Handberg's comments.  It's been a

3    pleasure to work with him through a difficult case.  And as

4    this Court knows, I have a high regard for his integrity.  So

5    having that high regard for his integrity, my respect for him,

6    it pains me, then, to note that my whole argument started today

7    with the concept that this Court's duty under *Pepper* is to

8    sentence Mr. Greenberg as he appears before the Court today,

9    not the Mr. Greenberg who committed those terrible crimes two

10   years ago.

11         And to the Government's credit, they admit that he

12   has shown remorse, that he has cooperated.  He has tried to

13   make amends.  And so he's a different person under *Pepper* --

14   excuse me, and a different person that stands before this Court

15   than the Joel Greenberg who committed his crimes.

16         The plea agreement is 86 pages to capture his

17   conduct.  But there's another part of it.  There's a

18   cooperation provision in his plea agreement.  If you look at

19   those myriad of charges, they included a number of other

20   individuals.  And so all of Mr. Greenberg's conduct had to be

21   listed in that statement of fact.  He accepted that plea

22   agreement.  He accepted it as part of his responsibility.

23         Page 17 of the memorandum written by

24   Ms. Harrington -- and I share Mr. Handberg's compliment of

25   Ms. Harrington's work on the memorandum.

1          That will be the one compliment you get from me

2     today.

3          She, at page 17, says:  "This Court should consider

4     the defendant's family history, his emotional and mental

5     health, his employment, educational background, substance abuse

6     history.  These are relevant factors, to be sure."

7          Yes, he came from a privileged background.  But when

8     we talk about his psych history and, "Oh, all these

9     psychiatrists got it wrong," if you look at Dr. Danziger's

10    report, he was diagnosed by some of those people, some of those

11    psychiatrists, the majority of them, when he was a child with

12    ADHD.  Obviously, bipolar doesn't come into effect until the

13    20's.  The bottom line is Dr. Danziger and his subsequent

14    treating psychiatrist both diagnosed Mr. Greenberg with bipolar

15    disorder.

16         So saying -- Danziger is not saying those people were

17    wrong.  Dr. Danziger is not saying those people were wrong when

18    they diagnosed him when he was seven or eight.  He did have

19    ADHD.  But, obviously, as this Court is probably well aware,

20    early ADHD often progresses to bipolar disorder.

21         And when you look at his conduct, his inability to

22    stop himself even after his arrest, the Government is right.

23    It's unbelievable.  It's completely irrational also.  It was

24    blatant.  It was right out in the open.

25         And while it shows his culpability, it also shows --

1    it's an important commentary on his insight.  And I think the

2    Government would agree that the Mr. Greenberg today, over the

3    past 20 months, who's not been on Adderall, who's not been on

4    stimulants, is a far different person than they confronted 20

5    months ago.

6           And I would note Dr. Danziger has been before this

7    Court.  He based his analysis on three different interviews

8    over a two-year time period, testing.  And it was corroborated

9    by Mr. Greenberg's mother, who's an outstanding woman.

10          If we're going to sit -- and I understand the

11   Government's comment about the minimum mandatory.  I understand

12   minimum mandatories too.  But in this case -- I understand that

13   he's guilty of that conduct.  That's not my argument.  My

14   argument is the Government has not taken the 5K off that

15   minimum mandatory.  So whatever the guideline sentence is, it's

16   going to be increased significantly with that two years.

17          The enhancements.  Judge, I didn't challenge the

18   enhancements on the fraud cases.  I didn't challenge those

19   other enhancements.  My argument is not that those enhancements

20   failed to apply.  That's never been my position.

21          What I said to this Court within the context of the

22   sex offenses is that -- those enhancements have irrationally

23   increased his sentence to a 41.  And we can call the person a

24   child.  And I'm not making a commentary on the victim.  But

25   realistically, this is not -- to call him a trafficker of a

1       child really mischaracterizes what happened in this case.

2               Your Honor, if *Pepper* is going to have any meaning,

3       if that really is the law of the land, then this Court needs to

4       sentence Mr. Greenberg as he appears today rather than the

5       Mr. Greenberg who committed his crime.

6               And if the idea in *Koon* about factors that mitigate

7       and magnify, then his sentence should not be solely based on

8       the outrageousness of his conduct but the other 3553 factors

9       and the significant mitigating circumstances in this case.

10              Thank you.

11      **THE COURT:**  Thank you, Mr. Scheller.

12              Well, as the lawyers here know, because I've said

13      this before many times, the hardest thing I believe a district

14      judge has to do is to sentence someone.  For those of you who

15      think that's an easy thing to do, it's not.  It's very

16      difficult to determine an appropriate sentence, to take

17      someone's liberty away from them.  And I take that obligation

18      quite seriously.  And I've often said that if it ever becomes

19      easy, I should stop doing this job.

20              I have been doing this for 22 years.  And as I said

21      the other day, I think I've sentenced well in excess of a

22      thousand people.  But I have never experienced a case like

23      this.  This is unique in my experience.  And that's probably

24      why my courtroom is full of people here today.

25              Let me begin by thanking the probation office and the

1     probation officers for their hard work, the extensive and

2     excellent presentence report they prepared.

3            I also want to thank the lawyers.  Our system works

4     not because of the judges but because of the lawyers.  And we

5     have two very good lead counsel here and other lawyers who

6     worked hard to present this case -- to bring this case, to

7     defend the case, and to present to me what they believe I

8     should consider before imposing sentence, and I am thankful for

9     that.

10           As I said at the outset, in terms of the 3553(a)

11    factors, there are two that really stand out -- and I think the

12    lawyers recognize this -- the seriousness of the offenses and

13    the history and characteristics of the defendant.

14           So let me begin with the first, the seriousness.

15           I have sentenced a lot of people for violent crimes.

16    There's no violence here.  I've sentenced people for economic

17    crimes involving a lot more money than Mr. Greenberg stole.

18    But I also have never seen a defendant who has committed so

19    many different types of crime within a relatively short period

20    like those crimes committed by Mr. Greenberg.

21           Mr. Scheller himself acknowledges that

22    Mr. Greenberg's crimes were outrageous, and they were.

23           Although the guideline score is based off the

24    commercial sex with a minor, Mr. Scheller is correct in the

25    sense that that's a little misleading because it appears as

1    though this minor, who was almost 18, was essentially a

2    prostitute.  Mr. Greenberg is not a pedophile.  And yet, as

3    observed by Mr. Scheller, he's going to be labeled one for the

4    rest of his life.  And that does have significant, substantial

5    collateral adverse consequences.

6          But these other crimes, one of the things that stands

7    out to me is the public trust, the violation of that trust by a

8    constitutional officer of the State of Florida.  We are living

9    at a time where our government at all levels is under

10   considerable stress.  And to have a tax collector stealing the

11   money he collects is truly outrageous.

12         And he goes on, even after he knows that the jig is

13   up, to steal substantial amounts of money from the

14   United States, money that was intended for people that had a

15   legitimate need for it.

16         Mr. Greenberg had no legitimate need to steal any

17   money.  He had a high-paying job.  He had all the accoutrements

18   of being the tax collector of Seminole County.  He didn't need

19   to steal the money.

20         The aggravated identity theft and production of

21   driver's licenses, I have seen so many cases here involving

22   identity theft.  These are real victims.  These people's lives

23   are turned upside down.  They're made miserable trying to get

24   their identity back.  It's a horrible crime.

25         And the stalking, to me, is perhaps the most

egregious of all of Mr. Greenberg's misconduct.  In order to
preserve his political power, which he was using for illegal
purposes, he attacks a schoolteacher and publicly accuses this
person, on numerous occasions, of molesting his own students.
I mean, that's just downright evil.

So suffice it to say I think that the criminal
conduct really does not get any more serious than this.  And I
don't know that Mr. Scheller really disputes that.  He
acknowledged it.  He relies primarily on the second major
sentencing factor, and that's the history and characteristics
of the defendant.

Mr. Scheller points out quite correctly that I need
to view Mr. Greenberg as an individual.  And Mr. Scheller
knows, after having appeared before me for the last 22 years,
that I do my best to do that.

And I also recognize the authority of *Pepper*.  And
I'm going to look at Mr. Greenberg as best I can today as he is
today and recognize the mitigating factors that should weigh on
my judgment.

I do recognize that Mr. Greenberg has had mental
health issues.  Does that justify the conduct?  No.  Does it
explain it?  Perhaps somewhat.  I'm really not in a position,
medically or scientifically, to make that judgment.

Mr. Scheller makes much of collateral consequences,
and I agree with him.  In far too many cases other judges fail

1    to recognize the collateral consequences of these -- these

2    judgments and particularly in a case like this.

3            I can tell you the types of cases a district judge

4    hates the worst are child pornography cases.  And I'm a senior

5    status judge.  And as senior status, I get to not take certain

6    cases.  And the first thing I did as a senior judge is I went

7    off the wheel, as we call it.  I'm not going to take any more

8    child porn cases because they're -- they're horrible.  I'll let

9    the active judges do that.

10           But the point here today is that Mr. Greenberg,

11   although he will go down as a sex offender, is not a pedophile.

12   He's going to have to participate in mental health treatment as

13   a sex offender and perhaps that's appropriate, but it's not

14   appropriate because he's a pedophile.

15           So I'm looking at the mitigating and aggravating

16   circumstances here as it affects Mr. Greenberg, and there's a

17   wealth of issues at play that the lawyers have very well stated

18   in their presentations to me.

19           Mr. Greenberg does come from a good family.  His

20   needs were met.  He received treatment.  He didn't need the

21   money.  He was a public official.  And the conduct that he

22   engaged in undermines the public's trust in our governmental

23   system.  And all of us -- all of us are victims of a crime or

24   crimes where public trust is abused.

25           And as Mr. Handberg pointed out, Mr. Greenberg

1        continued with his criminal conduct even after he knew he was

2        under criminal investigation and violated the terms of his

3        supervised release imposed by a magistrate judge of this court.

4        It does indicate that Mr. Greenberg, just a year ago, showed no

5        respect for the law because he violated the order of a

6        magistrate judge that allowed him to retain his liberty during

7        the process of this proceeding.

8                So, yes, there is mitigating evidence here.

9        Mr. Greenberg has expressed remorse.  Whether that's

10       legitimate, only time will tell.  But the lawyers both seem to

11       agree that your remorse is sincere, so I'll accept that.

12               He has provided substantial cooperation to the

13       Government, more than I've ever seen in 22 years.  And as a

14       result, he got the highest 5K1.1 guideline reduction that I've

15       ever seen and probably -- maybe the highest ever to have been

16       given to this court.

17               Mr. Scheller is shaking his head no.  Maybe he's --

18       being the good lawyer that he is, maybe he's gotten 12 or 14.

19       I don't know.  But I --

20               **MR. SCHELLER:**  I'm sorry.  I got 12 about a month ago

21       from Judge Mendoza.

22               **THE COURT:**  What judge?

23               **MR. SCHELLER:**  Not me, my client got 12 levels.

24               Judge Mendoza.

25               **THE COURT:**  Oh, okay.  I'll have to talk to Carlos

1      about that.

2              **MR. SCHELLER:**  The time period for imposing the

3      sentence is over, so I think we're -- you can talk to him.

4              **THE COURT:**  Okay.

5              **MR. SCHELLER:**  Thank you.  About a month ago.

6              **THE COURT:**  Mr. Scheller and I go way back, as I do

7      with Mr. Handberg.

8              Well, let me amend my statement, then, that it is

9      certainly one of the highest that I have ever seen, now that

10     he's pointed that out to me.

11             **MR. SCHELLER:**  Thank you, sir.

12             **THE COURT:**  So in weighing all these factors under

13     3553(a), using the guideline score as a benchmark, for the

14     reasons I indicated yesterday, there would be justification for

15     imposing a sentence above the high end of the guideline score

16     given the seriousness of the offenses and the fact that, in my

17     opinion, chapter 3D1.4 of the guidelines does not really help

18     me determine how to group these various crimes.  I think I'm

19     charting new territory here.  And I have discretion to do that.

20             But I'm also persuaded by Mr. Scheller's argument

21     that there is significant mitigation here that's going to lead

22     me to believe that an appropriate sentence is a sentence within

23     the guidelines.  And that's based upon the seriousness of these

24     offenses that I have summarized and that counsel have

25     discussed, as well as the mitigating circumstances that I have

1    also acknowledged exist in this case.

2           As I indicated previously, the probation officer

3    recommended a sentence at the high end of the guidelines.  And

4    I don't always follow the probation officer's recommendation.

5    I guess you could probably say I often do not follow that

6    recommendation.  But in this case, I am going to follow that

7    recommendation for the reasons that I have indicated.

8           So having considered the matter at great length,

9    including all of the written documentation that we've

10   discussed, having heard from counsel as well as from

11   Mr. Greenberg, it's the judgment of the Court that Joel Micah

12   Greenberg is committed to the custody of the Bureau of Prisons

13   to be imprisoned for a term of 132 months.  This term consists

14   of 108 months as to Counts 1, 14, and 26, and those terms shall

15   be served consecutive [sic] with each other, a 24-month

16   sentence as to Count 8, which also shall be served concurrent

17   with the other counts.

18          With respect to the stalking count, Count 24, because

19   of the seriousness of that offense, I'm going to sentence

20   Mr. Greenberg to 60 months as to Count 24, but I will run that

21   concurrent with the other counts.

22          And then with respect to Count 9, there's a mandatory

23   two-year consecutive sentence to be imposed as to Count 9.  And

24   as indicated, that 24 months will run consecutive to the other

25   counts for a total of 132 months.

1          Upon release from prison, Mr. Greenberg, you'll be

2     put on supervised release, serve a two -- a term of supervised

3     release for 10 years.  And that consists of 10 years as to

4     Count 1, three years as to Counts 8, 14, 24, and 26, and a

5     one-year term as to Count 9.  And all of those terms shall run

6     concurrently.

7          While on supervised release, you must comply with the

8     mandatory and standard conditions adopted by this court.  In

9     addition, you must comply with the following special

10    conditions:

11         First, you must participate in a substance abuse

12    program and follow your probation officer's instructions in

13    that regard.  You must contribute to the costs of those

14    services consistent with the probation office's sliding scale.

15    And during your term of supervision, you must submit to random

16    drug testing.

17         Second, you shall participate in a mental health

18    treatment program and follow your probation officer's

19    instructions in that regard as well and also contribute to the

20    costs of those services.

21         As part of your mental health treatment obligation,

22    you're required to participate in a mental health program

23    specializing in sexual-offender treatment and submit to

24    polygraph testing and monitoring for purposes of compliance

25    with that condition.  And it's ordered that you contribute to

1        the costs of those services as well.

2                You're required to register with the state sexual

3        offender agency in any state where you reside, visit, or are

4        employed.  And a probation officer shall provide the

5        information necessary to comply with the Florida statutes.

6                Probation has a risk control in here with respect to

7        direct contact with minors.  Unless the Government has a strong

8        argument in that regard, I'm not inclined to impose that.

9                Mr. Handberg?

10               **MR. HANDBERG:**  Your Honor, I think you are aware of

11       the facts that relate to his contact with minors, which was the

12       one minor for which he's been charged.  So I don't have

13       anything in addition to add to that.

14               **THE COURT:**  All right.  Well, I'm not going to impose

15       the requirement that he have no direct contact with minors

16       under the age of 18 without written approval of the probation

17       officer and the other extremely restrictive prohibitions that

18       normally would apply to a pedophile because Mr. Greenberg did

19       not engage in such conduct.

20               And for that same reason, I'm not going to impose

21       this condition regarding possessing or viewing images, nor am I

22       going to impose the prohibition against the use of a computer

23       or smartphone.

24               It is, however, ordered, Mr. Greenberg, that you have

25       no contact, direct or indirect, with the victim identified in

1        Count 24 of the third superseding indictment.

2              And given the nature and extent of your criminal

3        conduct, I am going to impose a search requirement requiring

4        you to submit to a search of your person, residence, place of

5        business, or any other facility under your control, based upon

6        a reasonable suspicion by the probation officer that you have

7        violated the terms of your supervision.

8              There is here a -- also a proposed prohibition about

9        lines of credit, credit cards, that sort of thing based upon

10       his restitution obligation.

11             Is that necessary, Mr. Handberg?

12             **MR. HANDBERG:**  I believe so, Your Honor.  Part of his

13       fraud as set out in the plea agreement involved his use of

14       government credit cards.  And I --

15             **THE COURT:**  Yeah.  But, you know, we're living in a

16       society where some people don't take cash.

17             **MR. HANDBERG:**  Well, but it's a prior-approval

18       requirement.  It just requires him to notify the probation

19       office, as I would understand it, which I think would be an

20       appropriate measure to ensure that he doesn't stray down the

21       wrong path.

22             **THE COURT:**  Mr. Scheller?

23             **MR. SCHELLER:**  Thank you.

24             Your Honor, I would object to that condition.  He's

25       essentially going to be serving the next nine or ten years.

1    It's going to be a different world when he gets out.  He's

2    going to -- he's already on conditions such as the polygraph

3    and sex -- and strict conditions.  I think that's just an added

4    burden that's just going to set him up to fail.

5         **THE COURT:**  Well, I tend to agree.  I think that the

6    negative aspects of that outweigh any need for it.  So I'm not

7    going to impose that condition.  And also, is there -- is there

8    a basis to require him to provide the probation officer with

9    access to financial information if he's satisfied his financial

10   obligations?

11        **MR. HANDBERG:**  He has not satisfied his financial

12   obligations, Your Honor.  He still has 400-plus thousand

13   dollars he owes to the Small Business Administration.

14        **THE COURT:**  Okay.  All right.  Mr. Greenberg, then, I

15   am going to require you to provide the probation officer with

16   access to any requested financial information.

17        Having been convicted of a qualifying felony, you

18   must cooperate in the collection of DNA.

19        You must refrain from the unlawful use of controlled

20   substances and submit to drug testing within 10 days of

21   placement on supervision and at least two periodic drug tests

22   thereafter as directed by your probation officer.  And you must

23   submit to random drug testing not to exceed 104 tests per year.

24        So with respect to the restitution obligation, it's

25   still $434,700?  Is that correct?

1           **MR. SCHELLER:**  Your Honor, I believe there's a

2      proposed restitution order.  There's $109,716.12 sitting in the

3      registry of the court that's going to be disbursed to Seminole

4      County.  And I think Mr. Handberg has the rest.

5           **MR. HANDBERG:**  And it's possible that the order we

6      sent Your Honor would have to be modified.

7           The amount for Seminole County is as Mr. Scheller

8      said, $109,716.12, which is the amount in the registry of the

9      court.

10          The amount for the --

11          **THE COURT:**  Let me stop you there.

12          I should order the clerk to release those funds to

13     Seminole County?  Is that correct?

14          **MR. SCHELLER:**  Yes, sir.

15          **MR. HANDBERG:**  Yes, sir.

16          **THE COURT:**  Okay.  Well, I'll put that in my judgment

17     that the $109,716.12 held in the registry of the Court shall be

18     released to Seminole County's attorney office, care of

19     Mr. Applegate.

20          So what's -- I do have this restitution order you

21     submitted to me this morning.  It includes this amount that

22     goes to Seminole County.  And then you have other amounts going

23     to the Small Business Administration.  Are those amounts not

24     correct?

25          **MR. HANDBERG:**  Those amounts are correct, Your Honor.

1    The amount that had to be changed was the Seminole County

2    amount.  It looked like we were $70 off.  So the amount in

3    paragraph B is correct.  And they just broke it out by the

4    three different loans he had.

5            **THE COURT:**  All right.  So the remaining restitution

6    order is correct?

7            **MR. HANDBERG:**  That's correct, Your Honor.

8            **THE COURT:**  All right.  Well, I have that order in

9    front of me.  And it has restitution owed to the SBA for loan

10   numbers -- loan number ending in 8000 in the amount of

11   145,133.97 and a $2,000 advance; and for loan number ending in

12   8103, 163,299.66 cents; and for loan number 8105 also

13   163,299.66.

14           **MR. HANDBERG:**  That's correct.

15           **THE COURT:**  So the clerk of the court shall disburse

16   this restitution first to Seminole County and then to the

17   nonfederal victim in this case, that is, the SBA.  And all of

18   this is specified in the restitution order that I signed this

19   morning.  And I'll give that to Lisa to docket as part of this

20   sentencing proceeding.

21           Lisa.

22           **PROBATION:**  Your Honor, can I clarify something?  I

23   think at the beginning you said 108 months consecutive for each

24   of those counts.  And I think you meant to say concurrently.

25           **THE COURT:**  I'm sorry if I said "consecutive."  I

1    certainly didn't intend that.

2           Yes.  Let me make it clear that all of those counts

3    were concurrent except for Count 9, which is the two-year

4    mandatory minimum, consecutive.  So thank you.  That would have

5    been the worst mistake I've made, today at least.

6           So I've indicated the restitution obligation.

7           While in the Bureau of Prisons' custody,

8    Mr. Greenberg, you shall pay $25 quarterly if you have a

9    non-UNICOR job or at least 50 percent of your monthly earnings

10   if you have a UNICOR job.  And upon release from custody, you

11   shall pay restitution at the rate of $250 per month until

12   you -- continue at that rate until such time as I change it

13   based on your financial circumstances post release.

14          Based on the current financial status of the

15   defendant, the fine is waived.

16          Is there still a forfeiture issue?

17          **MR. HANDBERG:**  There is, Your Honor.

18          We have a motion, and I think a proposed order, found

19   at Docket 120.

20          **THE COURT:**  Yes.  I have a motion in front of me,

21   Document 120, United States' Motion for Entry of Forfeiture.

22          **MR. SCHELLER:**  There's no objection, Your Honor.

23          **THE COURT:**  Without objection from the defendant, the

24   motion is granted, and I'll enter the order of forfeiture in

25   the amount of 654,799.95.  Correct?

1          **MR. HANDBERG:**  Correct.

2          **THE COURT:**  All right.  That judgment has been

3    entered.

4          Based on the defendant's indigency, a special

5    assessment pursuant to 18 United States Code 3014 is not

6    imposed.  It is, however, ordered the defendant pay the special

7    assessment of $600, which is due immediately.

8          The Court accepts the plea agreement.

9          Under the plea agreement, Counts 2 through 7, 10

10   through 13, 15 through 23, 25, and 27 through 33 of the third

11   superseding indictment are dismissed.

12         It is further ordered that the underlying indictment,

13   superseding indictment, and second superseding indictment are

14   also dismissed.

15         I think I've covered everything.

16         Is there any objection to my sentence, the manner in

17   which I conducted the proceeding, or the substance of the

18   sentence that I've imposed?

19         Mr. Handberg?

20         **MR. HANDBERG:**  No, Your Honor.  We do just have one

21   piece of housekeeping.  We're going to send your courtroom

22   deputy a revised restitution order.  I think the one you signed

23   might have had that 70-dollar error.  But we have no objections

24   to anything.

25         **THE COURT:**  Okay.

1          Mr. Scheller?

2          **MR. SCHELLER:**  No objection, Your Honor.

3          I would -- two requests, that the Court recommend

4     Coleman for Mr. Greenberg and recommend the RDAP program.

5          **THE COURT:**  Okay.  I will recommend to the Bureau of

6     Prisons that Mr. Greenberg be incarcerated at the Coleman

7     institution to the extent the BOP considers that to be

8     appropriate and they have places available for him there.

9          And I'll also recommend that he be allowed to

10    participate in the residential drug treatment program during

11    the period of his incarceration.

12         The defendant is remanded to the custody of the

13    marshal to await designation by the Bureau of Prisons.

14         Mr. Greenberg, to the extent permitted by your plea

15    agreement, you have the right to appeal this judgment within 14

16    days from today or the day that the actual judgment is entered.

17    If you fail to appeal within that period, it will be a waiver

18    of your right to appeal.

19         The Government can also appeal this sentence.

20         If you're -- if you wish to take an appeal, you're

21    entitled to the assistance of a lawyer.  And if you cannot

22    afford one, a lawyer will be provided for you.  And I'm sure

23    Mr. Scheller can help you with any issues you have with --

24    regarding to your appeal rights.

25         Is there anything else I need to address, gentlemen,

*United States District Court*
*Middle District of Florida*

1    ladies, before we adjourn?

2                **MR. HANDBERG:**  No, Your Honor.  Thank you.

3                **MR. SCHELLER:**  No, Your Honor.  Thank you.

4                **THE COURT:**  All right.  Good luck to you, sir.

5           (Proceedings adjourned at 11:15 a.m.)

6                        **C E R T I F I C A T E**

7

8                I certify that the foregoing is a correct transcript

9    from the record of proceedings in the above-entitled matter.

10

11   December 1, 2022

12        s\  Nikki L. Peters
     _____
     Nikki L. Peters, RMR, CRR, CRC
13   Federal Official Court Reporter
     United States District Court
14   Middle District of Florida

15

16

17

18

19

20

21

22

23

24

25